EXHIBIT "C"

# EXHIBIT "C1"

FILED
11/2/2022 5:23 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Christi Underwood DEPUTY

DC-22-15507

## CAUSE NO. _____

| | |
|---|---|
| 7-ELEVEN, INC. | IN THE DISTRICT COURT |
| Plaintiff, | |
| | _____ JUDICIAL DISTRICT |
| v. | |
| | DALLAS COUNTY, TEXAS |
| MITSUI SUMITOMO INSURANCE COMPANY OF AMERICA | 298th |
| Defendant. | |

### PLAINTIFF 7-ELEVEN, INC.'S ORIGINAL PETITION

Plaintiff 7-Eleven, Inc. ("7-Eleven") hereby files this Original Petition against Defendant Mitsui Sumitomo Insurance Company of America ("Mitsui"), and would respectfully show the Court as follows:

### DISCOVERY CONTROL PLAN

1.      Discovery in this matter is intended to be conducted under Level 2, pursuant to Rule 190.3 of the Texas Rules of Civil Procedure.

2.      Pursuant to Texas Rule of Civil Procedure 47(c), 7-Eleven seeks monetary relief over $1,000,000.

### NATURE OF THE ACTION

3.      7-Eleven is the largest convenience store network in the world and the premier name in the convenience-retailing industry.  Since its founding in Dallas, Texas over 95 years ago as the world's first convenience store, 7-Eleven has pioneered the franchise model and is consistently recognized as a top-10 franchiser, including receiving the highest placement of any convenience store in *Entrepreneur* magazine's 2022 Franchise 500® ranking.

4.      Unfortunately, like many other businesses throughout the country, 7-Eleven sustained significant losses as a result of the nationwide rioting following the tragic death of George Floyd.

5.      Despite taking reasonable and necessary measures to protect its property, 7-Eleven sustained property damage and business interruption losses to over 3,000 of its store locations across the United States as a result of the nationwide rioting, which also required the imposition of various civil authority closure and curfew orders that further suspended the stores' normal operations.

6.      To insure against situations such as this, 7-Eleven purchased "all risks" commercial property insurance from Mitsui in the form of Commercial Property Insurance Policy No. FIR1122580 (the "Policy," a true and correct copy of which is attached hereto as Exhibit 1 and incorporated by reference).  In exchange for substantial premium, the Policy expressly provides $50 million worth of broad protections against "direct physical loss or damage" to property, including the risk of civil unrest.  The Policy provides such protections through multiple, distinct coverage sections, including, but not limited to, for 7-Eleven's losses caused by:

- loss or damage to 7-Eleven's store locations;

- any prevention of access to 7-Eleven's property, including where caused by the order of a civil authority issued in response to physical loss or damage to property within 5 miles of a 7-Eleven store location;

- reasonable and necessary costs to temporarily protect or preserve 7-Eleven's store locations; and

- extra expenses incurred to continue 7-Eleven's business as nearly normal as practicable.

7.　　7-Eleven's riot losses unquestionably trigger each of these coverage sections under the Policy.  Yet, rather than honoring its clear coverage obligations, Mitsui continues to improperly withhold virtually all of the insurance proceeds owed to 7-Eleven under the Policy for its claim.

8.　　Notwithstanding the fact that it would render coverage under the Policy illusory, Mitsui has taken the extreme and unsupportable position that each of the over 3,000 affected 7-Eleven store locations is subject to its own $1 million deductible.  Refusing to withdraw that unreasonable coverage determination when challenged by 7-Eleven, Mitsui has instead engaged in a further misguided effort to minimize its claim payment by disputing the adequacy of 7-Eleven's robust claim support.

9.　　As a result of its continued gamesmanship, Mitsui has provided coverage for only a single 7-Eleven store location and continues to unreasonably withhold insurance for over 98 percent of 7-Eleven's covered riot losses.  Mitsui's continuing breach of its contractual obligations have therefore required 7-Eleven to commence this action to enforce its rights under the Policy.

## THE PARTIES

10.　　Plaintiff 7-Eleven is a Texas corporation with its principal place of business at 3200 Hackberry Road, Irving, Texas 75063.

11.　　Upon information and belief, Defendant Mitsui is an insurance company doing business in Texas and is a company formed under the laws of New York with its principal place of business in New York, New York.  Mitsui may be served with process by and through its registered agent, Corporation Service Company, 211 E. 7th St., Suite 620, Austin, Texas 78701-3218.

## JURISDICTION AND VENUE

12.     7-Eleven incorporates the foregoing allegations herein by reference.

13.     The Court has subject matter jurisdiction over this case, because the amount in controversy, exclusive of interests and costs, exceeds the Court's minimum jurisdictional limits.

14.     The Court has personal jurisdiction over Defendant Mitsui, because, as more specifically alleged below, Mitsui submitted to jurisdiction in Texas by conducting business in Texas, insuring property located in Texas, and making a contract substantially connected with Texas.  In particular, Mitsui issued and delivered the subject insurance Policy to 7-Eleven in Dallas County, and Mitsui has corresponded with 7-Eleven regarding the subject insurance claim in Dallas County.

15.     Venue is proper in Dallas County, Texas pursuant to Section 15.002(a)(1) of the Texas Civil Practice and Remedies Code because all or a substantial part of the events or omissions giving rise to 7-Eleven's claim occurred in Dallas County.

## FACTUAL BACKGROUND

### A.   7-Eleven

16.     Founded in Dallas, Texas over 95 years ago as the world's first convenience store, 7-Eleven is the largest convenience store network in the world and the premier name in the convenience-retailing industry.

17.     With more than 13,000 locations in North America and over 81,000 locations across 18 countries and regions, 7-Eleven operates more stores than any other retailer in the world and aims to be a one-stop shop for its customers.

18.     In addition to launching iconic products and innovative services – such as Slurpee® and Big Gulp® drinks, to-go coffee and 24/7 store hours – that have become a part of American culture, 7-Eleven has also helped to pioneer the franchise model.

19.     Consistently ranked as a top-10 franchisor, 7-Eleven's franchise model is based on the empowerment and success of small business entrepreneurs regardless of race, gender or background.  7-Eleven has also been consistently recognized as one of the Top 100 Military-Friendly Employers by VIQTORY Media (GI Jobs), having designed programs to encourage veteran entrepreneurship as franchisees and actively supporting military families through various non-profit military aid organizations.

20.     7-Eleven strives to play an integral role in the diverse neighborhoods it serves and is the proud creator and sponsor of numerous longstanding community outreach programs, which include:

- donating more than 23 million free Slurpee® drink coupons to law enforcement agencies in communities across the country to reward kids they observe doing good deeds or exhibiting positive behavior, as part of 7-Eleven's "Operation Chill" initiative created in 1995 with the goal of facilitating positive interactions between police and youths;

- awarding more than 5,000 grants to fund local schools and youth sports organizations as part of 7-Eleven's "Project A-Game" initiative designed to provide meaningful youth development opportunities through education and fitness; and

- partnering with Feeding America, the largest domestic hunger-relief organization in the United States, to provide tens of millions of meals to its nationwide network of over 200 food banks.

**B.     The Nationwide Floyd Rioting**

21.     On Memorial Day, May 25, 2020, George Floyd was tragically killed.

22.     As widely reported by news outlets throughout the country, the death of George Floyd "spurred a national uprising" and "triggered civic unrest in America at a scale not seen since the assassination of Martin Luther King Jr. in 1968."[1]

23.     In response to and in the immediate aftermath of Mr. Floyd's death, widespread rioting erupted in cities across the United States, involving arson, vandalism, looting and violence (the "Nationwide Floyd Rioting").

24.     In response to the Nationwide Floyd Rioting, 75,000 National Guard soldiers and airmen were activated in thirty-one states and the District of Columbia, surpassing the National Guard deployment for even Hurricane Katrina.[2]

25.     Attempting to maintain public safety and mitigate the physical loss and damage to property being caused by the Nationwide Floyd Rioting in the localities where 7-Eleven's stores were located, government authorities in cities across the country issued civil authority orders imposing curfews and/or otherwise suspending the operations of businesses, including, but not limited to, the following.

26.     On May 31, 2020, Texas Governor Abbott issued a proclamation certifying that "the ongoing threats of violence and looting" presented by the Nationwide Floyd Rioting constituted an imminent threat of disaster.[3]  The same day and continuing through June 6, 2020,

---

[1] TIME MAGAZINE, "Why the Killing of George Floyd Sparked an American Uprising" (June 4, 2020), https://time.com/magazine/us/5847952/june-15th-2020-vol-195-no-22-u-s/; *see also* VANITY FAIR, "George Floyd Protests Reveal America at a Boiling Point" (May 29, 2020), (https://www.vanityfair.com/news/2020/05/george-floyd-minneapolis-protests-americas-boiling-point); NBC NEWS, "Fury Across U.S. as Protesters Demand Justice for George Floyd's Death" (May 29, 2020), https://www.nbcnews.com/news/us-news/curfew-set-twin-cities-after-unrest-turns-chaos-during-48-n1218991)

[2] Jack Arnholz, et al., ABC News, *US Protests Map Shows Where Curfews and National Guard are Active* (June 4, 2020), https://abcnews.go.com/US/locations-george-floyd-protests-curfews-national-guard-deployments/story?id=70997568

[3] Governor Greg Abbott, *Proclamation by the Governor of the State of Texas* (May 31, 2020), https://gov.texas.gov/uploads/files/press/DISASTER_threats_and_incidents_of_violence_IMAGE_05-31-2020.pdf

the City of Dallas instituted a daily curfew from 7:00 p.m. until 6:00 a.m. due to "incidences of

vandalism, looting, and violence," which had resulted in "property damage."[4]

27.     From May 30, 2020 through June 7, 2020, Mayor Lori Lightfoot of Chicago

ordered a curfew for the city from 9 p.m. to 6 a.m., with Chicago's Police Department

Superintendent David Brown explaining that the Nationwide Floyd Rioting was "a synchronized

strategy to loot, burn and destroy" property.[5]

28.     On May 30, 2020, Los Angeles Mayor Eric Garcetti issued a curfew order from

8:00 p.m. to 5:00 a.m. via Twitter due to "fear of violence or vandalism."[6]  Mayor Garcetti later

published several press releases, extending the curfew order through June 4, 2020 in order "to

---

[4] City of Dallas, *Emergency Regulations 31544* (May 31, 2020),
http://citysecretary2.dallascityhall.com/pdf/meetings/053120_ORD.pdf

[5] ABC 7 Chicago, *Chicago's George Floyd Protests Carry on for 3rd Straight Day; Lightfoot Claims Looting Coordinated* (May 31, 2020), https://abc7chicago.com/chicago-news-protests-riots-police/6223656/#:~:text=Chicago's%20George%20Floyd%20protests%20carry,day%3B%20Lightfoot%20claims%20looting%20coordinated&text=Crowds%20of%20protesters%20marched%20through,the%20death%20of%20George%20Floyd

[6] Twitter, @MayorOfLA (May 30, 2020, 3:43 PM),
https://twitter.com/mayorofla/status/1266862801768726528?lang=en; ABC7, *Mayor Eric Garcetti Orders Curfew for Los Angeles, Neighboring Cities After Protestors Loot Stores, Vandalize Cars* (May 30, 2020), https://abc7.com/downtown-la-curfew-los-angeles-george-floyd-protests-mayor-garcetti/6221856/.

protect safety of demonstrators, residents, [and] businesses."[7]  Various other cities in Los Angeles County also instituted corresponding curfews.[8]

29.     From May 30, 2020 through June 4, 2020, the City of Santa Monica issued a series of curfew orders in response to the "looting and property destruction" caused by the Nationwide Floyd Rioting, noting that there was "a great deal of property damage caused by opportunistic looters."[9]

30.     The City of Long Beach issued a series of Regulations of the City Manager, declaring the existence of a local emergency after George Floyd's death caused "nationwide demonstrations and… civil unrest."[10]  The declaration noted that the Director of Civil Defense of

---

[7] City of Los Angeles, *Mayor Garcetti Expands Curfew to Entire City Tonight to Protect Safety of Demonstrators, Residents, Businesses* (May 30, 2020), https://www.lamayor.org/mayor-garcetti-expands-curfew-entire-city-tonight-protect-safety-demonstrators-residents-businesses; Press Release, LA Mayor, *Mayor Garcetti Reissues Citywide Curfew for Monday Evening to Protect Safety for Demonstrators, Residents, Businesses* (June 1, 2020), https://www.lamayor.org/mayor-garcetti-reissues-citywide-curfew-monday-evening-protect-safety-demonstrators-residents; Press Release, LA Mayor, *Mayor Garcetti Reissues Citywide Curfew for Tuesday Evening to Protect Safety for Demonstrators, Residents, Businesses* (June 2, 2020), https://www.lamayor.org/mayor-garcetti-reissues-citywide-curfew-tuesday-evening-protect-safety-demonstrators-residents; Press Release, LA Mayor, *Mayor Garcetti Issues Later Curfew for Wednesday Evening to Protect Safety, Lift Up Peaceful Demonstrations* (June 3, 2020), https://www.lamayor.org/mayor-garcetti-issues-later-curfew-wednesday-evening-protect-safety-lift-peaceful-demonstrations; Sareen Habeshian, KTLA, *L.A. Imposes Overnight Curfew for Entire City as Protests Continue Over Killing of George Floyd* (May 30, 2020), https://ktla.com/news/local-news/l-a-officials-to-address-citys-safety-efforts-as-protests-over-killing-of-george-floyd-continue/; Martin Macias Jr. & Nicholas Iovino, Courthouse News Service, *LA County Ends Nightly Curfews as Protests Continue* (June 4, 2020), https://www.courthousenews.com/la-county-ends-nightly-curfews-as-protests-continue/.

[8] ABC7, *Mayor Eric Garcetti Orders Curfew for Los Angeles, Neighboring Cities After Protestors Loot Stores, Vandalize Cars* (May 30, 2020), https://abc7.com/downtown-la-curfew-los-angeles-george-floyd-protests-mayor-garcetti/6221856/.

[9] Press Release, City of Santa Monica, *Santa Monica Prioritizing Life and Safety During Protests and Looting* (May 31, 2020), https://www.santamonica.gov/press/2020/05/31/santa-monica-prioritizing-life-and-safety-during-protests-and-looting; Press Release, City of Santa Monica, *Citywide Santa Monica Curfew is Now 1:30 p.m. Today* (June 1, 2020), https://santamonica.gov/press/2020/06/01/citywide-santa-monica-curfew-is-now-1-30-p-m-today; Press Release, City of Santa Monica, *A Message from Santa Monica Mayor Kevin McKeown* (June 1, 2020), https://santamonica.gov/press/2020/06/01/a-message-from-santa-monica-mayor-kevin-mckeown (emphasis added); Press Release, City of Santa Monica, *Santa Monica Curfew for Wednesday, June 3 is 6 p.m.* (June 3, 2020), https://santamonica.gov/press/2020/06/03/santa-monica-curfew-for-wednesday-june-3-is-6-p-m; City of Santa Monica, *Santa Monica Follows LA County, No Planned Curfew for Thursday, June 4* (June 4, 2020), https://santamonica.gov/press/2020/06/04/santa-monica-will-follow-la-county-curfew-for-thursday-june-4.

[10] Director of Civil Defense / City Manager, *A Proclamation by the City Manager of the City of Long Beach Acting in His Capacity as the Director of Civil Defense of the City of Long Beach Declaring the Existence of*

Long Beach found "an extreme threat to life, safety, and property now exists… due to civil unrest following the tragic death of George Floyd."[11]  The City Manager of Long Beach then proclaimed a local emergency curfew due to the "ongoing acts of civil unrest…"[12]  Long Beach extended this Curfew Order several times, increasing the number of business districts that were under curfew, and extending the Curfew Order through June 3, 2020.[13]

31.     On May 30, 2020, the City Manager of Pasadena signed a Declaration of Local Emergency, finding that "widespread arson, looting, assaults, vandalism and rioting stemming from public demonstrations in numerous other cities… across the country" represent "conditions of extreme peril to the safety of persons and property" within Pasadena.[14]  The City of Pasadena

---

*a Local Emergency* (May 31, 2020), https://longbeach.gov/globalassets/city-news/media-library/documents/curfew/final-cm-proclamation-of-local-emergency-re-civil-unrest-copy

[11] *Id.*

[12] Director of Civil Defense / City Manager, *Regulation of the City Manager of the City of Long Beach Acting in His Capacity as the Director of Civil Defense of the City of Long Beach Proclaiming a Local Emergency Curfew* (May 31, 2020), https://longbeach.gov/globalassets/city-news-media-library/documents/curfew/final-cm-regulation-issuing-curfew---civil-unrest-copy

[13] Director of Civil Defense / City Manager, *Regulation of the City Manager of the City of Long Beach Acting in His Capacity as the Director of Civil Defense of the City of Long Beach Proclaiming Extended and Additional Local Emergency Curfews* (June 1, 2020), https://www.longbeach.gov/globalassets/city-news-media-library/documents/curfew/cm-curfew-extension-6-1--multiple-curfews-bus-district-version--1-copy; Press Release, City of Long Beach, *City of Long Beach Orders Citywide Curfew Beginning at 4 p.m. Today* (June 1, 2020), https://www.longbeach.gov/press-releases/city-of-long-beach-orders-citywide-curfew-beginning-at-4-p.m.-today/; Director of Civil Defense / City Manager, *Regulation of the City Manager of the City of Long Beach Acting in His Capacity as the Director of Civil Defense of the City of Long Beach Proclaiming Extended/Additional Local Emergency Curfew* (June 2, 2020), https://www.longbeach.gov/globalassets/city-news/media-library/documents/curfew/final-6-2-cm-curfew-extension-copy; Press Release, City of Long Beach, *City of Long Beach Orders Citywide Curfew Beginning at 6 p.m. Today* (June 2, 2020), https://www.longbeach.gov/press-releases/city-of-long-beach-orders-citywide-curfew-beginning--at-6-p.m.-today/; Director of Civil Defense / City Manager, *Regulation of the City Manager of the City of Long Beach Acting in His Capacity as the Director of Civil Defense of the City of Long Beach Proclaiming Extended/Additional Local Emergency Curfew* (June 3, 2020), https://www.longbeach.gov/globalassets/city-news/media-library/documents/curfew/new-6-3-to-6-4-cm-curfew-extension-copy-copy; Press Release, City of Long Beach, *City of Long Beach Orders Citywide Curfew Beginning at 9 p.m. Today* (June 3, 2020), https://www.longbeach.gov/press-releases/city-of-long-beach-orders-citywide-curfew-beginning-at-9-p.m.-today/. Press Release, City of Long Beach, *City of Long Beach Announces No Curfew for Today, June 4* (June 4, 2020), https://www.longbeach.gov/press-releases/city-of-long-beach-announces-no-curfew-for-today-june-4/.

[14] City Manager, *Declaration of Local Emergency* (May 30, 2020), https://www.cityofpasadena.net/city-manager/wp-content/uploads/sites/2/Local-Emergency-Declaration_05.30.20.pdf?v=1666293210269 (emphasis added).

concurrently issued Curfew Regulations which applied from 8:00 p.m. until 5:30 a.m.[15] The City of Pasadena issued supplemental Curfew Regulations and press releases over the next several days, aligning local curfews with Los Angeles County's Curfew Orders.[16]

32.     From June 1, 2020 through June 8, 2020, New York City Mayor Bill de Blasio issued Emergency Executive Order Nos. 117 through 119 and 121, instituting a city-wide nightly curfew from 11:00 p.m. to 5:00 a.m. in response to "actions of assault, vandalism, property damage, and/or looting"[17] and as "necessary to protect the City and its residents from severe endangerment and harm to their health, safety and property…"[18]

33.     On May 30, 2020, Philadelphia Mayor James Kenney signed an Executive Order entitled "Declaration of Emergency Related Imminent Danger of Civil Disturbance, Disorder, or Riot in Philadelphia,"[19] which instituted a city-wide curfew between 8:00 p.m. and 6:00 a.m. until June 1, 2020, recognizing that the Nationwide Floyd Rioting included "actions of

---

[15] *Id.*

[16] City Manager, *Curfew Regulations* (May 31, 2020), https://www.cityofpasadena.net/city-manager/wp-content/uploads/sites/2/Curfew-Regulations_05.31.20.pdf?v=1666293209242; Press Release, Pasadena Office of the City Manager, *Curfew in Effect Starting at 6 P.M. June 1* (June 1, 2020), https://www.cityofpasadena.net/city-manager/news/curfew-in-effect-starting-at-6-p-m-june-1/; Press Release, Pasadena Office of the City Manager, *Curfew in Effect Starting at 6 P.M. June 2* (June 2, 2020), https://www.cityofpasadena.net/city-manager/news/curfew-in-effect-starting-at-6-p-m-june-2/; Press Release, Pasadena Office of the City Manager, *Curfew in Effect Starting at 9 P.M. June 3* (June 3, 2020), https://www.cityofpasadena.net/city-manager/news/curfew-in-effect-starting-at-9-p-m-june-3/.

[17] Office of the Mayor, *Emergency Executive Order No. 117* (June 1, 2020), https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-117.pdf

[18] Office of the Mayor, *Emergency Executive Order No. 118* (June 1, 2020), https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-118.pdf; Office of the Mayor, *Emergency Executive Order No. 119* (June 2, 2020), https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-119.pdf; Office of the Mayor, *Emergency Executive Order No. 121* (June 5, 2020), https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-121.pdf; Office of the Mayor, *Emergency Executive Order No. 122* (June 7, 2020), https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-122.pdf.

[19] James F. Kenney, Mayor, City of Philadelphia, *Declaration of Emergency Related Imminent Danger of Civil Disturbance, Disorder, or Riot in Philadelphia* (May 30, 2020), https://www.phila.gov/media/20200530221403/EO_curfew.pdf.

vandalism, property damage, rioting, and/or looting…"[20]  Mayor Kenney signed seven additional Executive Orders extending the Curfew Order through June 7, 2020 as "necessary to protect the City and its residents from severe endangerment and harm to their health, safety and property…,"[21] which specifically ordered "all retail businesses of any kind, including but not limited to… grocery stores, restaurants, general merchandise… and similar establishments, to close immediately and to remain closed…"[22]

34.     From May 31, 2020 through June 4, 2020, San Francisco Mayor London Breed signed an Order Setting Curfew During Local Emergency, enacting a city-wide and county-wide curfew between 8:00 p.m. and 5:00 a.m.[23]  This Curfew Order responded to conditions "of extreme peril to the safety of persons and property… arising from unrest and violence… around the country in the wake of the tragic death of George Floyd."[24]  These conditions included

---

[20] *Id.*

[21] James F. Kenney, Mayor, City of Philadelphia, *Declaration of Emergency Related Imminent Danger of Civil Disturbance, Disorder, or Riot in Philadelphia Order No. 2* (May 31, 2020), https://www.phila.gov/media/20200531163439/May-31-Curfew-Order-signed.pdf; James F. Kenney, Mayor, City of Philadelphia, *Declaration of Emergency Related Imminent Danger of Civil Disturbance, Disorder, or Riot in Philadelphia Order No. 3* (June 1, 2020), https://www.phila.gov/media/20200601141758/EO-Curfew-6.1.2020.pdf; James F. Kenney, Mayor, City of Philadelphia, *Declaration of Emergency Related Imminent Danger of Civil Disturbance, Disorder, or Riot in Philadelphia Order No. 4* (June 2, 2020), https://www.phila.gov/media/20200606072513/Curfew-Order-6-2-20.pdf; James F. Kenney, Mayor, City of Philadelphia, *Declaration of Emergency Related Imminent Danger of Civil Disturbance, Disorder, or Riot in Philadelphia Order No. 5* (June 3, 2020), https://www.phila.gov/media/20200603173812/Philadelphia-June-3.pdf; James F. Kenney, Mayor, City of Philadelphia, *Declaration of Emergency Related Imminent Danger of Civil Disturbance, Disorder, or Riot in Philadelphia Order No. 6* (June 4, 2020), https://www.phila.gov/media/20200604213215/Curfew-Order-6-4-20.pdf; James F. Kenney, Mayor, City of Philadelphia, *Declaration of Emergency Related Imminent Danger of Civil Disturbance, Disorder, or Riot in Philadelphia Order No. 7* (June 5, 2020), https://www.phila.gov/media/20200606072308/Curfew-Order-6-5-20.pdf; James F. Kenney, Mayor, City of Philadelphia, *Declaration of Emergency Related Imminent Danger of Civil Disturbance, Disorder, or Riot in Philadelphia Order No. 8* (June 6, 2020), https://www.phila.gov/media/20200606135347/Curfew-Order-6-6-20.pdf

[22] James F. Kenney, Mayor, City of Philadelphia, *Declaration of Emergency Related Imminent Danger of Civil Disturbance, Disorder, or Riot in Philadelphia Order No. 8* (June 6, 2020), https://www.phila.gov/media/20200606135347/Curfew-Order-6-6-20.pdf

[23] Office of the Mayor San Francisco, *Order Setting Curfew During Local Emergency* (May 31, 2020), https://sfmayor.org/sites/default/files/Order%20Setting%20Curfew%20During%20Local%20Emergency.pdf.

[24] *Id.*

"violence, vandalism, looting of businesses, arson, and failure to follow lawful dispersal orders."[25]  The City of San Francisco issued a corresponding press release further directing that "businesses must close to the public by 8 pm."[26]

35.     On June 2, 2020, St. Louis Mayor Lyda Krewson issued Executive Order Number 66, instituting a nightly curfew from 9:00 p.m. until 6:00 a.m., lasting through June 8, 2020, in response to the "rioting… which included widespread criminal behavior including… intentional damage to the property of persons…"[27]

36.     From May 31, 2020 through June 4, 2020, Washington D.C. Mayor Muriel Bowser issued Mayor's Order Nos. 2020-068 through 2020-071, enacting a district-wide nightly curfew from 11:00 p.m. through 6:00 a.m., in response to the fact that "numerous businesses and government buildings were vandalized, burned, or looted…" during the riots "following the murder of George Floyd…" [28]

37.     Despite these mitigation efforts, thousands of businesses and properties were looted, burned, or otherwise vandalized as a result of the Nationwide Floyd Rioting, causing an

---

[25] *Id.*

[26] SF.Gov, *Curfew in San Francisco May 31 to June 4, from 8 pm to 5 am* (June 1, 2020), https://sf.gov/news/curfew-san-francisco-begin-may-31-8-pm

[27] Office of the Mayor, City of St. Louis, *Executive Order Number 66* (June 2, 2020), https://www.stlouis-mo.gov/government/departments/mayor/documents/executive-orders/upload/mayor-executive-order-66-curfew.pdf (emphasis added); Office of the Mayor, City of St. Louis, *Executive Order Number 66* (June 8, 2020), https://www.stlouis-mo.gov/government/departments/mayor/documents/executive-orders/upload/mayor-executive-order-67-curfew-revoked.pdf.

[28] Office of the Mayor, *Mayor's Order 2020-068* (May 31, 2020), https://thedcline.org/wp-content/uploads/2020/05/Mayors-Order-2020-068.pdf; Office of the Mayor, *Mayor's Order 2020-069* (June 1, 2020), https://mayor.dc.gov/sites/default/files/dc/sites/mayormb/release_content/attachments/Mayor%27s%20Order%202020-069.pdf (emphasis added); Office of the Mayor, *Mayor's Order 2020-070* (June 3, 2020), https://mayor.dc.gov/sites/default/files/dc/sites/mayormb/release_content/attachments/Mayor%27s%20Order%202020-070.pdf; Office of the Mayor, *Mayor's Order 2020-071* (June 4, 2020), https://www.dcregs.dc.gov/common/NoticeDetail.aspx?noticeId=N0093798.

estimated $1 billion to $2 billion in property damage – the largest and most expensive riot event in United States history.[29]

### C.     The Effect of the Nationwide Floyd Rioting on 7-Eleven's Insured Store Locations

38.     While 7-Eleven took reasonable and necessary measures to temporarily protect and preserve its retail locations from the actual and imminent physical loss and damage caused by the Nationwide Floyd Rioting, its store locations were not spared.

39.     As a direct and proximate result of the Nationwide Floyd Rioting, 7-Eleven sustained property damage and business interruption losses to over 3,000 of its store locations across the United States.  The extensive property damage to 7-Eleven's store locations, included, but was not limited to, fire damage, shattering and smashing of glass doors and windows, looting and ransacking of store interiors, and, in the case of three stores located in Chicago, Philadelphia and St. Louis, total destruction of both the building and its contents.

40.     However, as noted above, the physical loss and damage caused to 7-Eleven's insured store locations by the Nationwide Floyd Rioting was not unique to 7-Eleven and instead affected numerous other locations within the Policy's expressly insured vicinity – *i.e.*, at locations away from, but within five miles of 7-Eleven's insured store locations.

41.     At the same time, the civil authority orders imposing curfews or otherwise suspending business operations in the localities in which 7-Eleven's stores were located caused significant additional business interruption losses to 7-Eleven's store locations.

42.     Accordingly, the physical loss and damage to 7-Eleven's insured locations, together with the impact of the related civil authority orders on 7-Eleven's operations, has

---

[29]Thomas Johansmeyer, WORLD ECONOMIC FORUM, *How 2020 Protests Changed Insurance Forever* (February 22, 2021), https://www.weforum.org/agenda/2021/02/2020-protests-changed-insurance-forever/

resulted in direct and immediate property and business interruption losses to 7-Eleven totaling at least $27.9 million.

**D.    The Mitsui "All Risks" Insurance Policy**

43.    In exchange for substantial premium, 7-Eleven purchased commercial property insurance from Mitsui for the May 10, 2020 to May 10, 2021 policy period in the form of Commercial Property Insurance Policy No. FIR1122580 (the "Policy," a true and correct copy of which is attached hereto as <u>Exhibit 1</u> and incorporated by reference), which insures 7-Eleven's thousands of store locations throughout the United States.

44.    The Policy provides a policy limit of liability of $50 million for "all coverages involved," with certain of its coverage sections, but not others, subject to sublimits and/or time limits.  (Ex. 1 at 7-Eleven_0000019).

45.    The Policy further provides that Mitsui's "maximum limit of liability in a single 'occurrence,' <u>regardless of the number of 'locations'</u> . . . will not exceed the policy limit of liability of $50,000,000."  (Ex. 1. at 7-Eleven_0000019) (emphasis added).

46.    The Policy is subject to a $1 million combined per "occurrence" deductible for property damage and time element losses, with the term "occurrence" defined, in relevant part, as "the sum total of all loss or damage of the type insured . . . arising out of or caused by one discrete event of physical loss or damage."  (Ex. 1 at 7-Eleven_0000006 and 67).

**i.    The Policy's "Property Damage" Coverage**

47.    The Policy's insuring agreement states that: "Coverage under the policy applies to direct physical loss or damage to insured property at an insured 'location' from a cause not hereinafter excluded."  (Ex. 1 at 7-Eleven_0000018).

48.     Accordingly, if the Policy does not expressly exclude a particular risk of physical loss or damage to property, then that non-excluded risk triggers coverage.

49.     The Policy defines "location" to include any location specified in the Policy's "schedule of locations" or any building "bounded on all sides by public streets, clear land space or open waterways . . . ." (Ex. 1 at 7-Eleven_0000065).

50.     In addition to providing broad "all risks" coverage, the Policy's "Property Damage" coverage section also contains several "Additional Coverages for direct physical loss or damage" including, but not limited to, "Debris Removal," "Expediting Costs" and "Protection and Preservation of Property."  (Ex. 1 at 7-Eleven_0000026, 30, 32 and 34).

51.     The Policy's "Debris Removal" additional coverage insures the "reasonable and necessary costs incurred to remove debris from an insured 'location' that remains as a direct result of physical loss or damage insured by this policy."  (Ex. 1 at 7-Eleven_0000030).

52.     The Policy's "Expediting Costs" additional coverage insures the "reasonable and necessary costs incurred to pay for the temporary repair of insured damage to insured property and to expedite the permanent repair or replacement of such damaged property."  (Ex. 1 at 7-Eleven_0000032).

53.     The Policy's "Protection and Preservation of Property" additional coverage insures the "[r]easonable and necessary costs incurred for actions to temporarily protect or preserve insured property provided such actions are necessary due to actual, or to prevent immediately impending, insured direct physical loss or damage to such insured property."  (Ex. 1 at 7-Eleven_0000037).

ii.     **The Policy's "Time Element" Coverage**

54.     In addition to its "Property Damage" coverage, the Policy also affords broad "Time Element" coverage, which insures 7-Eleven's lost earnings "directly resulting from physical loss or damage of the type insured" to 7-Eleven's property.  (Ex. 1 at 7-Eleven_0000043).

55.     The Policy's "Time Element" coverage section also "insures expenses reasonably and necessarily incurred by the Insured to reduce the loss otherwise payable under this section of this Policy."  (Ex. 1 at 7-Eleven_0000043).

56.     The Policy's "Time Element" coverage section also includes "Extra Expense" coverage, which is defined to include "[e]xtra expenses to temporarily continue as nearly 'normal' as practicable the conduct of the Insured's business…."  (Ex. 1 at 7-Eleven_0000045).

57.     The Policy's "Time Element" coverage section also includes various "Time Element Coverage Extensions," including, but not limited to, for:

- "Civil Authority";

- "Ingress/Egress";

- "Extended Period of Liability"; and

- "Protection and Preservation of Property – Time Element."

(Ex. 1 at 7-Eleven_0000047-49).

58.     The Policy's "Civil Authority" coverage extension provides:

This policy insures the actual loss sustained and **EXTRA EXPENSE** incurred by the Insured during the **PERIOD OF LIABILITY** if an order of civil authority prohibits access to the insured "location" provided such order is the direct result of physical damage of the type insured under this policy at the insured "location" or within 1,000 feet of it.

(Ex. 1 at 7-Eleven_0000047).

59.     The Policy's "Declarations" broaden the "Civil Authority" coverage to "CIVIL AUTHORITY WITHIN 5 MILES" and provide a "30 day period" time limit of "Civil Authority" coverage.  (Ex. 1 at 7-Eleven_0000022).

60.     The Policy's coverage for "Ingress/Egress" provides:

This policy insures the actual loss sustained and **EXTRA EXPENSE** incurred by the Insured due to the necessary interruption of the Insured's business due to physical prevention of ingress to or egress from a insured "location," whether or not the premises or property of the Insured is damaged, provided that such prevention is a direct result of physical damage of the type insured by this policy, to the kind of property not excluded by this policy and occurring within 1000 feet of the insured "location."

(Ex. 1 at 7-Eleven_0000048-49).

61.     The Policy's "Declarations" broaden the "Ingress/Egress" coverage to "INGRESS/EGRESS WITHIN 5 MILES" and provide a "30 day period" time limit of "Ingress/Egress" coverage.  (Ex. 1 at 7-Eleven_0000022).

62.     The Policy's "Time Element" coverage section also provides an "Extended Period of Liability," covering the reduction in sales resulting from the interruption of business for "such additional length of time as would be required with the exercise of due diligence and dispatch to restore the Insured's business to the condition that would have existed had no loss occurred." (Ex. 1 at 7-Eleven_0000048).

63.     The Policy has an "Extended Period of Liability" of 90 days.  (Ex. 1 at 7-Eleven_0000022).

64.     The Policy's "Protection and Preservation of Property -- Time Element" coverage extension provides that:

This policy insures the actual loss sustained by the Insured for a period of time not to exceed 48 hours prior to and 48 hours after the Insured first taking reasonable action for the temporary protection and preservation of property insured by this policy provided such action is necessary to prevent immediately impending direct physical loss or damage insured by this policy at such insured property.

This extension is subject to the deductible provisions that would have applied had the direct physical loss or damage occurred.

(Ex. 1 at 7-Eleven_0000049).

**E.    7-Eleven's Floyd Riot Losses Trigger Multiple Coverage Sections under the Mitsui Policy.**

65.    In addition to triggering the Policy's "all risks" property coverage, 7-Eleven's Floyd riot losses also trigger multiple "Additional Coverages," "Time Element" coverage, and "Time Element Coverage Extensions" provided under the Policy.

**i.    7-Eleven's Floyd Riot Losses Trigger the Policy's "Property Damage" Coverage**

66.    The Nationwide Floyd Rioting is an insured risk of "physical loss or damage" to property under the Policy.

67.    The Nationwide Floyd Rioting caused physical loss and damage to 7-Eleven's property by physically damaging, destroying or rendering such property dangerous, unsafe, uninhabitable, and unfit for its ordinary and intended use.

68.    Accordingly, the Policy's "all risks" "Property Damage" coverage has been triggered and 7-Eleven's physical loss and damage to its property caused by the Nationwide Floyd Rioting is covered by the Policy up to the full $50 million per "occurrence" limits provided by the Policy.

**ii.    7-Eleven's Floyd Riot Losses Trigger the Policy's "Protection and Preservation of Property" Additional Coverage**

69.    The actual and immediately impending direct physical loss or damage to 7-Eleven insured property caused by the Nationwide Floyd Rioting required 7-Eleven to take reasonable and necessary action to temporarily protect or preserve its insured property, the costs and resultant "Time Element" loss from which trigger coverage under the Policy's "Protection and

Preservation of Property" and "Protection and Preservation of Property – Time Element" additional coverage.

### iii.     7-Eleven's Floyd Riot Losses Trigger the Policy's "Time Element" and "Extra Expense" Coverage

70.     7-Eleven has suffered "Time Element" loss as a direct result of the physical loss and damage to its insured property caused by the Nationwide Floyd Rioting at its insured store locations.

71.     This loss triggers coverage under the Policy's "Time Element" coverage up to the full $50 million per "occurrence" limits provided under the Policy.

72.     The physical loss or damage caused by the Nationwide Floyd Rioting has also required 7-Eleven to incur reasonable and necessary extra expenses to temporarily continue as nearly normal as practicable the conduct of 7-Eleven's business.

73.     Such expenses are beyond those that would have normally been incurred in conducting 7-Eleven's business absent the physical loss or damage caused by the Nationwide Floyd Rioting at its insured locations, and trigger coverage under the Policy's "Extra Expense" coverage, subject to the Policy's applicable limits.

### iv.     7-Eleven's Floyd Riot Losses Trigger the Policy's "Expediting Costs" Additional Coverage

74.     The physical loss or damage caused by the Nationwide Floyd Rioting at its insured store locations has also required 7-Eleven to incur reasonable and necessary costs for the temporary repair or to expedite the permanent repair or replacement of such damaged property.

75.     Such costs trigger coverage under the Policy's "Expediting Costs" coverage, subject to the Policy's applicable limits.

     **v.**     **7-Eleven's Floyd Riot Losses Trigger the Policy's "Debris Removal" Additional Coverage**

76.     The physical loss or damage caused by the Nationwide Floyd Rioting at its insured store locations has also required 7-Eleven to incur reasonable and necessary costs to remove debris from its insured store locations.

77.     Such costs trigger coverage under the Policy's "Debris Removal" coverage, subject to the Policy's applicable limits.

     **vi.**     **7-Eleven's Floyd Riot Losses Trigger the Policy's "Civil Authority" Coverage**

78.     The physical damage caused by the Nationwide Floyd Rioting to property located at or within five miles of 7-Eleven's insured locations, including at or within 1,000 feet thereof, directly resulted in the issuance of orders from civil authorities prohibiting access to 7-Eleven's insured locations.

79.     7-Eleven has accordingly sustained "Time Element" loss and "Extra Expense" as a direct result of such civil authority orders prohibiting access to 7-Eleven's insured locations, which triggers coverage under the Policy's "Civil Authority" coverage, subject to the Policy's applicable limits.

     **vii.**     **7-Eleven's Floyd Riot Losses Trigger the Policy's "Ingress/Egress" Coverage**

80.     The physical damage caused by the Nationwide Floyd Rioting to property located at or within five miles of 7-Eleven's insured locations, including at or within 1,000 feet thereof, directly resulted in the physical prevention of ingress to or egress from 7-Eleven's insured locations.

81.     The necessary interruption of 7-Eleven's business due to such physical prevention of ingress to or egress from 7-Eleven's insured locations has caused 7-Eleven to sustain "Time

Element" loss and "Extra Expense" triggering coverage under the Policy's "Ingress/Egress" coverage, subject to the Policy's applicable limits.

**F.    No Policy Exclusion Applies to 7-Eleven's Floyd Riot Losses**

82.    The Nationwide Floyd Rioting is a covered, not an excluded, cause of direct physical loss or damage to property under the Policy.

83.    No exclusion in the Policy applies to preclude or limit coverage for 7-Eleven's Floyd riot losses.

**G.    Mitsui's Wrongful Breach of Its "All Risks" Insurance Policy**

84.    7-Eleven timely reported its Floyd riot claim to Mitsui under the Policy on June 3, 2020.

85.    In response, Mitsui began a concerted effort to improperly attempt to minimize and delay its coverage obligations for 7-Eleven's claim.

86.    Specifically, by letter dated September 23, 2020, Mitsui erroneously contended that "7-Eleven's losses involve more than a single 'occurrence' under the Policy," because the Floyd rioters purportedly had "different motives," and reserved its right to "deny coverage for losses sustained as a result [sic] any 'occurrence' that do not exceed $1 million," pursuant to the Policy's $1 million per "occurrence" deductible.  A true and correct copy of Mitsui's September 23, 2020 letter is attached hereto as <u>Exhibit 2</u> and incorporated by reference.

87.    Shortly thereafter, Mitsui adopted the equally unsupportable position that each of the over 3,000 7-Eleven store locations affected by the Nationwide Floyd Rioting constituted its own, separate "occurrence," subject to its own $1 million per "occurrence" deductible under the Policy.

88.     In that regard, by letter dated October 22, 2020, Sedgwick and JS Held, the insurance company consultants that Mitsui hired to minimize its claim payments, informed 7-Eleven that they had "completed inspection of three major loss sites" – 7-Eleven Store Nos. 11334 (Philadelphia), 33892 (Chicago) and 19501 (St. Louis) – but that payment would be issued only for 7-Eleven's St. Louis store, as the only 7-Eleven store location that had purportedly sustained Floyd riot losses in excess of $1 million.  A true and correct copy of Sedgwick and JS Held's October 22, 2020 letter is attached hereto as Exhibit 3 and incorporated by reference.

89.     Mitsui proceeded to issue its only payment for 7-Eleven's Floyd riot claim in the amount of $470,500.13, reflecting the amount of property damage to St. Louis Store No. 19501 that Mitsui had calculated, net of its erroneous $1 million deductible per store coverage determination.

90.     Mitsui's $470,500.13 fractional claim payment represents _less than 2 percent_ of 7-Eleven's over $26.9 million in Floyd riot property and business interruption losses due and owing under the Policy, prior to the application of the prejudgment and Texas Prompt Payment of Claims Statute penalty interest that continues to accrue for the outstanding balance of 7-Eleven's claim.s

91.     By letter dated April 7, 2021, 7-Eleven objected to Mitsui's incoherent multiple "occurrences" position and improper refusal to fully indemnify 7-Eleven's Floyd riot claim losses as a single "occurrence," consistent with the terms of the Policy.  A true and correct copy of 7-Eleven's April 7, 2021 letter is attached hereto as Exhibit 4 and incorporated by reference.

92.     Among other things, 7-Eleven explained to Mitsui that, under settled law, the words "arising out of," when used within an insurance policy, such as in the Policy's

"occurrence" definition here, are "broad, general, and comprehensive terms effecting broad coverage" and are uniformly understood to mean "originating from," "incident to," "growing out of" or "flowing from." 7-Eleven further explained that, under the broad meaning of the words "arising out of," the property damage and business interruption losses to the affected 7-Eleven stores arose out of a single event of physical loss or damage — the nationwide rioting following George Floyd's death.

93.     7-Eleven further noted that Mitsui had failed to coherently explain its purported "multiple" occurrence position. In particular, 7-Eleven explained that Mitsui's misguided attempt to manufacture separate occurrences by contending that the rioters had "different motives," even if credited, would not change the fact that 7-Eleven's losses unquestionably stemmed from the Nationwide Floyd Rioting.

94.     7-Eleven also noted that, in addition to being at odds with its "different motives" theory, Mitsui's "each store" theory of multiple occurrences would render coverage under the Policy illusory. By way of example and without limitation, 7-Eleven pointed out that Mitsui's contention that the loss at each store purportedly constituted its own separate "occurrence" would require that each store incur preservation of property costs in excess of $1 million in order to ever trigger coverage under the Policy's express "Protection and Preservation of Property Coverage" – an entirely unreasonable and unrealistic requirement given the nature of preservation losses and the "all risks" scope of the Policy.

95.     However, rather than unequivocally abandon its extreme and unsupported $1 million deductible per store position, by letter dated April 30, 2021, Mitsui continued to insist that 7-Eleven's Floyd riot claim involved multiple occurrences, while simultaneously stating that it was unable to "determine the number of 'occurrences' and therefore the number of separate

deductibles to apply to the adjustment of this claim." A true and correct copy of Mitsui's April 30, 2021 letter is attached hereto as <u>Exhibit 5</u> and incorporated by reference.

96.     Despite Mitsui's continued breach of its contractual obligations under the Policy by refusing to withdraw its incorrect multiple "occurrences" position, 7-Eleven nevertheless continued to supply Mitsui with detailed support for its Floyd riot losses, which entailed numerous rounds of information disclosures, including, but not limited to, the collection, preparation and transmittal to Mitsui of:

- detailed schedules and spreadsheets identifying each affected 7-Eleven insured location, including the dates of loss, narrative descriptions and quantifications of the physical loss and/or damage sustained by each insured location, along with store-by-store supporting data;

- detailed schedules and spreadsheets identifying and quantifying 7-Eleven's time element losses for each affected 7-Eleven insured location, including explanations of the methodology employed and store-by-store supporting data;

- invoices and estimates for all property damage repairs and extra expenses incurred as a result of the Nationwide Floyd Rioting by affected 7-Eleven insured location, including detailed explanations of the scope of work that was performed and the corresponding charges incurred for labor, materials and equipment to perform such necessary work;

- inventory lists and values damaged and/or discarded as a result of the Nationwide Floyd Rioting by 7-Eleven insured location;

- detailed monthly profit and loss statements for June 2019 through June 2020 for the affected 7-Eleven insured locations, as well as for certain nearby unaffected 7-Eleven insured locations requested by Mitsui (*i.e.*, in relation to destroyed St. Louis Store No. 19501);

- daily merchandise sales and daily gasoline sales dollars and volumes for the May 1, 2020 through June 30, 2020 period for each affected 7-Eleven insured location;

- weekly and/or biweekly payroll records for affected corporate owned stores for the May 1, 2020 through June 30, 2020 period;

- a representative compilation of the publicly available Nationwide Floyd Rioting civil authority orders affecting 7-Eleven's insured locations; and

- the relevant franchise agreements for the affected 7-Eleven insured locations.

97.    However, Mitsui continued to make assertions that were demonstrably false, contending that 7-Eleven had purportedly failed to provide support for its property damage losses or the methodology used in calculating its business interruption losses.  Indeed, Mitsui went so far as to contend that the record lacked any support for the property damage loss to 7-Eleven destroyed store No. 19501 (St. Louis), when Mitsui's own outside consultants had themselves inspected and acknowledged at least $1,470,500.13 in property damage losses for the store location.

98.    Mitsui has refused to withdraw each of the erroneous coverage determinations set forth above, which have resulted in a total payment of less than 2% of 7-Eleven's Floyd riot claim losses presently due and owing under the Policy.

## CAUSES OF ACTION

### COUNT ONE
### (Declaratory Relief)

99.    7-Eleven repeats and realleges the allegations in paragraphs 1 through 98 as though fully set forth herein.

100.    This Court has jurisdiction over this action for declaratory relief pursuant to Tex. Civ. Prac. & Rem. Code § 37.003.

101.    The Policy constitutes a valid and enforceable contract of insurance between 7-Eleven and Mitsui.

102.    7-Eleven has timely satisfied all obligations and complied with all conditions applicable under the Policy, including paying premiums and providing timely notice of its claim.

103.    An actual and justiciable controversy presently exists between 7-Eleven and Mitsui regarding their respective rights and obligations, and the availability of coverage, under the Policy for 7-Eleven's Floyd riot claim.

104.    Given that the parties have an actual and justiciable controversy regarding their respective rights and obligations under the Policy, a declaratory judgment of the parties' respective rights and obligations under the Policy is necessary.

105.    Pursuant to Tex. Civ. Prac. & Rem. Code § 37.003, 7-Eleven therefore seeks a declaratory judgment in favor of 7-Eleven and against Mitsui declaring that:

i.    7-Eleven's losses resulting from the physical loss or damage to property caused by the Nationwide Floyd Rioting are covered in their entirety by the Policy and that Mitsui is obligated to pay for such losses under the Policy's triggered coverage sections including, but not limited to:

  a.    Property Damage;

  b.    Expediting Costs;

  c.    Protection and Preservation of Property;

  d.    Time Element;

  e.    Extra Expense;

  f.    Civil or Military Authority;

  g.    Ingress/Egress;

  h.    Extended Period of Liability; and

  i.    Protection and Preservation of Property – Time Element;

ii.    No exclusion in the Policy applies to bar or limit coverage for 7-Eleven's Floyd riot claim;

iii.    7-Eleven's Floyd riot claim is subject to a single $1 million "per occurrence" deductible under the Policy; and

iv.　　7-Eleven is entitled to any other declaratory relief that the Court deems just and proper.

## COUNT TWO
### (Breach of Contract)

106.　　7-Eleven repeats and realleges the allegations in paragraphs 1 through 105 as though fully set forth herein.

107.　　The Policy constitutes a valid and enforceable contract of insurance between 7-Eleven and Mitsui, and its terms have been triggered to obligate Mitsui to provide insurance to 7-Eleven.

108.　　7-Eleven has timely satisfied all obligations and complied with all conditions applicable under the Policy, including paying premiums and providing timely notice of its claim.

109.　　Mitsui has materially breached its obligations under the Policy by unreasonably refusing to fully indemnify 7-Eleven for its Floyd riot claim losses.

110.　　7-Eleven has suffered and continues to suffer damages as a direct and proximate result of Mitsui's breach of its obligations under the Policy, with the exact amount to be proven at trial.

## COUNT THREE
### (Violations of Chapter 542 of the Texas Insurance Code)

111.　　7-Eleven repeats and realleges the allegations in paragraphs 1 through 110 as though fully set forth herein.

112.　　7-Eleven has made a claim under the Policy for its property damage and loss of business income caused by the Nationwide Floyd Rioting and has satisfied all conditions under the Policy.

113.　　Mitsui has violated the Prompt Payment of Claims Statute set forth in Chapter 542 of the Texas Insurance Code by delaying and/or failing to timely pay amounts due to 7-

Eleven under the Policy in connection with 7-Eleven's Floyd riot claim. *See* Tex. Ins. Code Ann. § 542.051, *et seq.*

114.    Consequently, 7-Eleven is entitled to the statutory damages set forth in § 542.060 of the Texas Insurance Code including, in addition to its reasonable and necessary attorneys' fees, penalty interest at a rate of eighteen percent (18%) per annum, as well as any and all other relief provided therein.

**COUNT FOUR**
**(Attorneys' Fees)**

115.    7-Eleven repeats and realleges the allegations in paragraphs 1 through 114 as though fully set forth herein.

116.    Due to the actions of Mitsui, 7-Eleven has been required to retain the services of the law firm of Jones Day.  7-Eleven has agreed to pay Jones Day a reasonable fee for its services necessarily rendered and to be rendered in this action.

117.    Pursuant to § 38.001 of the Texas Civil Practices & Remedies Code and § 542.060 of the Texas Insurance Code, 7-Eleven is entitled to an award of its reasonable attorneys' fees against Mitsui in an amount to be established at trial.

118.    Pursuant to § 37.009 of the Texas Civil Practices & Remedies Code, 7-Eleven also seeks its costs and reasonable and necessary attorneys' fees against Mitsui in pursuing its claim for declaratory judgment.

**JURY DEMAND**

119.    Pursuant to Rule 216(a) of the Texas Rules of Civil Procedure, 7-Eleven demands a jury trial in this matter and has paid the required jury fee.

**REQUEST FOR DISCLOSURE**

120.    Pursuant to Rule 194 of the Texas Rules of Civil Procedure, Mitsui is requested to disclose, within 30 days of the first answer or appearance, the information or material described in Texas Rule of Civil Procedure 194.

121.    Mitsui is hereby given notice that any document or other material, including electronically stored information, that may be evidence or relevant to any issue in this case is to be preserved in its present form until this litigation is concluded.

**PRAYER**

WHEREFORE, 7-Eleven respectfully requests that this Court grant 7-Eleven the following relief:

A.    Declaratory judgment as set forth in Count One above;

B.    Judgment against Mitsui and in favor of 7-Eleven:

    i.    awarding 7-Eleven all actual damages it has suffered as a result of Mitsui's breach of the Policy;

    ii.    awarding 7-Eleven all statutory damages it has sustained as a result of Mitsui's violations of Chapter 542 of the Texas Insurance Code, including, but not limited to, penalty interest at the rate of eighteen percent (18%) per year of its outstanding Floyd riot claim losses;

    iii.    awarding 7-Eleven all reasonable and necessary attorneys' fees and expenses incurred in this matter under § 38.001 of the Texas Civil Practice & Remedies Code, Chapter 542 of the Texas Insurance Code and/or § 37.009 of the Texas Civil Practices & Remedies Code;

    iv.    awarding 7-Eleven pre-judgment and post-judgment interest at the highest rate allowable by law;

    v.    awarding 7-Eleven all costs of court; and

vi.  such other and further relief, both at law and in equity, as the Court deems just

and proper.

Dated:  November 2, 2022                    Respectfully submitted,

                                            JONES DAY

                                            */s/ Peter D. Laun*

                                            Peter D. Laun, Esq.
                                            State Bar No. 24108952
                                            Joseph C. Van Asten, Esq.
                                            State Bar No. 24075598
                                            2727 N. Harwood Street – Suite 500
                                            Dallas, TX 75201
                                            Telephone: (214) 969-4530
                                            Facsimile: (214) 969-5100
                                            pdlaun@jonesday.com
                                            jcvanasten@jonesday.com

                                            Tyrone R. Childress, Esq.
                                            Quinten A. Levin, Esq.
                                            (*Pro Hac Vice Forthcoming*)
                                            555 South Flower Street, Fiftieth Floor
                                            Los Angeles, CA 90071
                                            Telephone: (213) 489-3939
                                            Facsimile: (213) 243-2539
                                            tchildress@jonesday.com
                                            qlevin@jonesday.com

                                            Jason B. Lissy, Esq.
                                            (*Pro Hac Vice Forthcoming*)
                                            250 Vesey Street
                                            New York, NY 10281-1047
                                            Telephone: (212) 326-3939
                                            Facsimile: (212) 755-7306
                                            jlissy@jonesday.com

                                            *Attorneys for Plaintiff 7-Eleven, Inc.*

# EXHIBIT 1



# To report a new loss, use one of the following options:

| | | |
|---|---|---|
| **Internet** | | **www.interactclaims.com**<br>*REGISTRATION REQUIRED — CLICK HERE TO REGISTER |
| **Telephone**<br>24 hours/day<br>365 days/year | | **866-MSMMUSA**<br>(866-676-6872)<br>*Interpreter Services available as needed or upon request |
| **Fax** | | **866-FAXMSMM**<br>(866-329-6766) |
| **E-Mail** | | **NEWLOSS@MSIGUSA.COM** |
| **Auto Mobile Reporting** | | https://www.interactclaims.com/MSMM/newclaim.jsp |

*Please contact our Customer Service Department for additional assistance or questions regarding previously reported claims - 866-MSMMCSC(866-676-6272).*

INSURED COPY

CLM2004/22/2015

**7-Eleven_0000001**

A Member of
**MS&AD** INSURANCE GROUP

**MSIG**

Policy Number
**FIR1122580**

## COMMON POLICY DECLARATIONS

**Insurance is afforded by the company indicated below:**

[X] **MITSUI SUMITOMO INSURANCE COMPANY OF AMERICA**

[ ] **MITSUI SUMITOMO INSURANCE USA INC.**

[ ]

(each of the above being a capital stock corporation)

| **Item 1.** Named Insured and Mailing Address | Agent Name and Address |
|---|---|
| 7-ELEVEN, INC.<br>3200 HACKBERRY ROAD<br>IRVING TX 75063 | AON RISK SERVICES SOUTHWEST INC.<br>5555 SAN FELIPE SUITE 1500<br>HOUSTON TX 77056 |
| | Agent No. 0030140 |

**Item 2.** Policy Period    From: 05-10-2020    To: 05-10-2021

**at 12:01 A.M., Standard Time at your mailing address shown above.**

**Item 3.** Business Description:

Form of Business: CORPORATION

**Item 4.** In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

This policy consists of the following coverage parts for which a premium is indicated.  Where no premium is shown, there is no coverage.  This premium may be subject to adjustment.

| Coverage Part(s) | Premium |
|---|---|
| Commercial Property Coverage Part | NOT COVERED |
| Commercial General Liability Coverage Part | NOT COVERED |
| Commercial Crime and Fidelity Coverage Part | NOT COVERED |
| Commercial Inland Marine Coverage Part | NOT COVERED |
| Commercial Auto (Business or Truckers) Coverage Part | NOT COVERED |
| Commercial Garage Coverage Part | NOT COVERED |
| Commercial Output Coverage Part (AAIS) | $    1,873,717.00 |
| | |
| TAX, SURCHARGE OR FEE | $        2,299.61 |
| **Total Policy Premium** | $    1,876,016.61 |

**Item 5.** Forms and Endorsements

Form(s) and Endorsement(s) made a part of this policy at time of issue:

**See Schedule of Forms and Endorsements**

Countersigned:

Date: _____    By: _____

THIS COMMON POLICY DECLARATION AND THE SUPPLEMENTAL DECLARATION(S), TOGETHER WITH THE COMMON POLICY CONDITIONS COVERAGE PART(S), COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, COMPLETE THE ABOVE NUMBERED POLICY.

MS 0001 09 13

Page 1 of 1

INSURED COPY

7-Eleven_0000002

 **Mitsui Sumitomo Insurance Group**

**Policy Number**
**FIR1122580**

## KENTUCKY MUNICIPAL TAX SCHEDULE

Named Insured  7-ELEVEN, INC.

Effective Date: 05/10/2020
12:01 A.M., Standard Time

Agent Name  AON RISK SERVICES SOUTHWEST

Agent No.  0030140

| TAX JURISDICTION | TAX AMOUNT |
|---|---|
| Bowling Green | $    15.61 |

**MS 0308 (12/08)**

INSURED COPY

 

Policy Number FIR1122580

## COMPANY SIGNATURE PAGE

**MITSUI SUMITOMO INSURANCE COMPANY OF AMERICA**
(A New York Stock Company)

**MITSUI SUMITOMO INSURANCE USA INC.**
(A New York Stock Company)

|  |  |
|---|---|
| **Home Office:** | 560 Lexington Avenue, 20th Floor<br>New York, New York 10022<br>(212) 446-3600 |
| **Administrative Offices:** | 15 Independence Boulevard<br>Warren, New Jersey 07059<br>(800) 388-1802 |

Policyholders may use the telephone numbers shown above for any purpose.

---

**IN WITNESS WHEREOF**, the Company has caused this policy to be executed and attested.  Except where prohibited by law or regulation, this policy shall not be valid unless countersigned by a duly authorized representative of the Company.

**Kurao Onouchi**
**President**

**Stephen P. Tasy**
**Secretary**

MITSUI SUMITOMO INSURANCE COMPANY OF AMERICA
MITSUI SUMITOMO INSURANCE USA INC.

MS 0002 01 16

Page 1 of 1

© 2016 MSIG Holdings (Americas), Inc. All rights reserved.

INSURED COPY

**7-Eleven_0000004**

| | Policy Number |
|---|---|
| | **FIR1122580** |

### SCHEDULE OF FORMS AND ENDORSEMENTS

Named Insured   7-ELEVEN, INC.

Effective Date:   05-10-20
12:01 A.M., Standard Time

Producer Name   AON RISK SERVICES SOUTHWEST INC.

Producer No.   0030140

---

**COMMON POLICY FORMS AND ENDORSEMENTS**

| | | |
|---|---|---|
| MS 0001 | 09-13 | COMMON POLICY DECLARATIONS |
| MS 0308 | 12-08 | KENTUCKY MUNICIPAL TAX SCHEDULE |
| MS 0002 | 01-16 | COMPANY SIGNATURE PAGE |
| MS 0101 | 01-16 | SCHEDULE OF FORMS AND ENDORSEMENTS |
| MAN-CO | 01-02 | MANUSCRIPT ENDORSEMENT |
| MS 0104 | 01-16 | SCHEDULE OF TAXES, SURCHARGES OR FEES |
| MS 0504 | 01-16 | EXCLUSION-US ECONOMIC OR TRADE SANCTIONS |
| MS 0810 | 01-16 | CONFORMANCE WITH LAW/SEVERABILITY |
| MS 5509 | 02-16 | EXCLUSION-FOREIGN TERRORISM |
| MS 0817 | 06-10 | CANCELLATION OR NONRENEWAL AMENDMENTS-NO |

**COMMERCIAL OUTPUT PROGRAM FORMS AND ENDORSEMENTS**

| | | |
|---|---|---|
| CL 0600 | 01-15 | CERTIFIED TERRORISM LOSS |
| CL 0605 | 01-15 | CERTIFIED TERR LOSS DISCLOSURE OF PREMIU |
| MS 5205 | 05-08 | MANUSCRIPT POLICY |
| MS 5627 | 05-20 | LONG TERM AGREEMENT ENDORSEMENT |
| MS5533 | 04-20 | VIRUS & BACTERIA EXCLUSION (MANUSCRIPT P |

---

MS 0101 01 16

© 2016 MSIG Holdings (Americas), Inc. All rights reserved.

Page 1 of 1

INSURED COPY

7-Eleven_0000005

Policy Number
**FIR1122580**

**MANUSCRIPT ENDORSEMENT**

# MITSUI SUMITOMO INSURANCE COMPANY OF AMERICA

| | | |
|---|---|---|
| Named Insured | 7-ELEVEN, INC. | Effective Date: 05-10-2020 |
| | | 12:01 A.M., Standard Time |
| Agent Name | AON RISK SERVICES SOUTHWEST INC. | Agent No. 0030140 |

DECLARATIONS, SECTION A.13 IS HEREBY DELETED IN ITS ENTIRETY AND
REPLACED WITH THE FOLLOWING SECTION:

13. DEDUCTIBLES

IN EACH CASE OF LOSS INSURED BY THIS POLICY, THE COMPANY WILL BE
LIABLE ONLY IF THE INSURED SUSTAINS A LOSS, INCLUDING ANY INSURED
TIME ELEMENT LOSS, IN A SINGLE "OCCURRENCE" GREATER THAN THE
APPLICABLE DEDUCTIBLE SPECIFIED BELOW, AND ONLY FOR ITS SHARE OF THAT
GREATER AMOUNT.

UNLESS OTHERWISE STATED BELOW:

A. WHEN THIS POLICY INSURES MORE THAN ONE "LOCATION", THE DEDUCTIBLE
WILL APPLY AGAINST THE TOTAL LOSS INSURED BY THIS POLICY IN ANY
ONE "OCCURRENCE".

B. IF TWO OR MORE DEDUCTIBLES PROVIDED IN THIS POLICY APPLY TO A
SINGLE "OCCURRENCE", THE TOTAL TO BE DEDUCTED WILL NOT EXCEED THE
LARGEST DEDUCTIBLE APPLICABLE, UNLESS OTHERWISE PROVIDED.

POLICY DEDUCTIBLE

$1,000,000 PROPERTY DAMAGE AND TIME ELEMENT COMBINED
PER "OCCURRENCE", EXCEPT AS FOLLOWS:

EXCEPTIONS TO POLICY DEDUCTIBLE:

A. EARTH MOVEMENT

$1,000,000 PROPERTY DAMAGE AND TIME ELEMENT COMBINED PER "OCCURRENCE"
FOR INSURED PROPERTY, EXCEPT: $2,500,000 PROPERTY DAMAGE AND TIME
ELEMENT COMBINED PER "OCCURRENCE" FOR INSURED PROPERTY SITUATED IN
DEFINED "HIGH HAZARD ZONES FOR EARTH MOVEMENT".

B. FLOOD

$1,000,000 PROPERTY DAMAGE AND TIME ELEMENT COMBINED PER "OCCURRENCE"
FOR INSURED PROPERTY, EXCEPT: $2,500,000 PROPERTY DAMAGE AND TIME
ELEMENT COMBINED PER "OCCURRENCE" FOR INSURED PROPERTY SITUATED

**MAN-CO (01/02)**

INSURED COPY

Policy Number
**FIR1122580**

**MANUSCRIPT ENDORSEMENT**

## MITSUI SUMITOMO INSURANCE COMPANY OF AMERICA

Named Insured   7-ELEVEN, INC.

Effective Date: 05-10-2020
12:01 A.M., Standard Time

Agent Name   AON RISK SERVICES SOUTHWEST INC.

Agent No. 0030140

---

C. NAMED WINDSTORM

$5,000,000 PROPERTY DAMAGE AND TIME ELEMENT COMBINED PER "OCCURRENCE" FOR INSURED PROPERTY SITUATED WITHIN A "NAMED WINDSTORM ZONE".

**MAN-CO (01/02)**

INSURED COPY

7-Eleven_0000007

Policy Number

**FIR1122580**

### SCHEDULE OF TAXES, SURCHARGES OR FEES

| | | | |
|---|---|---|---|
| Named Insured | 7-ELEVEN, INC. | Effective Date: | 05/10/2020 |
| | | | 12:01 A.M., Standard Time |
| Producer Name | AON RISK SERVICES SOUTHWEST INC. | Producer No. | 0030140 |

MS 0001 (cont.)

```
      TAXES, SURCHARGES OR FEES DETAILED BREAKDOWN :

    *KY-PUBLIC SERVICE SURCHARGE               $            4.01
     KY-MUNICIPAL TAX                          $           15.61
     NYFIF                                     $        1,539.03
     NJ-PLIGA SURCHARGE                        $          401.81
     WV-POLICY SURCHARGE                       $           52.54
     FL-COMMERCIAL PROPERTY SURCHARGE          $          199.25
     FL-INSURANCE PREMIUM SURCHARGE            $            4.00
     LA-FAIR PLAN EMERGENCY ASSESSMENT         $           27.43
     WA-REGULATORY SURCHARGE                   $           55.93
                                                 --------------
     TOTAL TAXES, SURCHARGES OR FEES           $        2,299.61
```

```
  * Please note that the total amount due includes a premium surcharge
    pursuant to Section 136.392 of the Kentucky Revised Statutes.
```

INSURED COPY

**7-Eleven_0000008**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – U.S. ECONOMIC OR TRADE SANCTIONS

This endorsement modifies Insurance provided under all Coverage Parts included in this policy.

This insurance does not apply under any coverage part to "bodily injury", "property damage" or loss in whole or in part:

A. when the United States of America has imposed any trade or economic sanction or embargo prohibiting the insurance of such "bodily injury", "property damage" or loss; or

B. occuring in any jurisdiction that is the subject of any trade or economic sanction or embargo imposed by the United States of America.

All other terms and conditions remain unchanged.

INSURED COPY

7-Eleven_0000009

**THIS ENDORSEMENT CHANGES YOUR POLICY. PLEASE READ IT CAREFULLY.**

# CONFORMANCE WITH LAW/SEVERABILITY

This endorsement modifies insurance provided under all Coverage Parts included in this policy.

It is agreed that the Policy is amended as follows:

The following Clause is added:

**Conformance With Law/Severability**

**a.**  Any terms or conditions of the Policy which are in conflict with the applicable statutes, laws or regulations of the jurisdiction in which the Policy is delivered are amended to conform to such statutes, laws or regulations.

**b.**  If any provision of the Policy is invalid or unenforceable under any applicable statute, regulation or rule of law, then it will be enforced to the extent permissible and the enforceability of the other provisions of the Policy will not be affected.

All other terms and conditions remain unchanged.

INSURED COPY

7-Eleven_0000010

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – FOREIGN TERRORISM

This endorsement modifies insurance provided under the following:

> COMMERCIAL CRIME COVERAGE FORM
> COMMERCIAL INLAND MARINE COVERAGE PART
> COMMERCIAL PROPERTY COVERAGE PART
> EQUIPMENT BREAKDOWN PROTECTION COVERAGE FORM
> COMMERCIAL OUTPUT PROGRAM

**A.** The following exclusion is added:

**FOREIGN TERRORISM**

**We will not pay for loss or damage caused directly or indirectly by "foreign terrorism", including action in hindering or defending against an actual or expected incident of "foreign terrorism". Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss or damage.**

**B.** The following definition is added:

"Foreign terrorism" means activities against persons, organizations or property of any nature committed outside of the United States of America and not subject to the Terrorism Risk Insurance Act of 2002, as amended:

1. That involve the following or preparation for the following:

   **a.** Use or threat of force or violence; or

   **b.** Commission or threat of a dangerous act; or

   **c.** Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

2. When one or both of the following applies:

   **a.** The effect is to intimidate or coerce a government or the civilian population or any segment thereof, or to disrupt any segment of the economy; or

   **b.** It appears that the intent is to intimidate or coerce a government, or to further political, ideological, religious, social or economic objectives or to express (or express opposition to) a philosophy or ideology.

All other terms and conditions remain unchanged.

**MS 5509 02 16**                                                                                               **Page 1 of 1**

© 2016 MSIG Holdings (Americas), Inc.  All rights reserved.
(Includes copyrighted material of Insurance Services Office, Inc. with its permission)
(Includes copyrighted material of American Association of Insurance Services, Inc. with its permission)

INSURED COPY

 **MSIG**

# CANCELLATION / NONRENEWAL AMENDMENTS – NOTIFICATION OF DESIGNATED ENTITIES

This endorsement modifies insurance provided under the following:

Commercial Property

The cancellation provision in the policy, and any nonrenewal provision contained in the policy, are amended by adding the following:

If this policy is cancelled or not renewed either by us or the first named insured, the first named insured acknowledges that we will send notice of such cancellation or nonrenewal to the person(s) or organization(s) designated in the Schedule below, for which the first named insured or any other named insured has:

a.  Agreed to provide notice of cancellation or nonrenewal of this policy; and

b.  Provided the name and address of such person or organization to us.

Notice will be sent thirty [30] days (ten [10] days in the event of non-payment of premium) in advance of the cancellation date, or nonrenewal date, if applicable.

Our failure to provide the notice will not impose liability of any kind upon us, or invalidate the cancellation or nonrenewal.

All other terms and conditions remain unchanged.


Schedule:


As per schedule to be provided by Aon


**MS 0817 06 10**                                                                                                                **Page 1 of 1**

(Includes copyrighted material of Insurrance Services Offices, Inc. with its permission)
INSURED COPY

7-Eleven_0000012

**AAIS**
**CL 0600 01 15**
**Page 1 of 1**

This endorsement changes
the policy
-- **PLEASE READ THIS CAREFULLY** --

# CERTIFIED TERRORISM LOSS

1. The following definitions are added.

   a. "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security, and the Attorney General of the United States:

      1) to be an act of terrorism;
      2) to be a violent act or an act that is dangerous to human life, property, or infrastructure;
      3) to have resulted in damage:

         a) within the United States; or
         b) to an air carrier (as defined in section 40102 of title 49, United States Code); to a United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), regardless of where the loss occurs; or at the premises of any United States mission;

      4) to have been committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion; and
      5) to have resulted in insured losses in excess of five million dollars in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act, as amended.

   b. "Certified terrorism loss" means loss that results from a "certified act of terrorism".

2. The "terms" of any terrorism exclusion that is part of or that is attached to this Coverage Part are amended by the following provision:

   This exclusion does not apply to "certified terrorism loss".

3. The following provision is added.

   If the Secretary of the Treasury determines that the aggregate amount of "certified terrorism loss" has exceeded one hundred billion dollars in a calendar year (January 1 through December 31), and "we" have met "our" insurer deductible under the Terrorism Risk Insurance Act, as amended, "we" will not pay for any portion of "certified terrorism loss" that exceeds one hundred billion dollars. If the "certified terrorism loss" exceeds one hundred billion dollars in a calendar year (January 1 through December 31), losses up to one hundred billion dollars are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury under the Terrorism Risk Insurance Act, as amended.

4. The following provisions are added.

   a. Neither the "terms" of this endorsement nor the "terms" of any other terrorism endorsement attached to this Coverage Part provide coverage for any loss that would otherwise be excluded by this Coverage Part under:

      1) exclusions that address war, military action, or nuclear hazard; or
      2) any other exclusion; and

   b. the absence of any other terrorism endorsement does not imply coverage for any loss that would otherwise be excluded by this Coverage Part under:

      1) exclusions that address war, military action, or nuclear hazard; or
      2) any other exclusion.

---

**CL 0600 01 15**

Copyright, American Association of Insurance Services, Inc., 2015

INSURED COPY

| | | |
|---|---|---|
| **AAIS** | This endorsement changes | **POLICY NUMBER** |
| **CL 0605 01 15** | the policy | FIR1122580 |
| **Page 1 of 1** | **-- PLEASE READ THIS CAREFULLY --** | |

# CERTIFIED TERRORISM LOSS DISCLOSURE OF PREMIUM AND FEDERAL SHARE OF INSURED LOSSES

(The entries required to complete this endorsement will be shown below, on the "declarations", or on the "schedule of coverages".)

**SCHEDULE**

Certified Terrorism Loss Premium   $      58,370

Additional information, if any, concerning terrorism premium:

1. The portion of "your" premium that is attributed to coverage for "certified terrorism loss" is shown in the Schedule above.

2. Coverage for "certified terrorism loss", to the extent that such coverage is provided by this policy or Coverage Part, will be partially reimbursed by the United States Government, Department of Treasury under a federal program. Under that program, the United States pays the following percentage of insured losses for "certified terrorism loss" that exceeds the statutorily established deductible that "we" retain:

   a. 85%, for insured losses occurring before January 1, 2016;

   b. 84%, for insured losses occurring during the 2016 calendar year;

   c. 83%, for insured losses occurring during the 2017 calendar year;

   d. 82%, for insured losses occurring during the 2018 calendar year;

   e. 81%, for insured losses occurring during the 2019 calendar year; and

   f. 80%, for insured losses occurring on or after January 1, 2020.

   However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act, as amended, exceed one hundred billion dollars in a calendar year (January 1 through December 31), the Treasury will not make payment for any portion of the amount of such losses that exceeds one hundred billion dollars.

   If the Secretary of the Treasury determines that the aggregate amount of "certified terrorism loss" has exceeded one hundred billion dollars in a calendar year (January 1 through December 31), and "we" have met "our" insurer deductible under the Terrorism Risk Insurance Act, as amended, "we" will not pay for any portion of "certified terrorism loss" that exceeds one hundred billion dollars. If the "certified terrorism loss" exceeds one hundred billion dollars in a calendar year (January 1 through December 31), losses up to one hundred billion dollars are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury under the Terrorism Risk Insurance Act, as amended.

**CL 0605 01 15**

Copyright, American Association of Insurance Services, Inc., 2015

INSURED COPY



# 7-ELEVEN, INC

## Mitsui Sumitomo Insurance Co. USA
### POLICY: FIR1122580

# LARGE PROPERTY COVERAGE FORM

**TABLE OF CONTENTS**
**(Order In Which They Appear)**

Page No.

DECLARATIONS - SECTION A ................................................................................ 1
1. NAMED INSURED ............................................................................................ 1
2. POLICY PERIOD ............................................................................................. 1
3. PREMIUM ........................................................................................................ 1
4. PREMIUM PAYABLE ....................................................................................... 1
5. LOSS OR DAMAGE INSURED ....................................................................... 1
6. TERRITORY ..................................................................................................... 1
7. INSURED "LOCATION" ................................................................................... 1
8. CURRENCY ..................................................................................................... 2
9. PARTICIPATION .............................................................................................. 2
10. LIMITS OF LIABILITY ..................................................................................... 2
11. ANNUAL VALUE REPORTING PROVISIONS ............................................... 5
12. WAITING PERIOD ........................................................................................... 5
13. DEDUCTIBLES ................................................................................................ 5

PROPERTY DAMAGE - SECTION B ....................................................................... 8
1. PROPERTY INSURED ..................................................................................... 8
2. PROPERTY EXCLUDED ................................................................................. 8
3. ADDITIONAL COVERAGES ............................................................................ 9

   a. ACCOUNTS RECEIVABLE ........................................................................ 9
   b. AUTOMATIC COVERAGE ........................................................................ 10
   c. BRANDS AND LABELS ............................................................................ 11
   d. CONSEQUENTIAL REDUCTION IN VALUE ........................................... 11
   e. CONTROL OF DAMAGED PROPERTY .................................................... 11
   f. DATA, PROGRAMS OR SOFTWARE ...................................................... 11
   g. DEBRIS REMOVAL .................................................................................. 13
   h. DECONTAMINATION COSTS .................................................................. 13
   i. DEFERRED PAYMENTS .......................................................................... 13
   j. DEMOLITION AND INCREASED COST OF CONSTRUCTION ................ 14
   k. EARTH MOVEMENT ................................................................................ 14
   l. ERRORS AND UNINTENTIONAL OMISSIONS ....................................... 15
   m. EXPEDITING COSTS ............................................................................... 15
   n. FINE ARTS ............................................................................................... 15
   o. FLOOD ...................................................................................................... 15
   p. LAND & WATER CONTAMINANT OR POLLUTANT CLEANUP, REMOVAL AND DISPOSAL16
   q. PROFESSIONAL FEES ............................................................................ 16
   r. PROTECTION AND PRESERVATION OF PROPERTY ............................ 17

MS 5205 05 08                    i



Policy Number – FIR 1122580

s.  SERVICE INTERRUPTION PROPERTY DAMAGE .................................................. 17
t.  TAX TREATMENT OF PROFITS .................................................. 18
u.  TEMPORARY REMOVAL OF PROPERTY .................................................. 18
v.  TRANSPORTATION .................................................. 18
w.  VALUABLE PAPERS AND RECORDS .................................................. 20

4.  APPLICATION OF POLICY TO DATE OR TIME RECOGNITION .................................................. 21
5.  EXCLUSIONS: .................................................. 22

TIME ELEMENT - SECTION C .................................................. 26

1.  TIME ELEMENT .................................................. 26
2.  LOSS INSURED .................................................. 26
3.  TIME ELEMENT COVERAGES .................................................. 27

a.  GROSS EARNINGS .................................................. 27
b.  EXTRA EXPENSE .................................................. 27
c.  LEASEHOLD INTEREST .................................................. 28
d.  RENTAL INSURANCE .................................................. 29
e.  COMMISSIONS, PROFITS AND ROYALTIES .................................................. 29

4.  TIME ELEMENT COVERAGE EXTENSIONS .................................................. 30

a.  CIVIL AUTHORITY .................................................. 30
b.  DEPENDENT TIME ELEMENT .................................................. 30
c.  EXTENDED PERIOD OF LIABILITY .................................................. 31
d.  INGRESS/EGRESS .................................................. 31
e.  ON PREMISES SERVICES .................................................. 32
f.  PROTECTION AND PRESERVATION OF PROPERTY – TIME ELEMENT .................................................. 32
g.  RELATED REPORTED VALUES .................................................. 32
h.  RESEARCH AND DEVELOPMENT .................................................. 33
i.  SERVICE INTERRUPTION TIME ELEMENT .................................................. 33

5.  PERIOD OF LIABILITY .................................................. 34
6.  TIME ELEMENT EXCLUSIONS .................................................. 36
7.  TIME ELEMENT INTERDEPENDENCY .................................................. 36

LOSS ADJUSTMENT AND SETTLEMENT - SECTION D .................................................. 37

1.  LOSS ADJUSTMENT/PAYABLE .................................................. 37
2.  CURRENCY FOR LOSS PAYMENT .................................................. 37
3.  VALUATION .................................................. 37
4.  LOSS CONDITIONS .................................................. 39

a.  REQUIREMENTS IN CASE OF LOSS .................................................. 39
b.  COMPANY OPTION .................................................. 40
c.  ABANDONMENT .................................................. 40
d.  SUBROGATION .................................................. 40
e.  APPRAISAL .................................................. 41
f.  SUIT AGAINST THE COMPANY .................................................. 41

5.  SETTLEMENT OF CLAIMS .................................................. 42
6.  COLLECTION FROM OTHERS .................................................. 42

INSURED COPY



7.   PARTIAL PAYMENT OF LOSS SETTLEMENT ............................................................. 42
8.   JURISDICTION .......................................................................................................... 42
9.   ASSIGNMENT OF POLICY ........................................................................................ 42

GENERAL PROVISIONS - SECTION E ............................................................................. 43
1.   ADDITIONAL INSURABLE INTERESTS/CERTIFICATES OF INSURANCE .................... 43
2.   CANCELLATION/NONRENEWAL ............................................................................... 43
3.   INSPECTIONS .......................................................................................................... 43
4.   PROVISIONS / CONDITIONS APPLICABLE TO SPECIFIC JURISDICTIONS ................. 44
5.   MISREPRESENTATION AND FRAUD ......................................................................... 44
6.   LENDERS LOSS PAYEE AND MORTGAGEE INTERESTS AND OBLIGATIONS .......... 44
7.   LIBERALIZATION ...................................................................................................... 45
8.   NO BENEFIT TO BAILEE ........................................................................................... 45
9.   OTHER INSURANCE ................................................................................................. 45
10.  POLICY MODIFICATION ............................................................................................ 46
11.  REDUCTION BY LOSS .............................................................................................. 46
12.  TITLES .................................................................................................................... 46
13.  VACANCY ................................................................................................................ 46
14.  DEFINITIONS ........................................................................................................... 47

INSURED COPY

7-Eleven_0000017

 **MSIG**

**Policy Number – FIR 1122580**

# LARGE PROPERTY COVERAGE FORM

## DECLARATIONS - SECTION A

**1. NAMED INSURED**

**7-Eleven, Inc.** (hereinafter referred to as the "Named Insured") and any subsidiary, and the interest of the Named Insured in any partnership or joint venture in which the Named Insured has management control or ownership as now constituted or hereafter is acquired, as the respective interest of each may appear; (hereinafter collectively referred to as the "Insured"), including legal representatives.

**2. POLICY PERIOD**

FROM: **May 10, 2020**
TO: **May 10, 2021**
TERM: **Annual**

**3. PREMIUM**

This policy is issued in consideration of an initial premium. If the term of this policy is longer than one year, for each subsequent year of coverage, premium will be due at the anniversary and will be subject to rules and rates in effect at that time.

**4. PREMIUM PAYABLE**

The first Named Insured shall pay the premium under this policy, and any return of the paid premium accruing under this policy will be paid to the first Named Insured.

**5. LOSS OR DAMAGE INSURED**

Coverage under this policy applies to direct physical loss or damage to insured property at an insured "location" from a cause not hereinafter excluded.

**6. TERRITORY**

This policy covers insured "locations" in the United States of America, its territories or possessions, its territorial waters, Canada and Puerto Rico.

As respects **DEPENDENT TIME ELEMENT**, the coverage in this policy is extended to cover **7-Eleven's interest in the EDP Systems located in Osaka and Yokohama, Japan.**

**7. INSURED "LOCATION"**

The coverages under this policy apply to an insured "location" unless otherwise provided.

An insured "location" is a "location":

**a.** Listed on a schedule of locations attached to this policy.

**b.** Listed on a schedule of locations or a statement of values on file with the Company dated

---

**MS 5205 05 08**                                                                                     **Page 1**

INSURED COPY



**April 4, 2020**

   **c.** Insured as a "miscellaneous unnamed location".

   **d.** Insured under the terms and conditions of the **AUTOMATIC COVERAGE** or **ERRORS AND UNINTENTIONAL OMISSIONS** provisions.

**8. CURRENCY**

All amounts, including deductibles and limits of liability, indicated in this policy are stated in the currency of the United States of America.  Losses will be adjusted and paid as provided in the **CURRENCY FOR LOSS PAYMENT** clause of the **LOSS ADJUSTMENT AND SETTLEMENT** section.

Premium for this policy is stated and payable in the currency of the United States of America.

**9. PARTICIPATION**

The Company's liability under this policy will not exceed 100**%** of any limits of liability as provided in the **LIMITS OF LIABILITY** provision in this section.

**10. LIMITS OF LIABILITY**

The Company's maximum limit of liability in a single "occurrence" regardless of the number of "locations" or coverages involved, including any insured **TIME ELEMENT** loss, will not exceed the policy limit of liability of **$50,000,000** subject to the following provisions:

   **a.** Limits of liability stated below or elsewhere in this policy are part of, and not in addition to, the policy limit of liability.

   **b.** Limits of liability in an "occurrence" apply to the total loss or damage at all "locations" and for all coverages involved, including any insured TIME ELEMENT loss, subject to the following provisions:

      **1)** When a limit of liability applies in the Aggregate During Any Policy Year, the Company's maximum amount payable will not exceed such limit of liability during any policy year regardless of the number of "locations", coverages or "occurrences" involved.

      **2)** When a limit of liability applies to a "location" or other specified property, such limit of liability will be the maximum amount payable for all loss or damage at all "locations" arising from physical loss or damage at such "location" or to such other specified property.

   **c.** Should an "occurrence" result in liability payable under more than one policy issued to the Named Insured by the Company, the maximum amount payable in the aggregate under all such policies will be the applicable limit(s) of liability indicated in this policy regardless of the number of "locations", coverages or perils involved.

INSURED COPY

 **MSIG**

**Policy Number – FIR 1122580**

<u>**Limits of Liability**</u>

| | | |
|---|---|---|
| $ | 7,500,000 | "MISCELLANEOUS UNNAMED LOCATIONS" PER LOCATION |
| $ | 5,000,000 | ACCOUNTS RECEIVABLE<br>$10,000 – TRANSIT AND MISCELLANEOUS UNNAMED LOCATIONS |
| $ | INCLUDED | CONSQUENTIAL REDUCTION IN VALUE |
| $ | INCLUDED | CONTROL OF DAMAGED PROPERTY |
| $ | 2,500,000 | DATA, PROGRAMS OR SOFTWARE in any "occurrence" |
| $ | NOT APPLICABLE | DATA, PROGRAMS OR SOFTWARE in the Aggregate During Any Policy Year |
| $ | 5,000,000 | DEBRIS REMOVAL<br>[OR 25% of PROPERY DAMAGE loss, whichever is greater] |
| $ | 1,000,000 | DECONTAMINATION COSTS |
| $ | NOT APPLICABLE | DECONTAMINATION COSTS in the Aggregate During Any Policy Year |
| $ | NOT COVERED | DEFERRED PAYMENTS |
| $ | 5,000,000 | DEMOLITION AND INCREASED COST OF CONSTRUCTION |
| $ | 25,000,000 | EARTH MOVEMENT in the Aggregate During Any Policy Year but not to exceed the following limits in the Aggregate During Any Policy Year for property located in High Hazard Zones for Earth Movement: |

$6,000,000  For property within **HIGH HAZARD ZONES FOR EARTH MOVEMENT**

| | | |
|---|---|---|
| $ | 5,000,000 | ERRORS AND UNINTENTIONAL OMISSIONS |
| $ | 250,000 | EXPEDITING COSTS but not to exceed  $250,000 |
| $ | 5,000,000 | FINE ARTS |
| $ | 25,000,000 | FLOOD in the Aggregate During Any Policy Year but not to exceed the following limits in the Aggregate During Any Policy Year for property within FEMA Special Hazard Areas: |

$5,000,000  For property within FEMA Special Flood Hazard Area (SFHA) A or V

$25,000,000  For property within FEMA Special Flood Hazard Area (SFHA) B or X (Shaded).

| | | |
|---|---|---|
| $ | 100,000 | LAND AND WATER CONTAMINANT OR POLLUTANT CLEANUP, REMOVAL AND DISPOSAL in the Aggregate During Any Policy Year |
| $ | 25,000 | LAND IMPROVEMENTS per exception under SECTION B PROPERTY DAMAGE, Paragraph 2. Property Excluded, Subparagraph b.(1) |

**MS 5205 05 08**

**Page 3**

7-Eleven_0000020

 **MSIG**

**Policy Number – FIR 1122580**

| | | |
|---|---|---|
| $ | **250,000** | **PROFESSIONAL FEES** |
| $ | **2,500,000** | **PROPERTY IN THE COURSE OF CONSTRUCTION** |
| $ | **25,000** | **RADIOACTIVE CONTAMINATION** per exception under **SECTION B PROPERTY DAMAGE**, Paragraph **5. EXCLUSIONS**, Subparagraph **b.(1)(b)** |
| $ | **5,000,000** | **SERVICE INTERRUPTION PROPERTY DAMAGE** and **TIME ELEMENT INCLUDING OVERHEAD TRANSMISSION LINES**<br>            (combined as respects all specified services interrupted) |
| $ | **NOT APPLICABLE** | **TAX TREATMENT OF PROFITS** |
| $ | **2,500,000** | **TEMPORARY REMOVAL OF PROPERTY** |
| $ | **2,500,000** | **TRANSPORTATION** |
| $ | **5,00,000** | **VALUABLE PAPERS AND RECORDS** |
| $ | **10,000** | **PROPERTY IN TRANSIT** |
| $ | **INCLUDED** | **COMMISSIONS, PROFITS AND ROYALITIES** |
| $ | **10,000,000** | **DEPENDENT TIME ELEMENT** but not to exceed a **$10,000,000** limit per "dependent time element location" |
| $ | **15,000,000** | **EXTRA EXPENSE** |
| $ | **2,500,000** | **ON PREMISES SERVICES** |
| $ | **INCLUDED** | **PROTECTION AND PRESERVATION OF PROPERTY - TIME ELEMENT** |
| $ | **INCLUDED** | **RENTAL INSURANCE** |
| $ | **NOT APPLICABLE** | **RESEARCH AND DEVELOPMENT** |
| $ | **5,000,000** | **NAMED WINDSTORM** |
| $ | **10,000** | **STAMPS, TICKETS, INCLUDING LOTTERY TICKETS HELD FOR SALE** |

# EQUIPMENT BREAKDOWN

**$10,000,000 EXCEPT FOR;**

**$100,000 SPOILAGE**

**$100,000 AMMONIA CONTAMINATION**

**$100,000 HAZARDOUS SUBSTANCES**

<u>**Time Limits**</u>

MS 5205 05 08                                                                                    **Page 4**

7-Eleven_0000021

 **MSIG**

**Policy Number – FIR 1122580**

In addition to the Time Limits shown elsewhere in this policy, the following apply:

| | |
|---|---|
| **180** day period but not to exceed a **$5,000,000 Real Property and $2,000,000 Personal Property** limit | **AUTOMATIC COVERAGE** |
| **30** day period | **CIVIL AUTHORITY WITHIN 5 MILES** |
| **90** day period | **EXTENDED PERIOD OF LIABILITY** |
| **30** day period | **INGRESS/EGRESS WITHIN 5 MILES** |

## 11. ANNUAL VALUE REPORTING PROVISIONS

The Named Insured will provide the Company 100% values by "location".

These statement(s) of values are due on the date(s) shown below:

| Values as Of | Due Date | Type of Values |
|---|---|---|
| **April 4, 2020** | **April 4, 2020** | Property values in accordance with the **VALUATION** clause of the **LOSS ADJUSTMENT AND SETTLEMENT** section. |
| **April 4, 2020** | **April 4, 2020** | In addition, Stock and Supplies on the average and maximum values based on the previous 12 months period. |
| **April 4, 2020** | **April 4, 2020** | **TIME ELEMENT** values anticipated for the 12 months following the "Value as Of" date, and the actual **TIME ELEMENT** values for the previous 12 month period. |

## 12. WAITING PERIOD

For the purposes of applying **DATA, PROGRAMS OR SOFTWARE** coverage when the loss or damage is caused by the malicious introduction of a machine code or instruction, the Waiting Period is **NOT APPLICABLE** hours.

For the purposes of applying **SERVICE INTERRUPTION** coverage, the Waiting Period is **24** hours.

## 13. DEDUCTIBLES

In each case of loss insured by this policy, the Company will be liable only if the Insured sustains a loss, including any insured **TIME ELEMENT** loss, in a single "occurrence" greater than the applicable deductible specified below, and only for its share of that greater amount.

Unless otherwise stated below:

**a.** When this policy insures more than one "location", the deductible will apply against the total loss insured by this policy in any one "occurrence".

INSURED COPY

 **MSIG**

**Policy Number – FIR 1122580**

**b.** If two or more deductibles provided in this policy apply to a single "occurrence", the total to be deducted will not exceed the largest deductible applicable, unless otherwise provided.

**Policy Deductible**

**$1,000,000 Property Damage and Time Element Combined** per "occurrence", except as follows:

**Exceptions to Policy Deductible**

**a. Earth Movement**

**$1,000,000** combined all coverages, except:

As respects "locations" in defined "high hazard zones for earth movement", the following deductibles apply to "earth movement" and will apply separately at each "location" irrespective of any other deductibles applying:

**(1)** Property Damage - The greater of **0**% of the value, per the **VALUATION** clause of the **LOSS ADJUSTMENT AND SETTLEMENT** section, of the property insured (including foundations) at the "location" where the direct physical loss or damage occurred or **$2,500,000 COMBINED WITH TIME ELEMENT**.

**(2)** Time Element - The greater of **0**% of the full 12 months **TIME ELEMENT** values that would have been earned in the 12 month period following the "occurrence" by use of the facilities at the "location" where the direct physical loss or damage occurred and all other "locations" where **TIME ELEMENT** loss ensues or **$2,500,000 COMBINED WITH PROPERTY DAMAGE**.

**(3)** The above deductibles are subject to a minimum deductible of **$NOT APPLICABLE** per "location", combined all coverages.

**b. Flood**

**$1,000,000** combined all coverages, except:

As respects "locations" within FEMA Special Flood Hazard Area (SFHA) A or V, the following deductibles apply to "flood" losses and will apply separately at each "location" irrespective of any other deductibles applying:

**(1)** Property Damage - The greater of **0**% of the value, per the **VALUATION** clause of the **LOSS ADJUSTMENT AND SETTLEMENT** section, of the property insured (including foundations) at the "location" where the direct physical loss or damage occurred or **$2,500,000 COMBINED WITH TIME ELEMENT**.

**(2)** Time Element - The greater of **0**% of the full 12 months **TIME ELEMENT** values that would have been earned in the 12 month period following the "occurrence" by use of the facilities at the "location" where the direct physical loss or damage occurred and all other "locations" where **TIME ELEMENT** loss ensues or **$2,500,000 COMBINED WITH PROPERTY DAMAGE**.

**(3)** The above deductibles are subject to a minimum deductible of **$NOT APPLICABLE** per "location", combined all coverages.

**MS 5205 05 08**                                                                                                        **Page 6**

INSURED COPY



As respects "locations" within FEMA Special Flood Hazard Area (SFHA) B or X (Shaded), a **$1,000,000** deductible applies to "flood" losses and will apply separately at each "location" irrespective of any other deductibles applying.

**c.  Named Windstorm**

**$5,000,000** combined all coverages, except:

As respects "locations" in defined "named windstorm zone", the following deductibles apply to "named windstorm" losses and will apply separately at each "location" irrespective of any other deductibles applying:

**(1)** Property Damage - The greater of **0%** of the value, per the **VALUATION** clause of the **LOSS ADJUSTMENT AND SETTLEMENT** section, of the property insured (including foundations) at the "location" where the direct physical loss or damage occurred or **$0**.

**(2)** Time Element - The greater of **0%** of the full 12 months **TIME ELEMENT** values that would have been earned in the 12 month period following the "occurrence" by use of the facilities at the "location" where the direct physical loss or damage occurred and all other "locations" where **TIME ELEMENT** loss ensues or **$0**.

**(3)** The above deductibles are subject to a minimum deductible of **$0** per "location", combined all coverages.

**d.  Dependent Time Element Location**

**$1,000,000** per "location", at each "dependent time element location" where the physical damage occurs regardless of any other deductibles that may also apply.  However, when the loss results from "earth movement", "flood" and/or "named windstorm", such loss shall be subject to the following deductibles:

**$SEE EARTH MOVEMENT DEDUCTIBLE** "earth movement" at each "dependent time element location" where the physical damage occurs.

**$ SEE FLOOD DEDUCTIBLE** "flood" at each "dependent time element location" where the physical damage occurs.

**$SEE NAMED WINDSTORM DEDUCTIBLE** "named windstorm" at each "dependent time element location" where the physical damage occurs.

INSURED COPY

 **MSIG**

**PROPERTY DAMAGE - SECTION B**

1. **PROPERTY INSURED**

    This policy insures the following property, unless otherwise excluded elsewhere in this policy, located at an insured "location" or within 1,000 feet thereof, to the extent of the interest of the Insured in such property.

    a. Real property, including new buildings (or structures), alterations, repairs and additions under construction at an insured "location", in which the Insured has an insurable interest.

    b. Personal property:

    (1) Owned by the Insured, including the Insured's interest as a tenant in improvements and betterments.  In the event of direct physical loss or damage, the Company agrees to accept and consider the Insured as sole and unconditional owner of improvements and betterment, notwithstanding any contract or lease to the contrary.

    (2) Of officers and employees of the Insured.

    (3)  Of others in the Insured's custody to the extent the Insured is obligated to keep insured for direct physical loss or damage insured by this policy.

    (4) Of others in the Insured's custody to the extent of the Insured's legal liability for direct physical loss or damage to personal property.  The Company will defend that portion of any suit against the Insured that alleges such liability and seeks damages for such insured direct physical loss or damage.  The Company may, without prejudice, investigate, negotiate and settle any claim or suit, as the Company deems expedient.

    This policy also insures the interest of contractors and subcontractors in insured property during construction at an insured "location" or within 1,000 feet thereof, to the extent of the Insured's legal liability for insured direct physical loss or damage to such property.  Such interest of contractors and subcontractors is limited to the property for which they have been hired to perform work and such interest will not extend to any **TIME ELEMENT COVERAGE** provided under this policy.

2. **PROPERTY EXCLUDED**

    This policy excludes:

    a. Accounts, bills, coins, currency, food stamps, money, notes, securities, evidences of debt or title; precious metal in bullion form; jewelry, precious and semi-precious stones or gems; furs or garments trimmed with fur.

    b. Land, water or any other substance in or on land; except this exclusion does not apply to:

    (1) Land improvements consisting of landscape gardening, roadways and pavements, but not including any fill or land beneath such property; or

    (2) Water that is contained within any enclosed tank, piping system or any other processing equipment.

    c. Animals, standing timber, growing crops.

**MS 5205 05 08**                                                      **Page 8**

7-Eleven_0000025



**Policy Number – FIR 1122580**

**d.**  Watercraft or aircraft, except when unfueled and manufactured by the Insured.

**e.**  Vehicles licensed and designated for highway use, locomotives, rolling stock or other similar conveyances, when outside of an insured "location".

**f.**  Underground mines, mine shafts, caverns or any property within such mine, mine shaft or cavern.

**g.**  Bridges, tunnels, dams, dikes, and air supported structures including any property contained in air supported structures.

**h.**  Property in transit, except as otherwise provided by this policy.

**i.**  Property sold by the Insured under conditional sale, trust agreement, installment plan or other deferred payment plan after delivery to customers, except as provided by the **DEFERRED PAYMENTS** coverage of this policy.

**j.**  Electronic data, programs and software, except when they are raw materials, stock in process or finished goods manufactured by the Insured, or supplies or merchandise not manufactured by the Insured or as otherwise provided by the **DATA, PROGRAMS OR SOFTWARE** coverage of this policy.

**k.**  Contractors' and subcontractors' machinery, tools and equipment used in the erection or repair of insured property, unless the total capital value of such machinery, tools and equipment is specifically charged to that erection or repair.

**l.**  Transmission and distribution lines, including wires, cables, poles, pylons, standards, towers or other supporting structures, which may be attendant to the transmission or distribution of electrical power, telephone or telegraph signals, and all other communications signals, whether voice/data or visual.  However, this exclusion does not apply when 1) such property is situated on or within 1000 feet of an insured Location(s) or 2) loss or damage is insured under the Service Interruption/Off-Premises clause in the policy.

**m.**  Satellites, spacecraft and off-shore property.

## 3.  ADDITIONAL COVERAGES

This policy includes the following Additional Coverages for direct physical loss or damage insured by this policy.

These Additional Coverages are subject to the applicable limit of liability, will not increase the policy limit of liability, and are subject to the policy provisions, including applicable exclusions and deductibles, all as shown in this section and elsewhere in this policy.

### a.  ACCOUNTS RECEIVABLE

This policy insures any shortage in the collection of accounts receivable, resulting from insured direct physical loss or damage to accounts receivable records, including accounts receivable records stored as electronic data, while anywhere within this policy's **TERRITORY**, including while in transit.  The Company will be liable for the interest charges on any loan to offset impaired collections pending repayment of such sum uncollectible as the result of such loss or damage. Unearned interest and service charges on deferred payment accounts and normal credit losses on bad debts will be deducted in determining the recovery.

**MS 5205 05 08**                                                                                 **Page 9**

INSURED COPY



**(1)** In the event of loss to accounts receivable records, the Insured will use all reasonable efforts, including legal action, if necessary, to effect collection of outstanding accounts receivable.

**(2)** The Insured agrees to use any suitable property or service:

    **(a)** Owned or controlled by the Insured; or

    **(b)** Obtainable from other sources,

in reducing the loss under this Additional Coverage.

**(3)** This policy insures any other necessary and reasonable costs incurred to reduce the loss, to the extent the losses are reduced.

**(4)** If it is possible to reconstruct accounts receivable records so that no shortage is sustained, the Company will be liable only for the reasonable and necessary cost incurred for material and time required to reestablish or to reconstruct such records, and not for any costs insured by any other insurance.

**(5)** **ACCOUNTS RECEIVABLE** Exclusions:

The following exclusions are in addition to the **EXCLUSIONS** clause of this section.

This Additional Coverage does not cover shortage resulting from:

    **(a)** Bookkeeping, accounting or billing errors or omissions; or

    **(b) (i)** Alteration, falsification, manipulation; or

        **(ii)** Concealment, destruction or disposal,

    of accounts receivable records committed to conceal the wrongful giving, taking, obtaining or withholding of money, securities or other property; but only to the extent of such wrongful giving, taking, obtaining or withholding.

**(6)** The settlement of loss will be made within 90 days from the date of direct physical loss or damage.  All amounts recovered by the Insured on outstanding accounts receivable on the date of loss will belong and be paid to the Company up to the amount of loss paid by the Company.  All recoveries exceeding the amount paid will belong to the Insured.

**b.  AUTOMATIC COVERAGE**

This policy covers insured property at any "location" rented, leased or purchased by the Insured after the inception date of this policy.  This coverage applies from the date of rental, lease or purchase.

This Additional Coverage does not apply to property insured in whole or in part by any other insurance policy.

This coverage will apply until whichever of the following occurs first:

**(1)** The "location" is actually bound by the Company.

INSURED COPY

7-Eleven_0000027



**(2)** Agreement is reached that the "location" will not be insured under this policy.

**(3)** The Time Limit shown in the **LIMITS OF LIABILITY** clause in the **DECLARATIONS** section has been reached.  The Time Limit begins on the date of rental, lease or purchase.

**c.  BRANDS AND LABELS**

If branded or labeled property insured by this policy is physically damaged and the Company elects to take all or any part of that property, the Insured may at the Company's expense:

**(1)** Mark the property or its container as salvage; or

**(2)** Remove or obliterate the brands or labels,

if doing so will not damage the property.  In either event, the Insured must re-label such property or its containers to be in compliance with any applicable law.

**d.  CONSEQUENTIAL REDUCTION IN VALUE**

This policy insures the reduction in value of insured merchandise that is a part of pairs, sets, or components, directly resulting from direct physical loss or damage insured by this policy to other insured parts of pairs, sets or components of such merchandise.  If settlement is based on a constructive total loss, the Insured will surrender the undamaged parts of such merchandise to the Company.

**e.  CONTROL OF DAMAGED PROPERTY**

This policy gives control of physically damaged property consisting of finished goods as follows:

**(1)** The Insured will have full rights to the possession and control of damaged property in the event of insured direct physical damage to such property provided proper testing is done to show which property is physically damaged.

**(2)** The Insured using reasonable judgment will decide if the physically damaged property can be reprocessed or sold.

**(3)** Property so judged by the Insured to be unfit for reprocessing or selling will not be sold or disposed of except by the Insured, or with the Insured's consent.

**(4)** Any salvage proceeds received will go to the:

**(a)** Company at the time of loss settlement; or

**(b)** Insured if received prior to loss settlement and such proceeds will reduce the amount of loss payable accordingly.

**f.  DATA, PROGRAMS OR SOFTWARE**

This policy insures "direct physical loss or damage to electronic data, programs or software", including direct physical loss or damage caused by the malicious introduction of a machine code or instruction, while anywhere within this policy's **TERRITORY**, including while in transit.

INSURED COPY

**7-Eleven_0000028**

 **MSIG**

**(1)** With respect to "direct physical loss or damage to electronic data, programs or software" caused by the malicious introduction of machine code or instruction, this Additional Coverage will apply when the Period of Liability is in excess of the time shown as Waiting Period in the **WAITING PERIOD** provision of the **DECLARATIONS** section.

**(2)** This Additional Coverage also insures the cost of the following reasonable and necessary actions taken by the Insured:

    **(a)** Actions to temporarily protect and preserve insured electronic data, programs or software;

    **(b)** Actions taken for the temporary repair of insured "direct physical loss or damage to electronic data, programs or software" and to expedite the permanent repair or replacement of such damaged property,

provided such actions are taken due to actual insured "direct physical loss or damage to electronic data, programs or software".

**(3)** This Additional Coverage also insures the reasonable and necessary costs incurred by the Insured to temporarily protect or preserve insured electronic data, programs or software against immediately impending insured "direct physical loss or damage to electronic data, programs or software". In the event that the direct physical loss or damage does not occur, the costs insured under this item **(3)** will be subject to the deductible that would have applied if the physical loss or damage had occurred.

**(4)** Costs recoverable under this Additional Coverage are excluded from coverage elsewhere in this policy.

**(5)** This Additional Coverage excludes loss or damage to data, programs or software when they are raw stock, stock in process or finished goods manufactured by the Insured, or supplies or merchandise not manufactured by the Insured.

**(6)** **DATA, PROGRAMS OR SOFTWARE** Exclusions:

The exclusions in the **EXCLUSIONS** clause of this section do not apply to **DATA, PROGRAMS OR SOFTWARE** except for **a.(1)**, **a.(2)**, **a.(6)**, **b.(1)**, **b.(2)**, **b.(3)(a)**, **b.(4)** and **b.(5)**.

In addition as respects **DATA, PROGRAMS OR SOFTWARE** coverage, the following exclusions apply:

This policy does not insure:

    **(a)** Errors or omissions in processing, or copying; all unless direct physical damage not excluded by this policy results, in which event, only that resulting damage is insured.

    **(b)** Loss or damage to data, programs or software from errors or omissions in programming or machine instructions; all unless direct physical damage not excluded by this policy results, in which event, only that resulting damage is insured.

    **(c)** Deterioration, inherent vice, vermin or wear and tear; all unless direct physical damage not excluded by this policy results, in which event, only that resulting damage is insured.

INSURED COPY



**g.  DEBRIS REMOVAL**

This policy insures the reasonable and necessary costs incurred to remove debris from an insured "location" that remains as a direct result of physical loss or damage insured by this policy.

This Additional Coverage does not cover the costs of removal of:

**(1)**  Contaminated uninsured property; or

**(2)**  The contaminant in or on uninsured property,

whether or not the contamination results from insured direct physical loss or damage. Contamination includes, but is not limited to, the presence of pollution or hazardous material, including but not limited to asbestos.

**h.  DECONTAMINATION COSTS**

If insured property is contaminated as a direct result of physical damage insured by this policy and there is in force at the time of the loss any law or ordinance regulating contamination, including but not limited to the presence of pollution, asbestos or hazardous material, then this policy insures, as a direct result of enforcement of such law or ordinance, the increased cost of decontamination and/or removal of such contaminated insured property in a manner to satisfy such law or ordinance.  This Additional Coverage applies only to that part of insured property so contaminated as a direct result of insured physical damage.

The Company is not liable for the costs required for removing contaminated uninsured property nor the contaminant therein or thereon, whether or not the contamination results from an insured event.

**i.  DEFERRED PAYMENTS**

This policy covers insured direct physical loss or damage to personal property of the type insured by this policy, sold by the Insured under a conditional sale or trust agreement or any installment or deferred payment plan and after such property has been delivered to the buyer.  Coverage is limited to the unpaid balance for such property.

In the event of loss to property sold under deferred payment plans, the Insured will use all reasonable efforts, including legal action, if necessary, to effect collection of outstanding amounts due or to regain possession of the property.

There is no liability under this policy for loss:

**(1)**  Pertaining to products recalled including, but not limited to, the costs to recall, test or to advertise such recall by the Insured.

**(2)**  From theft or conversion by the buyer of the property after the buyer has taken possession of such property.

**(3)**  To the extent the buyer continues payments.

**(4)**  Not within the **TERRITORY** of this policy.

INSURED COPY

**7-Eleven_0000030**



**j.   DEMOLITION AND INCREASED COST OF CONSTRUCTION**

(1)   This policy insures the reasonable and necessary costs incurred, described in item **(3)** below, to satisfy the minimum requirements of the enforcement of any law or ordinance regulating the demolition, construction, repair, replacement or use of buildings or structures at an insured "location", provided:

    (a)   Such law or ordinance is in force on the date of insured direct physical loss or damage; and

    (b)   Its enforcement is a direct result of such insured direct physical loss or damage.

(2)   This Additional Coverage does not cover loss due to any law or ordinance with which the Insured was required to comply had the loss not occurred.

(3)   This Additional Coverage, as respects the property insured in item **(1)** above, insures:

    (a)   The cost to repair or rebuild the physically damaged portion of such property with materials and in a manner to satisfy such law or ordinance; and

    (b)   The cost:

        (i)   To demolish the physically undamaged portion of such insured property; and

        (ii)  To rebuild it with materials and in a manner to satisfy such law or ordinance,

        to the extent that such costs result when the demolition of the physically damaged insured property is required to satisfy such law or ordinance.

(4)   This Additional Coverage excludes any costs incurred as a direct or indirect result of enforcement of any laws or ordinances regulating any form of contamination including but not limited to the presence of pollution, asbestos or hazardous material.

(5)   The Company's maximum liability for this Additional Coverage at each insured "location" in any "occurrence" will not exceed the actual cost incurred in demolishing the physically undamaged portion of the property insured in item **(1)** above plus the lesser of:

    (a)   The reasonable and necessary actual cost incurred, excluding the cost of land, in rebuilding on another site; or

    (b)   The cost of rebuilding on the same site.

**k.   EARTH MOVEMENT**

This policy insures direct physical loss or damage caused by or resulting from "earth movement".

This Additional Coverage does not apply to loss or damage caused by or resulting from "flood"; surface waters; rising waters; waves; tide or tidal water; the release of water; the rising, overflowing or breaking of boundaries of natural or man-made bodies of water; or the spray therefrom; or sewer back-up resulting from any of the foregoing; all regardless of any other cause or event contributing concurrently or in any other sequence to the loss.

INSURED COPY

7-Eleven_0000031



This Additional Coverage does not apply to loss or damage caused by "earth movement" to insured property if the "earth movement" commenced prior to the inception date of the policy and does not exceed a seventy-two (72) hour period from the time the "earth movement" commenced.

**l.   ERRORS AND UNINTENTIONAL OMISSIONS**

If an amount for direct physical loss or damage is not payable under this policy solely due to an error or unintentional omission:

**(1)** In the description of where insured property is physically located;

**(2)** To include any "location":

  **(a)** Owned, rented or leased by the Insured on the effective date of this policy; or

  **(b)** Purchased, rented or leased by the Insured during the term of this policy; or

**(3)** That results in the denial of coverage for the direct physical loss or damage to property that would have been insured had the error or unintentional omission not occurred.

this policy insures such direct physical loss or damage, to the extent it would have provided coverage had such error or unintentional omission not been made.

It is a condition of this Additional Coverage that any error or unintentional omission be reported by the Insured to the Company when discovered and corrected.

**m.  EXPEDITING COSTS**

This policy insures the reasonable and necessary costs incurred to pay for the temporary repair of insured damage to insured property and to expedite the permanent repair or replacement of such damaged property.

This Additional Coverage does not cover costs:

**(1)** Recoverable elsewhere in this policy; or

**(2)** Of permanent repair or replacement of damaged property.

**n.  FINE ARTS**

This policy covers insured direct physical loss or damage to "fine arts" articles while anywhere within this policy's **TERRITORY**, including while in transit.

**(1)** This Additional Coverage excludes loss or damage if the "fine arts" cannot be replaced with other of like kind and quality, unless it is specifically declared to the Company.

**(2) FINE ARTS** Exclusion:

  The exclusions in the **EXCLUSIONS** clause of this section do not apply to **FINE ARTS** coverage except for **a.(1)**, **a.(2)**, **a.(6)**, **a.(7)**, **b.(1)**, **b.(2)**, **b.(3)(a)**, **b.(4)**, **b.(5)** and **d.(5)**.

INSURED COPY

 **MSIG**

In addition, as respects **FINE ARTS**, the following exclusions apply:

This policy does not cover:

**(a)** Deterioration, wear and tear or inherent vice.

**(b)** Loss or damage from any repairing, restoration or retouching process.

**o. FLOOD**

This policy insures direct physical loss or damage caused by or resulting from "flood".

This Additional Coverage does not apply to loss or damage caused by "flood" to insured property if the "flood" commenced prior to the inception date of the policy and does not exceed a seventy-two (72) hour period from time the "flood" commenced.

**p. LAND AND WATER CONTAMINANT OR POLLUTANT CLEANUP, REMOVAL AND DISPOSAL**

This policy insures the reasonable and necessary cost for the cleanup, removal and disposal of contaminants or "pollutants" from uninsured property consisting of land, water or any other substance in or on land at the insured "location" if the release, "discharge" or dispersal of contaminants or "pollutants" is a direct result of insured physical loss or damage to insured property.

This policy does not cover the cost to cleanup, remove and dispose of contaminants or "pollutants" from such property:

**(1)** At any "location" insured for personal property only.

**(2)** At any property insured under **AUTOMATIC COVERAGE, ERRORS AND OMISSIONS** or "miscellaneous unnamed location" coverage provided by this policy.

**(3)** When the Insured fails to give written notice of loss to the Company within 180 days after inception of the loss.

**q. PROFESSIONAL FEES**

This policy insures the actual costs, incurred by the Insured, of reasonable fees payable to the Insured's accountants, architects, auditors, engineers, or other professionals and the cost of using the Insured's employees, for producing and certifying any particulars or details contained in the Insured's books or documents, or such other proofs, information or evidence required by the Company resulting from insured loss payable under this policy for which the Company has accepted liability.

**(1)** This Additional Coverage will not include the fees and costs of attorneys, public adjusters, and loss appraisers, all including any of their subsidiary, related or associated entities either partially or wholly owned by them or retained by them for the purpose of assisting them, nor the fees and costs of loss consultants who provide consultation on coverage or negotiate claims.

**(2)** This Additional Coverage is subject to the deductible that applies to the insured loss.

INSURED COPY



**Policy Number – FIR 1122580**

**r. PROTECTION AND PRESERVATION OF PROPERTY**

This policy insures:

**(1)** Reasonable and necessary costs incurred for actions to temporarily protect or preserve insured property provided such actions are necessary due to actual, or to prevent immediately impending, insured direct physical loss or damage to such insured property. The expenses incurred will be equally shared with the Insured. The Company's share of such expenses is in addition to any other amount collectible under this policy.

**(2)** Reasonable and necessary:

    **(a)** Fire department fire fighting charges imposed as a result of responding to a fire in, on or exposing the insured property.

    **(b)** Costs incurred for restoring and recharging fire protection systems following an insured loss.

    **(c)** Costs incurred for the water used for fighting a fire in, on or exposing the insured property.

This Additional Coverage is subject to the deductible provisions that would have applied had the direct physical loss or damage occurred.

**s. SERVICE INTERRUPTION PROPERTY DAMAGE**

**(1)** This policy covers insured direct physical loss or damage to insured property at an insured "location" when such direct physical loss or damage results from the interruption of incoming services consisting of electricity, gas, fuel, steam, water, refrigeration or from the lack of outgoing sewerage service by reason of any insured direct physical loss or damage to the facilities of the supplier of such service located within this policy's **TERRITORY**, that immediately prevents in whole or in part the delivery of such usable service.

**(2)** This Additional Coverage will apply when the Period of Service Interruption is in excess of the time shown as the Waiting Period for **SERVICE INTERRUPTION** coverage in the **WAITING PERIOD** provision of the **DECLARATIONS** section.

**(3)** The exclusions in the **EXCLUSIONS** clause of this section do not apply to **SERVICE INTERRUPTION PROPERTY DAMAGE** coverage except for:

    **(a)** **a.(1)**, **a.(2)**, **a.(3)**, **a.(6)**, **b.(1)**, **b.(2)**, **d.(3)**; and

    **(b)** **b.(4)** with respect to incoming or outgoing voice, data, or video.

In addition, as respects **SERVICE INTERRUPTION PROPERTY DAMAGE** coverage the following exclusion applies:

This policy excludes loss or damage directly or indirectly caused by or resulting from "earth movement" for property located in "high hazard zones for earth movement" regardless of any other cause or event, whether or not insured under this policy, contributing concurrently or in any other sequence to the loss.

**(4)** Additional General Provisions:

MS 5205 05 08                                                             Page 17

INSURED COPY

 **MSIG**

**(a)** The Insured will immediately notify the suppliers of services of any interruption of such services.

**(b)** The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has for the supply of such specified services.

**(5)** As used in this **SERVICE INTERRUPTION PROPERTY DAMAGE** coverage:

The Period of Service Interruption is the period starting with the time when an interruption of specified services occurs; and ending when with due diligence and dispatch the service could be wholly restored.

**t.   TAX TREATMENT OF PROFITS**

This policy is extended to cover the increased tax liability from an insured loss at an insured "location" if the tax treatment of:

**(1)** The profit portion of a loss payment under this policy involving finished stock manufactured by the Insured; and/or

**(2)** The profit portion of a **TIME ELEMENT** loss payment under this policy;

is greater than the tax treatment of profits that would have been incurred had no loss occurred.

**u.   TEMPORARY REMOVAL OF PROPERTY**

**(1)** When insured property is removed from an insured "location" for the purpose of being repaired or serviced or in order to avoid threatened direct physical loss or damage of the type insured by this policy, this policy insures such property:

**(a)** While at the "location" to which such property has been moved; and

**(b)** For direct physical loss or damage as provided at the insured "location" from which such property was removed.

**(2)** This Additional Coverage does not apply to property:

**(a)** Insured, in whole or in part, elsewhere in this policy.

**(b)** Insured, in whole or in part, by any other insurance policy.

**(c)** Removed for normal storage, processing or preparation for sale or delivery.

**v.   TRANSPORTATION**

**(1)** This policy insures the following personal property, except as excluded by this policy, while in transit within the **TERRITORY** of this policy:

**(a)** Owned by the Insured.

INSURED COPY

 **MSIG**

**Policy Number – <span style="color:red">FIR 1122580</span>**

**(b)** Shipped to customers under F.O.B., C & F or similar terms.  The Insured's contingent interest in such shipments is admitted.

**(c)** Of others in the actual or constructive custody of the Insured to the extent of the Insured's interest or legal liability.

**(d)** Of others sold by the Insured, that the Insured has agreed prior to the loss to insure during course of delivery.

**(2)** This Additional Coverage excludes:

**(a)** Samples in the custody of salespeople or selling agents.

**(b)** Property insured under import or export ocean marine insurance.

**(c)** Waterborne shipments, unless:

**(i)** By inland water; or

**(ii)** By coastal shipments.

**(d)** Airborne shipments unless by regularly scheduled passenger airlines or air freight carriers.

**(e)** Property of others, including the Insured's legal liability for it, hauled on vehicles owned, leased or operated by the Insured when acting as a common or contract carrier.

**(f)** Any transporting vehicle.

**(3)** Coverage Attachment and Duration:

**(a)** This Additional Coverage insures from the time the property leaves the original point of shipment for transit.  It then insures continuously in the due course of transit:

**(i)** Anywhere in and in transit within and between the continental United States of America and Canada, excluding intercoastal shipments to or from Alaska; and

**(ii)** Anywhere in and in transit within:

- The state of Hawaii;

- Puerto Rico; and

- Territories or possessions of the United States of America.

**(b)** However, coverage on export shipments not insured under ocean cargo policies ends when the property is loaded on board overseas vessels or aircraft.  Coverage on import shipments not insured under ocean cargo policies begins after discharge from overseas vessels or aircraft.

**(4)** This Additional Coverage:

**(a)** Insures general average and salvage charges on shipments insured while waterborne.

**MS 5205 05 08**

**Page 19**

INSURED COPY



**Policy Number – FIR 1122580**

    (b)  Insures direct physical loss or damage caused by or resulting from:

        (i)  Unintentional acceptance of fraudulent bills of lading, shipping or messenger receipts.

        (ii)  Improper parties having gained possession of property through fraud or deceit.

**(5)**  The exclusions in the **EXCLUSIONS** clause of this section do not apply to **TRANSPORTATION** coverage except for **a.(1)** through **a.(4)**, **b.(1)** through **b.(4)**, **c.(1)**, **c.(3)**, **c.(5)**, **c.(6)**, and **d.(1)** through **d.(5)**.

**(6)**  Additional General Provisions:

    (a)  This Additional Coverage will not inure directly or indirectly to the benefit of any carrier or bailee.

    (b)  The Insured has permission, without prejudicing this insurance, to accept:

        (i)  Ordinary bills of lading used by carriers;

        (ii)  Released bills of lading;

        (iii) Undervalued bills of lading; and

        (iv) Shipping or messenger receipts.

    (c)  The Insured may waive subrogation against railroads under side track agreements.

    Except as otherwise stated in **(b)** and **(c)** above, the Insured will not enter into any special agreement with carriers releasing them from their common law or statutory liability.

**w.  VALUABLE PAPERS AND RECORDS**

This policy covers insured direct physical loss or damage to "valuable papers and records" while anywhere within this policy's **TERRITORY**, including while in transit.

**(1)**  This Additional Coverage excludes loss or damage to:

    (a)  Property described below, if such property cannot be replaced with other of like kind and quality, unless specifically declared to the Company.

    (b)  Currency, money or securities.

    (c)  Property held as samples or for sale or for delivery after sale.

**(2)  VALUABLE PAPERS AND RECORDS** Exclusions:

The exclusions in the **EXCLUSIONS** clause of this section do not apply to **VALUABLE PAPERS AND RECORDS** coverage except for **a.(1)**, **a.(2)**, **a.(6)**, **a.(7)**, **b.(1)**, **b.(2)**, **b.(3)(a)**, **b.(4)** and **b.(5)**.

**MS 5205 05 08**        **Page 20**

 **MSIG**

Policy Number – **FIR 1122580**

In addition, as respects **VALUABLE PAPERS AND RECORDS** the following exclusions apply:

This policy does not insure:

**(a)** Errors or omissions in processing, or copying; all unless direct physical damage not excluded by this policy results, in which event, only that resulting damage is insured.

**(b)** Loss or damage to data, programs or software from errors or omissions in programming or machine instructions; all unless direct physical damage not excluded by this policy results, in which event, only that resulting damage is insured.

**(c)** Deterioration, inherent vice, vermin or wear and tear; all unless direct physical damage not excluded by this policy results, in which event, only that resulting damage is insured.

**x.   PROPERTY WHILE IN THE COURSE OF CONSTRUCTION**

When there is a sub-limit provided for Property While in the Course of Construction, that sub-limit shall only apply to property which does not pertain to alterations, revamping, refurbishment, maintenance, or extensions to existing property of the Insured. Property While in the Course of Construction does not include any existing property which is not part of the course of construction. Any loss or damage to existing property not part of the course of construction which results from a covered occurrence to Property While in the Course of Construction is not subject to the sub-limit of liability attributable to Property While in the Course of Construction.

**4.      APPLICATION OF POLICY TO DATE OR TIME RECOGNITION**

With respect to situations caused by the so-called Year 2000 problem or any other "date or time recognition" problem by "electronic data processing equipment or media", this policy applies as follows:

**a.**   This policy does not pay for remediation, change, correction, repair or assessment of any Year 2000 or any other "date or time recognition" problem in any "electronic data processing equipment or media", whether preventative or remedial, and whether before or after a loss, including temporary protection and preservation of property.  This policy does not pay for any **TIME ELEMENT** loss resulting from the foregoing remediation, change, correction, repair or assessment.

**b.**   Failure of "electronic data processing equipment or media" to correctly recognize, interpret, calculate, compare, differentiate, sequence, access or process data involving one or more dates or times, including the Year 2000, is not physical loss or damage insured against by this policy. This policy does not pay for any such incident or for any **TIME ELEMENT** loss resulting from any such incident.

Subject to all of its terms and conditions, this policy does pay for direct physical loss or damage not excluded by this policy that results from a failure of "electronic data processing equipment or media" to correctly recognize, interpret, calculate, compare, differentiate, sequence, access or process data involving one or more dates or times, including the Year 2000.  Such insured resulting direct physical loss or damage does not include any loss, cost or expense described in **a.** or **b.** above.  If such insured resulting direct physical loss or damage occurs, and if this policy provides **TIME ELEMENT**

INSURED COPY

**7-Eleven_0000038**

 **MSIG**

**COVERAGE**, then, subject to all of its terms and conditions, this policy also covers any insured **TIME ELEMENT** loss directly resulting therefrom.

5.    **EXCLUSIONS:**

The following exclusions apply unless specifically stated elsewhere in this policy:

**a.**  This policy excludes:

   **(1)**  Indirect or remote loss or damage.

   **(2)**  Delay, interruption of business, except to the extent provided by this policy.

   **(3)**  Loss of market or loss of use.

   **(4)**  Loss or damage or deterioration arising from any delay.

   **(5)**  Mysterious disappearance, loss or shortage disclosed on taking inventory, or any unexplained loss.

   **(6)**  Loss from enforcement of any law or ordinance:

      **(a)**  Regulating the construction, repair, replacement, use or removal, including debris removal, of any property; or

      **(b)**  Requiring the demolition of any property, including the cost in removing its debris;

      except as provided by the **DECONTAMINATION COSTS** and **DEMOLITION AND INCREASED COST OF CONSTRUCTION** coverages of this section of this policy.

   **(7)**  Loss caused by or resulting from the voluntary parting with title or possession of property if induced by any fraudulent act or by false pretense.

.

   **(8)**  Loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with the actual or threatened malicious use of pathogenic or poisonous biological or chemical materials regardless of any other cause or event contributing concurrently or in any sequence thereto.

**b.**  This policy excludes loss or damage directly or indirectly caused by or resulting from any of the following regardless of any other cause or event, whether or not insured under this policy, contributing concurrently or in any other sequence to the loss:

   **(1)**  Nuclear reaction or nuclear radiation or radioactive contamination.

      However:

      **(a)**  If physical damage by fire or sprinkler leakage results, then only that resulting damage is insured; but not including any loss or damage due to nuclear reaction, radiation or radioactive contamination.

INSURED COPY



**(b)** This policy does cover physical damage directly caused by sudden and accidental radioactive contamination, including resultant radiation damage, from material used or stored or from processes conducted on the insured "location", provided that on the date of loss, there is neither a nuclear reactor nor any new or used nuclear fuel on the insured "location".

**(2)** **(a)** Hostile or warlike action in time of peace or war, including action in hindering, combating or defending against an actual, impending or expected attack by any:

    **(i)** Government or sovereign power (de jure or de facto);

    **(ii)** Military, naval or air force; or

    **(iii)** Agent or authority of any party specified in **(i)** or **(ii)** above.

**(b)** Discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion or radioactive force, whether in time of peace or war and regardless of who commits the act.

**(c)** Insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such an event.

**(d)** Seizure or destruction under quarantine or custom regulation, or confiscation, expropriation or nationalization by order of any governmental or public authority.

**(e)** Risks of contraband, or illegal transportation or trade.

**(3)** Any willful, fraudulent or dishonest act, including but not limited to theft, committed alone or in collusion with others, at any time:

**(a)** By an Insured or any proprietor, partner, director, trustee, officer, or employee of an Insured; or

**(b)** By any proprietor, partner, director, trustee, or officer of any business or entity (other than a common carrier) engaged by an Insured to do anything in connection with property insured under this policy.

This policy does cover acts of direct insured physical damage intentionally caused by an employee of an Insured or any individual specified in **(b)** above, and done without the knowledge of the Insured. In no event does this policy cover loss by theft by any individual specified in **(a)** or **(b)** above.

**(4)** Lack of the following services:

**(a)** Incoming electricity, fuel, water, gas, steam, refrigerant;

**(b)** Outgoing sewerage;
**(c)** Incoming or outgoing voice, data or video,

all when caused by an "occurrence" away from the insured "location", except as provided in **SERVICE INTERRUPTION** in the **PROPERTY DAMAGE** or **TIME ELEMENT** section of this policy.  But, if the lack of such a service directly causes physical damage insured by this policy at the insured "location", then only that resulting damage is insured.

**MS 5205 05 08**                          **Page 23**

INSURED COPY



**Policy Number – FIR 1122580**

c.  This policy excludes the following, but if physical damage not excluded by this policy results, then only that resulting damage is insured:

(1)  Faulty workmanship, error, omission or deficiency in material, construction or design from any cause.

(2)  Loss or damage to stock or material attributable to manufacturing or processing operations while such stock or material is being processed, manufactured, tested, or otherwise worked on.

(3)  Deterioration, depletion, rust, corrosion or erosion, wear and tear, inherent vice or latent defect, evaporation, or loss of weight.

(4)  Settling, cracking, shrinking, bulging, or expansion of:

(a)  Foundations (including any pedestal, pad, platform or other property supporting machinery).

(b)  Floors.

(c)  Pavements.

(d)  Walls.

(e)  Ceilings.

(f)  Roofs.

(5)  (a)  Changes of temperature damage (except to machinery or equipment); or

(b)  Changes in relative humidity damage,

all whether atmospheric or not.

(6)  Disease, insect, animal or vermin damage.

(7)  Loss or damage to the interior portion of buildings under construction from rain, sleet or snow, whether or not driven by wind, when the installation of the roof, walls and windows of such buildings has not been completed.

(8)  Loss or damage from water pressure, ice or impact of watercraft to retaining walls, bulkheads, docks, piers, wharves, and structures located on or partially over water.

d.  This policy excludes the following unless directly resulting from other physical damage not excluded by this policy:

(1)  Shrinkage.

(2)  Changes in color, flavor, texture or finish.

(3)  Property damage or time element arising out of "discharge" of "pollutants" into or upon buildings or other man-made structures, or liability, loss, cost or expense of any Insured or

**MS 5205 05 08**                                                                                      **Page 24**

INSURED COPY



others arising out of any direction or request, whether governmental or otherwise, that any Insured or other test for, monitor, clean-up, remove, contain, treat, detoxify or neutralize "pollutants".

This exclusion applies whether or not such "discharge" of such "pollutants":

**(a)** Results from the Insured's activities or the activities of any person or entity;

**(b)** Is sudden, gradual, accidental, unexpected or unintended; or

**(c)** Arises out of or relates to industrial operations or the waste or by-products thereof, all unless such damage directly results from or causes other physical damage not otherwise excluded by this policy.

**(4)** Accumulated effects of smog, smoke vapor, liquid or dust.

**(5)** Presence, growth, proliferation, spread or any activity of "fungi", wet or dry rot, or bacteria.

INSURED COPY

**7-Eleven_0000042**

 **M S I G**

### TIME ELEMENT - SECTION C

1. **TIME ELEMENT** loss as provided in the **TIME ELEMENT COVERAGES and TIME ELEMENT COVERAGE EXTENSIONS** of this policy**:**

   a. Is subject to the applicable limit of liability that applies to the insured physical loss or damage but in no event for more than any limit of liability that is stated as applying to the specific **TIME ELEMENT COVERAGE and/or TIME ELEMENT COVERAGE EXTENTION; and**

   b. Will not increase the policy limit of liability; and

   c. Is subject to the policy provisions, including applicable exclusion and deductibles, all as shown in this section and elsewhere in this policy.

2. **LOSS INSURED**

   a. This policy insures **TIME ELEMENT** loss, as provided in the **TIME ELEMENT COVERAGES**, directly resulting from physical loss or damage of the type insured by this policy:

      (1) To property described elsewhere in this policy and not otherwise excluded by this policy or otherwise limited in the **TIME ELEMENT COVERAGES** below;

      (2) Used by the Insured, or for which the Insured has contracted use;

      (3) Located at an insured "location"; or

      (4) While in transit, as provided by this policy, and

      (5) During the Periods of Liability described in this section.

   b. This policy insures **TIME ELEMENT** loss only to the extent it cannot be reduced through:

      (1) The use of any property or service owned or controlled by the Insured;

      (2) The use of any property or service obtainable from other sources;

      (3) Working extra time or overtime; or

      (4) The use of inventory,

      all whether at an insured "location" or at any other "location". The Company reserves the right to take into consideration the combined operating results of all associated, affiliated or subsidiary companies of the Insured in determining the **TIME ELEMENT** loss.

   c. This policy insures expenses reasonably and necessarily incurred by the Insured to reduce the loss otherwise payable under this section of this policy. The amount of such recoverable expenses will not exceed the amount by which the loss has been reduced.

   d. Except as respects **LEASEHOLD INTEREST**, in determining the amount of loss payable, the Company will consider the experience of the business before and after and the probable experience during the **PERIOD OF LIABILITY**.

INSURED COPY

7-Eleven_0000043

 **MSIG**

3.  **TIME ELEMENT COVERAGES**

a.  **GROSS EARNINGS**

As respects all insured "locations":

(1) Measurement of Loss:

(a) The recoverable **GROSS EARNINGS** loss is the actual loss sustained by the Insured of the following during the **PERIOD OF LIABILITY**:

(i) Gross Earnings;

(ii) Less all charges and expenses that do not necessarily continue during the interruption of production or suspension of business operations or services;

(iii) Plus all other earnings derived from the operation of the business.

(b) In determining the indemnity payable as the actual loss sustained, the Company will consider the continuation of only those normal charges and expenses that would have been earned had no interruption of production or suspension of business operations or services occurred.

(c) There is recovery hereunder but only to the extent that the Insured is:

(i) Wholly or partially prevented from producing goods or continuing business operations or services;

(ii) Unable to make up lost production within a reasonable period of time, not limited to the period during which production is interrupted;

(iii) Unable to continue such operations or services during the **PERIOD OF LIABILITY**; and

(iv) Able to demonstrate a loss of sales for the operations, services or production prevented.

(2) Gross Earnings, as used in item **(1)(a)(i)** above is:

(a) For manufacturing operations: the net sales value of production less the cost of all raw stock, materials and supplies used in such production; or

(b) For mercantile or non-manufacturing operations: the total net sales less cost of merchandise sold, materials and supplies consumed in the operations or services rendered by the Insured.

Any amount recovered under property damage coverage at selling price for loss or damage to merchandise will be considered to have been sold to the Insured's regular customers and will be credited against net sales.

b.  **EXTRA EXPENSE**

(1) Measurement of Loss:

INSURED COPY

**7-Eleven_0000044**



The recoverable **EXTRA EXPENSE** loss will be the reasonable and necessary extra costs incurred by the Insured of the following during the **PERIOD OF LIABILITY**:

**(a)** Extra expenses to temporarily continue as nearly "normal" as practicable the conduct of the Insured's business; and

**(b)** Extra costs of temporarily using property or facilities of the Insured or others,

less any value remaining at the end of the **PERIOD OF LIABILITY** for property obtained in connection with the above.

**(2) EXTRA EXPENSE** Exclusions:  As respects **EXTRA EXPENSE**, the following are also excluded:

**(a)** Any loss of income.

**(b)** Costs that normally would have been incurred in conducting the business during the same period had no physical loss or damage occurred.

**(c)** Cost of permanent repair or replacement of property that has been damaged or destroyed.

**(d)** Any expense recoverable elsewhere in this policy.

**c.  LEASEHOLD INTEREST**

**(1)** Measurement of Loss:

The recoverable **LEASEHOLD INTEREST** incurred by the Insured of the following:

**(a)** If the lease agreement requires continuation of rent; and if the property is wholly untenantable or unusable, the actual rent payable for the unexpired term of the lease; or if the property is partially untenantable or unusable, the proportion of the rent payable for the unexpired term of the lease.

**(b)** If the lease is canceled by the lessor pursuant to the lease agreement or by the operation of law; the "lease interest" for the first three months following the loss; and the "net lease interest" for the remaining unexpired term of the lease.

**(2) LEASEHOLD INTEREST** Exclusions:

As respects **LEASEHOLD INTEREST**, **TIME ELEMENT EXCLUSIONS a.**, **b.**, and **c.** do not apply and are replaced by the following:

This policy does not insure any increase in loss resulting from the suspension, lapse or cancellation of any license, or from the Insured exercising an option to cancel the lease; or from any act or omission of the Insured that constitutes a default under the lease.

In addition, there is no coverage for the Insured's loss of **LEASEHOLD INTEREST** directly resulting from physical loss or damage to personal property.

INSURED COPY



**d. RENTAL INSURANCE**

**(1)** Measurement of Loss:

The recoverable **RENTAL INSURANCE** loss is the actual loss sustained by the Insured of the following during the **PERIOD OF LIABILITY**:

**(a)** The fair rental value of any portion of the property occupied by the Insured;

**(b)** The income reasonably expected from rentals of unoccupied or unrented portions of such property; and

**(c)** The rental income from the rented portions of such property according to bona fide leases, contracts or agreements in force at the time of loss,

all not to include non-continuing charges and expenses.

**(2)** **RENTAL INSURANCE** Exclusions:

As respects **RENTAL INSURANCE**, **TIME ELEMENT EXCLUSION a.** does not apply and is replaced by the following:

This policy does not insure any loss of rental income during any period in which the insured property would not have been tenantable for any reason other than an insured loss.

**e. COMMISSIONS, PROFITS AND ROYALTIES**

**(1)** Measurement of Loss:

**(a)** The recoverable **COMMISSIONS, PROFITS AND ROYALTIES** loss is the actual loss sustained by the Insured of the following during the **PERIOD OF LIABILITY**:

**(i)** "Commissions", "profits" and "royalties";

**(ii)** Less non-continuing expenses and charges during the **PERIOD OF LIABILITY**.

**(b)** The "commissions", "profits" and "royalties" payable hereunder will be the actual loss sustained of income to the Insured during the **PERIOD OF LIABILITY** under any royalty, licensing fee or commission agreement between the Insured and another party which is not realizable due to direct physical loss or damage insured by this policy to property of the other party of the type insured by this policy located within the policy's **TERRITORY**.

**(c)** The Insured will influence, to the extent possible, said party(ies) with whom the agreements described above have been made to use any other machinery, supplies or "locations" in order to resume business so as to reduce the amount of loss hereunder, and the Insured will cooperate with that party in every way to effect this. This policy does not cover any cost to effect the above unless authorized in advance by the Company.

**(d)** In determining the indemnity payable hereunder, the Company will consider the amount of income derived from such agreements before and the probable amount of income after the date of loss or damage.

INSURED COPY

**7-Eleven_0000046**



**(e)** There is recovery hereunder but only if such loss or damage interrupts the delivery of goods in whole or in part to the Insured or for their account.

**(2) COMMISSIONS, PROFITS AND ROYALTIES** Exclusions:

As respects **COMMISSIONS, PROFITS AND ROYALTIES, TIME ELEMENT EXCLUSION c.** does not apply.

**4. TIME ELEMENT COVERAGE EXTENSIONS**

This policy also insures **TIME ELEMENT** loss, as provided by the **TIME ELEMENT COVERAGES** of this policy, for the **TIME ELEMENT COVERAGE EXTENSIONS** described below.

**a. CIVIL AUTHORITY**

This policy insures the actual loss sustained and **EXTRA EXPENSE** incurred by the Insured during the **PERIOD OF LIABILITY** if an order of civil authority prohibits access to the insured "location" provided such order is the direct result of physical damage of the type insured under this policy at the insured "location" or within 1,000 feet of it.

The **PERIOD OF LIABILITY** for this **TIME ELEMENT COVERAGE EXTENSION** will be:

The period of time:

**(1)** Starting at the time of such physical damage; but

**(2)** Not to exceed the Time Limit shown in Section A – Declarations for **CIVIL AUTHORITY**,

this period of time is part of and not in addition to any **PERIOD OF LIABILITY** applying to any coverage provided in the **TIME ELEMENT** section.

However this extension does not apply to **LEASEHOLD INTERESTS**.

**b. DEPENDENT TIME ELEMENT**

This policy insures the actual loss sustained and **EXTRA EXPENSE** incurred by the Insured during the **PERIOD OF LIABILITY** directly resulting from physical loss or damage of the type insured to property of the type insured at "dependent time element locations" located within the **TERRITORY** of this policy.

**(1)** As respects **DEPENDENT TIME ELEMENT**:

**(a)** The Insured will influence and cooperate with the "dependent time element locations" in every way and take any reasonable and necessary action, including the use of other machinery, supplies or locations, to effect mitigation of the loss payable hereunder.

**(b)** In determining the indemnity payable hereunder, the Company will consider the amount of income derived before the date of physical loss or damage and the probable amount of income after the date of loss or damage.

**(c) TIME ELEMENT EXCLUSION c.** does not apply.

INSURED COPY

7-Eleven_0000047

 **MSIG**

**(2)  DEPENDENT TIME ELEMENT** Exclusions:

As respects **DEPENDENT TIME ELEMENT**, the following exclusions apply:

This policy does not insure loss resulting from:

**(a)**  Lack of incoming or outgoing transmission of voice, data or video.

**(b)**  "Earth movement" for locations of a direct or indirect customer, supplier, contract manufacturer or contract service provider that is located in "high hazard zones for earth movement".

**(c)**  "Flood" as respects "dependent time element locations" not listed on a schedule on file with the Company.

**(d)**  "Named windstorm" as respects "dependent time element locations" not listed on a schedule on file with the Company.

**c.  EXTENDED PERIOD OF LIABILITY**

The **GROSS EARNINGS** coverage is extended to cover the reduction in sales resulting from:

**(1)**  The interruption of business as covered by **GROSS EARNINGS**;

**(2)**  For such additional length of time as would be required with the exercise of due diligence and dispatch to restore the Insured's business to the condition that would have existed had no loss occurred; and

**(3)**  Commencing with the date on which the liability of the Company for loss resulting from interruption of business would terminate if this extension had not been included herein.

**EXTENDED PERIOD OF LIABILITY** Exclusions:

As respects **EXTENDED PERIOD OF LIABILITY**, the **TIME ELEMENT EXCLUSION b.** of this coverage section does not apply and the following applies instead:

This policy does not insure any increase in loss due to fines or damages for breach of contract or for late or non-completion of orders, or penalties of any nature.

Coverage under this extension for the reduction in sales due to contract cancellation will include only those sales that would have been earned under the contract during the extended period of liability.

Coverage under this extension does not apply for more than the number of consecutive days shown in the Time Limits of the **LIMITS OF LIABILITY** clause of the **DECLARATIONS** section.

**d.  INGRESS/EGRESS**

This policy insures the actual loss sustained and **EXTRA EXPENSE** incurred by the Insured due to the necessary interruption of the Insured's business due to physical prevention of ingress to or egress from an insured "location", whether or not the premises or property of the Insured is damaged, provided that such prevention is a direct result of physical damage of the type insured

INSURED COPY

7-Eleven_0000048

 **MSIG**

by this policy, to the kind of property not excluded by this policy and occurring within 1000 feet of the insured "location".

**INGRESS/EGRESS** Exclusions:

As respects **INGRESS/EGRESS**, the following exclusions are applicable:

This policy does not insure loss resulting from:

**(1)** Lack of incoming or outgoing service consisting of electric, fuel, gas, water, steam, refrigerant, sewerage and voice, data or video.

**(2)** Picketing or other action by strikers except for physical damage not excluded by this policy.

This policy does not provide coverage under this extension for more than the number of consecutive days shown in the Time Limits of the **LIMITS OF LIABILITY** clause of the **DECLARATIONS** section.

**e.   ON PREMISES SERVICES**

This policy insures the actual loss sustained and **EXTRA EXPENSE** incurred by the Insured during the **PERIOD OF LIABILITY** directly resulting from direct physical loss or damage of the type insured to the following property located within 1,000 feet of the insured "location":

**(1)** Electrical equipment and equipment used for the transmission of voice, data or video.

**(2)** Electrical, fuel, gas, water, steam, refrigeration, sewerage, voice, data or video transmission lines.

**f.   PROTECTION AND PRESERVATION OF PROPERTY – TIME ELEMENT**

This policy insures the actual loss sustained by the Insured for a period of time not to exceed 48 hours prior to and 48 hours after the Insured first taking reasonable action for the temporary protection and preservation of property insured by this policy provided such action is necessary to prevent immediately impending direct physical loss or damage insured by this policy at such insured property.

This extension is subject to the deductible provisions that would have applied had the direct physical loss or damage occurred.

**g.   RELATED REPORTED VALUES**

If reported **TIME ELEMENT** values include:

**(1)** "locations" used by the Insured (such as branch stores, sales outlets and other plants) but not listed on a schedule under this policy; and

**(2)** A **TIME ELEMENT** loss would result at such "locations",

**(3)** From insured direct physical loss or damage at an insured "location",

then this policy provides coverage for such resulting **TIME ELEMENT** loss in accordance with the coverage applicable at such insured "location".

**MS 5205 05 08**                                                                                           **Page 32**

INSURED COPY

7-Eleven_0000049

 **MSIG**

**h. RESEARCH AND DEVELOPMENT**

The **GROSS EARNINGS** coverage is extended to insure the actual loss sustained by the Insured of continuing fixed charges and ordinary payroll directly attributable to the interruption of research and development activities, that in themselves would not have produced income during the **PERIOD OF LIABILITY**.

The **PERIOD OF LIABILITY** for this **TIME ELEMENT COVERAGE EXTENSION** will be the period from the time of direct physical loss or damage of the type insured by this policy to the time when the property could be repaired or replaced and made ready for operations, but not to be limited by the date of expiration of this policy.

**i. SERVICE INTERRUPTION TIME ELEMENT**

(1) This policy insures the actual loss sustained and **EXTRA EXPENSE** incurred by the Insured during the Period of Service Interruption at insured "locations" when the loss is caused by the interruption of incoming services consisting of electricity, gas, fuel, steam, water, refrigeration or from the lack of outgoing sewerage service by reason of any accidental event at the facilities of the supplier of such service located within this policy's **TERRITORY**, that immediately prevents in whole or in part the delivery of such usable services.

(2) This Extension will apply when the Period of Service Interruption is in excess of the time shown as the Waiting Period for **SERVICE INTERRUPTION** coverage in the **WAITING PERIOD** provision of the **DECLARATIONS** section.

(3) The exclusions in the **EXCLUSIONS** clause of the **PROPERTY DAMAGE** section do not apply to **SERVICE INTERRUPTION TIME ELEMENT** coverage except for:

(a) **a.(1)**, **a.(2)**, **a.(3)**, **a.(6)**, **b.(1)**, **b.(2)**, **d.(3)**; and
(b) **b.(4)** with respect to incoming or outgoing voice, data or video.

In addition, as respects **SERVICE INTERRUPTION TIME ELEMENT** coverage, the following exclusion applies:

This policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this policy, contributing concurrently or in any other sequence to the loss:

(a) "Earth movement" for property located in "high hazard zones for earth movement".

(b) "Flood" for property located at "miscellaneous unnamed locations" and located within FEMA Special Flood Hazard Area (SFHA) A or V.

(c) "Named windstorm" for property located at "miscellaneous unnamed locations" and located in a "named windstorm zone".

(d) The interruption of incoming or outgoing voice, data or video services as a result of an accidental event involving loss of or physical damage to a satellite.

(4) Additional General Provisions:

(a) The Insured will immediately notify the suppliers of services of any interruption of such services.

INSURED COPY

7-Eleven_0000050

 **MSIG**

**(b)** The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has for the supply of such specified services.

**(5)** As used in this **TIME ELEMENT COVERAGE EXTENSION**:

The Period of Service Interruption is:

**(a)** The period starting with the time when an interruption of specified services occurs; and ending when with due diligence and dispatch the service could be wholly restored and the "location" receiving the service could or would have resumed normal operations following the restorations of service under the same or equivalent physical and operating conditions as provided by the **PERIOD OF LIABILITY** clause in this section.

**(b)** The Period of Service Interruption is limited to only those hours during which the Insured would or could have used service(s) if it had been available.

**(c)** The Period of Service Interruption does not extend to include the interruption of operations caused by any reason other than interruption of the specified service(s).

## 5.  PERIOD OF LIABILITY

**a.**  **The PERIOD OF LIABILITY** applying to all **TIME ELEMENT COVERAGES**, except **LEASEHOLD INTEREST** and as shown below or if otherwise provided under the **TIME ELEMENT COVERAGE EXTENSIONS**, and subject to any Time Limit provided in the **LIMITS OF LIABILITY** clause in the **DECLARATIONS** section, is as follows:

**(1)** For building and equipment, the period:

**(a)** Starting from the time of direct physical loss or damage of the type insured; and

**(b)** Ending when with due diligence and dispatch the building and equipment could be:

**(i)**  Repaired or replaced; and

**(ii)**  Made ready for operations,

under the same or equivalent physical and operating conditions that existed prior to the damage.

**(c)** Not to be limited by the expiration of this policy.

**(2)** For building and equipment under construction:

**(a)** The equivalent of the above period of time will be applied to the level of business that would have been reasonably achieved after construction and startup would have been completed had no direct physical damage happened; and

**(b)** Due consideration will be given to the actual experience of the business compiled after completion of the construction and startup.

This item does not apply to **COMMISSIONS, PROFITS AND ROYALTIES**.

INSURED COPY



(3) For stock-in-process and mercantile stock, including finished goods not manufactured by the Insured, the time required with the exercise of due diligence and dispatch:

    (a) To restore stock in process to the same state of manufacture in which it stood at the inception of the interruption of production or suspension of business operations or services; and

    (b) To replace physically damaged mercantile stock.

    This item does not apply to **RENTAL INSURANCE**.

(4) For raw materials and supplies, the period of time:

    (a) Of actual interruption of production or suspension of operations or services resulting from the inability to get suitable raw materials and supplies to replace similar ones damaged; but

    (b) Limited to that period for which the damaged raw materials and supplies would have supplied operating needs.

(5) If water:

    (a) Used for any manufacturing purpose, including but not limited to as a raw material or for power;

    (b) Stored behind dams or in reservoirs; and

    (c) On any insured "location",

    is released as the result of direct physical damage of the type insured under this policy to such dam, reservoir or connected equipment, the Company's liability for the actual interruption of production or suspension of operations or services due to inadequate water supply will not extend beyond thirty (30) consecutive days after the damaged dam, reservoir or connected equipment has been repaired or replaced.

    This item does not apply to **RENTAL INSURANCE**.

(6) For physically damaged exposed films, records, manuscripts and drawings, the time required to copy from backups or from originals of a previous generation.  This time does not include research, engineering or any other time necessary to restore or recreate lost information.

    This item does not apply to **RENTAL INSURANCE**.

(7) For physically damaged or destroyed property insured under **DATA, PROGRAMS OR SOFTWARE**, the time to recreate or restore including the time for researching or engineering lost information.

    This item does not apply to **RENTAL INSURANCE**.

b. **The PERIOD OF LIABILITY** does not include any additional time due to the Insured's inability to resume operations for any reason, including but not limited to:

INSURED COPY

7-Eleven_0000052

 **MSIG**

**(1)** Making changes to equipment.

**(2)** Making changes to the buildings or structures except as provided in the **DEMOLITION AND INCREASED COST OF CONSTRUCTION** clause in the **PROPERTY DAMAGE** section.

**(3)** Re-staffing or retraining employees.

If two or more Periods of Liability apply such periods will not be cumulative.

6. **TIME ELEMENT EXCLUSIONS**

In addition to the exclusions elsewhere in this policy, the following exclusions apply to **TIME ELEMENT** loss:

This policy does not cover:

**a.** Any loss during any idle period, including but not limited to when production, operation, service or delivery or receipt of goods would cease, or would not have taken place or would have been prevented due to:

**(1)** Direct physical loss or damage not insured by this policy on or off of the insured "location".

**(2)** Planned or rescheduled shutdown.

**(3)** Strikes or other work stoppage.

**(4)** Any other reason other than direct physical loss or damage insured by this policy.

**b.** Any increase in loss due to:

**(1)** Suspension, cancellation or lapse of any lease, contract, license or orders.

**(2)** Fines or damages for breach of contract or for late or non-completion of orders.

**(3)** For penalties of any nature.

**(4)** Any other consequential or remote loss.

**c.** Any loss resulting from loss or damage to finished goods manufactured by the Insured, nor the time required for their reproduction.

7. **TIME ELEMENT INTERDEPENDENCY**

If there is a loss at an insured "location" that involves interdependency at one or more other insured "locations", the loss, including any resulting interdependency loss, will be adjusted based on the **TIME ELEMENT COVERAGE** that applies at the insured "location" where the direct physical loss or damage insured by this policy occurred.

INSURED COPY

7-Eleven_0000053



**Policy Number – FIR 1122580**

**LOSS ADJUSTMENT AND SETTLEMENT - SECTION D**

**1.  LOSS ADJUSTMENT/PAYABLE**

Loss, if any, will be adjusted with and payable to the first Named Insured, or as may be directed by the first Named Insured.  Additional insured interests will also be included in loss payment as their interests may appear when named as additional insured, lender, mortgagee and/or loss payee in the Certificates of Insurance on file with the Company.

**2.  CURRENCY FOR LOSS PAYMENT**

Losses will be adjusted and paid in the currency of the United States of America except in Canada where losses will be paid in Canadian currency, unless directed otherwise by the Insured.

**3.  VALUATION**

Adjustment of the physical loss amount under this policy will be computed as of the date of loss at the location of the loss, and for no more than the interest of the Insured, subject to the following:

**a.**  On stock in process, the value of raw materials and labor expended plus the proper proportion of overhead charges.

**b.**  On finished goods manufactured by the Insured, the regular cash selling price at the location where the loss happens, less all discounts and charges to which the finished goods would have been subject had no loss happened.

**c.**  On raw materials, supplies and other merchandise not manufactured by the Insured:

   **(1)**  If repaired or replaced, the actual expenditure incurred in repairing or replacing the damaged or destroyed property; or

   **(2)**  If not repaired or replaced, the "actual cash value".

**d.**  On exposed films, records, manuscripts and drawings, that are not "valuable papers and records", the value blank plus the cost of copying information from back-up or from originals of a previous generation.  These costs will not include research, engineering or any costs of restoring or recreating lost information.

**e.**  On property insured under **DEFERRED PAYMENTS**, the lesser of the:

   **(1)**  Total amount of unpaid installments less finance charges;

   **(2)**  "Actual cash value" of the property at the time of loss; or

   **(3)**  Cost to repair or replace with material of like size, kind and quality.

**f.**  On **FINE ARTS** articles, the lesser of:

   **(1)**  The reasonable and necessary cost to repair or restore such property to the physical condition that existed on the date of loss;

   **(2)**  Cost to replace the article; or

INSURED COPY

7-Eleven_0000054

 **MSIG**

**(3)** The value, if any, stated on a schedule on file with the Company.

In the event a "fine arts" article is part of a pair or set, and a physically damaged article cannot be replaced, or repaired or restored to the condition that existed immediately prior to the loss, the Company will be liable for the lesser of the full value of such pair or set or the amount designated on the schedule.  The Insured agrees to surrender the pair or set to the Company.

**g.** On property insured under **DATA, PROGRAMS OR SOFTWARE**:

**(1)** The cost to repair, replace or restore data, programs or software including the costs to recreate, research and engineer.

**(2)** If not repaired, replaced or restored within two years from the date of loss, the blank value of the media.

**h.** On "**VALUABLE PAPERS AND RECORDS**", the lesser of the following:

**(1)** The cost to repair or restore the item to the condition that existed immediately prior to the loss.

**(2)** The cost to replace the item.

**(3)** The amount designated for the item on the schedule on file with the Company.

**i.** On property in transit:

**(1)** Property shipped to or for the account of the Insured will be valued at actual invoice to the Insured.  Included in the value are accrued costs and charges legally due.  Charges may include the Insured's commission as selling agent.

**(2)** Property sold by the Insured and shipped to or for the purchaser's account will be valued at the Insured's selling invoice amount.  Prepaid or advanced freight costs are included.

**(3)** Property not under invoice will be valued:

**(a)** For property of the Insured, at the valuation provisions of this policy applying at the "location" from which the property is being transported; or

**(b)** For other property, at the actual cash market value at the destination point on the date of loss,

less any charges saved which would have become due and payable upon arrival at destination.

**j.** On all other property, the loss amount will not exceed the lesser of the following:

**(1)** The cost to repair.

**(2)** The cost to rebuild or replace on the same site with new materials of like size, kind and quality.

**(3)** The cost in rebuilding, repairing or replacing on the same or another site, but not to exceed the size and operating capacity that existed on the date of loss.

INSURED COPY

7-Eleven_0000055

 **MSIG**

**(4)** The selling price of real property or machinery and equipment, other than stock, offered for sale on the date of loss.

**(5)** The cost to replace un-repairable electrical or mechanical equipment, including computer equipment, with equipment that is the most functionally equivalent to that damaged or destroyed, even if such equipment has technological advantages and/or represents an improvement in function and/or forms part of a program of system enhancement.

**(6)** The increased cost of demolition, if any, resulting from loss insured by this policy, if such property is scheduled for demolition.

**(7)** The unamortized value of improvements and betterments, if such property is not repaired or replaced at the Insured's expense.

**(8)** The "actual cash value" if such property is:

    **(a)** Useless to the Insured; or

    **(b)** Not repaired, replaced or rebuilt on the same or another site within two years from the date of loss.

The Insured may elect not to repair or replace the insured real and/or personal property lost, damaged or destroyed.  Loss settlement may be elected on the lesser of repair or replacement cost basis if the proceeds of such loss settlement are expended on other capital expenditures related to the Insured's operations within two years from the date of loss.  As a condition of collecting under this item, such expenditure must be unplanned as of the date of loss and be made at an insured "location" under this policy.  This item does not extend to **DEMOLITION AND INCREASED COST OF CONSTRUCTION**.

**4. LOSS CONDITIONS**

  **a. REQUIREMENTS IN CASE OF LOSS**

    The Insured will:

    **(1)**  Give immediate written notice to the Company of any loss.

    **(2)**  Protect the property from further loss or damage.

    **(3)**  Promptly separate the damaged and undamaged property; put it in the best possible order; and furnish a complete inventory of the lost, destroyed, damaged and undamaged property showing in detail the quantities, costs, "actual cash value", replacement value and amount of loss claimed.

    **(4)**  Give a signed and sworn proof of loss to the Company within 90 days after the loss, unless that time is extended in writing by the Company.  The proof of loss must state the knowledge and belief of the Insured as to:

      **(a)** The time and origin of the loss.

      **(b)** The Insured's interest and that of all others in the property.

INSURED COPY

 **MSIG**

(c) The "actual cash value" and replacement value of each item and the amount of loss to each item; all encumbrances; and all other contracts of insurance, whether valid or not, covering any of the property.

(d) Any changes in the title, use, occupation, location, possession or exposures of the property since the effective date of this policy.

(e) By whom and for what purpose any location insured by this policy was occupied on the date of loss, and whether or not it then stood on leased ground.

(5) Include a copy of all the descriptions and schedules in all policies and, if required, provide verified plans and specifications of any buildings, fixtures, machinery or equipment destroyed or damaged.

(6) Further, the Insured will, as often as may be reasonably required:

(a) Exhibit to any person designated by the Company all that remains of any property;

(b) Submit to examination under oath by any person designated by the Company and sign the written records of examinations; and

(c) Produce for examination at the request of the Company:

(i) All books of accounts, business records, bills, invoices and other vouchers; or

(ii) Certified copies if originals are lost,

at such reasonable times and places that may be designated by the Company or its representative and permit extracts and machine copies to be made.

**b. COMPANY OPTION**

The Company has the option to take all or any part of damaged property at the agreed or appraised value.  The Company must give notice to the Insured of its intention to do so within 30 days after receipt of proof of loss.

**c. ABANDONMENT**

There may be no abandonment of any property to the Company.

**d. SUBROGATION**

The Insured is required to cooperate in any subrogation proceedings.  The Company may require from the Insured an assignment or other transfer of all rights of recovery against any party for loss to the extent of the Company's payment.

The Company will not acquire any rights of recovery that the Insured has expressly waived prior to a loss, nor will such waiver affect the Insured's rights under this policy.

Any recovery from subrogation proceedings, less costs incurred by the Company in such proceedings, will be payable to the Insured in the proportion that the amount of:

(1) Any applicable deductible; and/or

INSURED COPY

**7-Eleven_0000057**

 **MSIG**

**Policy Number – FIR 1122580**

**(2)** Any provable loss not insured under this policy,

bears to the entire provable loss amount.

**e. APPRAISAL**

If the Insured and the Company fail to agree on the amount of loss, each will, on the written demand of either, select a competent and disinterested appraiser after:

**(1)** The Insured has fully complied with all provisions of this policy, including **REQUIREMENTS IN CASE OF LOSS**; and

**(2)** The Company has received a signed and sworn proof of loss from the Insured.

Each will notify the other of the appraiser selected within 20 days of such demand.

The appraisers will first select a competent and disinterested umpire.  If the appraisers fail to agree upon an umpire within 30 days then, on the request of the Insured or the Company, the umpire will be selected by a judge of a court of record in the jurisdiction in which the appraisal is pending.  The appraisers will then appraise the amount of loss, stating separately the "actual cash value" and replacement cost value as of the date of loss and the amount of loss, for each item of direct physical loss or damage or if, for **TIME ELEMENT** loss, the amount of loss for each **TIME ELEMENT COVERAGE** of this policy.

If the appraisers fail to agree, they will submit their differences to the umpire.  An award agreed to in writing by any two will determine the amount of loss.

The Insured and the Company will each:

**(1)** Pay its chosen appraiser; and

**(2)** Bear equally the other expenses of the appraisal and umpire.

A demand for **APPRAISAL** shall not relieve the Insured of its continuing obligation to comply with the terms and conditions of this policy, including as provided under **REQUIREMENTS IN CASE OF LOSS**.

The Company will not be held to have waived any of its rights by any act relating to appraisal.

**f. SUIT AGAINST THE COMPANY**

No suit, action or proceeding for the recovery of any claim will be sustained in any court of law or equity unless:

**(1)** The Insured has fully complied with all the provisions of this policy; and

**(2)** Legal action is started within twelve months after inception of the loss.

If under the insurance laws of the jurisdiction in which the property is located, such twelve months' limitation is invalid, then any such legal action needs to be started within the shortest limit of time permitted by such laws.

INSURED COPY

7-Eleven_0000058

 **MSIG**

**Policy Number – FIR 1122580**

**5. SETTLEMENT OF CLAIMS**

The amount of loss, except for **ACCOUNTS RECEIVABLE** coverage, for which the Company may be liable will be paid within 30 days after:

**a.** Proof of loss as described in this policy is received by the Company; and

**b.** When a resolution of the amount of loss is made either by:

   **(1)** Written agreement between the Insured and the Company; or

   **(2)** The filing with the Company of an award as provided in the **APPRAISAL** clause of this section.

**6. COLLECTION FROM OTHERS**

The Company will not be liable for any loss to the extent that the Insured has collected for such loss from others.

**7. PARTIAL PAYMENT OF LOSS SETTLEMENT**

In the event of a loss occurring which has been ascertained to be insured loss or damage under this policy and determined by the Company's representatives to be in excess of the applicable policy deductible, the Company will advance mutually agreed upon partial payment(s) on the insured loss or damage, subject to the policy's provisions.  To obtain said partial payments, the Insured will submit a signed and sworn Proof of Loss as described in this policy, with adequate supporting documentation.

**8. JURISDICTION**

This policy will be governed by the laws of the state or territory of the United States of America in which the covered loss or damage occurs.  If the covered loss or damage occurs in Canada, this policy will be governed by the laws of the state of the Named Insured's mailing address as show in the Declarations section.  Any disputes arising hereunder will be exclusively subject to the jurisdiction of the state or territory governing the policy.

**9. ASSIGNMENT OF POLICY**

Assignment of any interest in or arising out of this policy shall not be binding on the Company without the prior written consent of the Company.

INSURED COPY

**7-Eleven_0000059**

 **MSIG**

**GENERAL PROVISIONS - SECTION E**

**1.   ADDITIONAL INSURABLE INTERESTS/CERTIFICATES OF INSURANCE**

Additional insured interests are automatically added to this policy as their interest may appear when named as additional insured, lender, mortgagee and/or loss payee in the Certificates of Insurance on a schedule on file with the Company.  Such interests become effective on the date shown in the Certificate of Insurance and will not amend, extend or alter the terms, conditions, provisions and limits of this policy.

**2.   CANCELLATION/NONRENEWAL**

This policy may be:

**a.**   Cancelled at any time at the request of the first Named Insured by surrendering this policy to the Company or by giving written notice to the Company stating when such cancellation will take effect; or

**b.**   Cancelled by the Company by giving the first Named Insured not less than:

   **(1)**   **60** days' written notice of cancellation; or

   **(2)**   10 days' written notice of cancellation if the Named Insured fails to remit, when due, payment of premium for this policy; or

**c.**   Non-renewed by the Company by giving the Named Insured not less than 60 days' written notice of non-renewal.

If the Company cancels or nonrenews the policy, the Company will mail or deliver notice to the Named Insured's last mailing address known to the Company.  If notice is mailed, the proof of mailing will be sufficient proof of notice.

Return of any unearned premium will be calculated on the customary short rate basis if the Named Insured cancels and on a pro-rata basis if the Company cancels this policy.  Return of any unearned premium will be made by the Company as soon as practicable.

**3.   INSPECTIONS**

The Company, at all reasonable times, will be permitted, but will not have the duty, to inspect insured property.

The Company's:

**a.**   Right to make inspections;

**b.**   Making of inspections; or

**c.**   Analysis, advice or inspection report,

will not constitute an undertaking, on behalf of or for the benefit of the Insured or others, to determine or warrant that the insured property is safe or healthful.  The Company will have no liability to the Insured or any other person because of any inspection or failure to inspect.

INSURED COPY

**7-Eleven_0000060**

 **MSIG**

4. **PROVISIONS / CONDITIONS APPLICABLE TO SPECIFIC JURISDICTIONS**

If the provisions of this policy conflict with the laws of any jurisdictions in which this policy applies, and if certain provisions are required by law to be stated in this policy, this policy will be read so as to eliminate such conflict or deemed to include such provisions for insured "locations" within such jurisdictions.

5. **MISREPRESENTATION AND FRAUD**

This entire policy will be void if, whether before or after a loss, an Insured has:

a. Willfully concealed or misrepresented any material fact or circumstance concerning this insurance, the subject thereof, any insurance claim, or the interest of an Insured.

b. Made any attempt to defraud the Company.

c. Made any false swearing.

6. **LENDERS LOSS PAYEE AND MORTGAGEE INTERESTS AND OBLIGATIONS**

a. The Company will pay for loss to specified property insured under this policy to each specified lender loss payee (hereinafter referred to as lender) as its interest may appear, and to each specified mortgagee as its interest may appear, under all present or future mortgages upon such property, in order of precedence of the mortgages.

b. The interest of the lender or mortgagee (as the case may be) in property insured under this policy will not be invalidated by:

(1) Any act or neglect of the debtor, mortgagor, or owner (as the case may be) of the property.

(2) Foreclosure, notice of sale, or similar proceedings with respect to the property.

(3) Change in the title or ownership of the property.

(4) Change to a more hazardous occupancy.

The lender or mortgagee will notify the Company of any known change in ownership, occupancy, or hazard and, within 10 days of written request by the Company, may pay the increased premium associated with such known change.  If the lender or mortgagee fails to pay the increased premium, all coverage under this policy will cease.

c. If this policy is cancelled at the request of the Named Insured or its agent, the coverage for the interest of the lender or mortgagee will terminate 10 days after the Company sends to the lender or mortgagee written notice of cancellation, unless:

(1) Sooner terminated by authorization, consent, approval, acceptance, or ratification of the Named Insured's action by the lender or mortgagee, or its agent.

(2) This policy is replaced by the Named Insured, with a policy providing coverage for the interest of the lender or mortgagee, in which event coverage under this policy with respect to such interest will terminate as of the effective date of the replacement policy, notwithstanding any other provision of this policy.

INSURED COPY

7-Eleven_0000061



d.  The Company may cancel this policy and/or the interest of the lender or mortgagee under this policy, by giving the lender or mortgagee written notice 60 days prior to the effective date of cancellation, if cancellation is for any reason other than non-payment.  If the debtor, mortgagor, or owner has failed to pay any premium due under this policy, the Company may cancel this policy for such non-payment, but will give the lender or mortgagee written notice 10 days prior to the effective date of cancellation.  If the lender or mortgagee fails to pay the premium due by the specified cancellation date, all coverage under this policy will cease.

e.  If the Company pays the lender or mortgagee for any loss, and denies payment to the debtor, mortgagor or owner, the Company will, to the extent of the payment made to the lender or mortgagee be subrogated to the rights of the lender or mortgagee under all securities held as collateral to the debt or mortgage. No subrogation will impair the right of the lender or mortgagee to sue or recover the full amount of its claim. At its option, the Company may pay to the lender or mortgagee the whole principal due on the debt or mortgage plus any accrued interest.  In this event, all rights and securities will be assigned and transferred from the lender or mortgagee to the Company, and the remaining debt or mortgage will be paid to the Company.

f.  If the Insured fails to render proof of loss, the lender or mortgagee, upon notice of the Insured's failure to do so, will render proof of loss within 60 days of notice and will be subject to the provisions of this policy relating to **APPRAISAL, SETTLEMENT OF CLAIMS**, and **SUIT AGAINST THE COMPANY**.

g.  Other provisions relating to the interests and obligations of the lender or mortgagee may be added to this policy by agreement in writing.

## 7.  LIBERALIZATION

If during the period that insurance is in force under this policy, any filed rules or regulations affecting the same are revised by statute so as to broaden the insurance without additional premium charge, such extended or broadened insurance will inure to the benefit of the Insured within such jurisdiction, effective the date of the change specified in such statute.

## 8.  NO BENEFIT TO BAILEE

No person or organization other than the Insured will benefit from this insurance.

## 9.  OTHER INSURANCE

a.  If there is any other insurance that would apply in the absence of this policy, this policy will apply only for the amount of insured loss in excess of the amount due from that other insurance, whether that other insurance is collectible or not.  The Company, however, will not pay more than any applicable limit in this policy.

b.  In no event will this policy apply as contributing insurance.

c.  The Insured is permitted to have other insurance over any limits or sublimits of liability specified elsewhere in this policy without prejudice to this policy.  The existence of any such insurance will not reduce any limit or sublimit of liability in this policy.  Any other insurance that would have provided primary coverage in the absence of this policy will not be considered excess.

d.  The Insured is permitted to have other insurance for all, or any part, of any deductible in this policy.  The existence of such other insurance will not prejudice recovery under this policy.  If the

INSURED COPY

7-Eleven_0000062

 **MSIG**

limits of liability of such other insurance are greater than this policy's applicable deductible, this policy's insurance will apply only after such other insurance has been exhausted.

If the Insured has purchased any "flood" insurance at any "location" insured by this policy under the National Flood Insurance Program [NFIP], then the NFIP insurance is primary insurance at that premises in relation to the "flood" insurance provided by this policy. This policy is excess insurance of such NFIP insurance and any applicable deductible amount therein. The "flood" deductible(s) under this policy shall apply against the total amount of loss or damage for the total of all coverage(s) at each insured "location" and remains after the application of any NFIP insurance deductible in force. In the event the amount payable and reinsured under the NFIP insurance in force at the time of loss exceeds the property damage deductible under this policy, then the property damage deductible shall no longer apply at that insured "location".

**e.** In the event a court of competent jurisdiction deems this policy to contribute with other insurance, the limit of liability applicable at the covered "location", for the purpose of such contribution with other insurers, will be the latest value the Insured reported to the Company, prior to the loss, for such "location".

## 10. POLICY MODIFICATION

This policy contains all of the agreements between the Insured and the Company concerning this insurance.  The Named Insured and the Company may request changes to this policy.  This policy can be changed only by endorsements issued by the Company and made a part of this policy.

Notice to any agent or knowledge possessed by any agent or by any other person will not:

**a.** Create a waiver, or change any part of this policy; or

**b.** Prevent the Company from asserting any rights under the provisions of this policy.

## 11. REDUCTION BY LOSS

Claims paid under this policy will not reduce its limit of liability, except claims paid will reduce any Aggregate During Any Policy Year.

## 12. TITLES

The titles in this policy are only for reference.  The titles do not in any way affect the provisions of this policy.

## 13. VACANCY

This policy shall not be liable for any loss or damage at a "location" at which the Insured has ceased business activities or that is unoccupied unless all fire protection features and watch / alarm services are adequately maintained; and the "location" is secured from third party intrusion. The building is considered vacant or unoccupied when it does not contain enough insured property to conduct customary business activities..

INSURED COPY

**7-Eleven_0000063**



**14. DEFINITIONS**

Wherever used in this policy:

**a.** "Actual cash value" means the amount it would cost to repair or replace insured property, on the date of loss, with material of like kind and quality, with proper deduction for obsolescence and physical depreciation.

**b.** "Commissions" means the income that would have been received by the Insured from the sale of goods not owned by the Insured.

**c.** "Contaminant" means anything that causes "contamination".

**d.** "Contamination" means any condition of property due to the actual or suspected presence of any foreign substance, impurity, "pollutant", hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, "fungi", mold or mildew.

**e.** "Date or time recognition" means the recognition, interpretation, calculation, comparison, differentiation, sequencing, accessing or processing of data involving one or more dates or times, including the Year 2000.

**f.** "Dependent time element location" means:

    **(1)** Any location:

        **(a)** Of a direct customer, supplier, contract manufacturer or contract service provider to the Insured.

        **(b)** Of any company under a royalty, licensing fee or commission agreement with the Insured.

    **(2)** Any location of a company that is a direct or indirect customer, supplier, contract manufacturer or contract service provider to a location described in **(1)** above.

    **(3)** A "dependent time element location" does not include locations of any company directly or indirectly supplying to, or receiving from, the Insured, electricity, fuel, gas, water, steam, refrigeration, sewerage, voice, data or video.

**g.** "Direct physical loss or damage to electronic data, programs or software" means the destruction, distortion or corruption of electronic data, programs or software.

**h.** "Discharge" means the discharge, emission, dispersal, migration, release or escape (or any series of such a similar nature at the same site) including any discharge, emission, dispersal, migration, release or escape to the extent that the "pollutants" involved remain confined within the building or other man-made structure in which they initially were located.

**i.** "Earth movement" means any natural or man-made earth movement including but not limited to earthquake; landslide; mine subsidence; earth sinking, rising or shifting; "sinkhole collapse"; or "volcanic action", regardless of any other cause or event contributing concurrently or in any other sequence of loss.  However, direct physical damage by fire, explosion or sprinkler leakage resulting from earth movement will not be considered to be loss by earth movement within the terms and conditions of this policy.  All earth movements within a continuous seventy-two (72)

INSURED COPY

**7-Eleven_0000064**



hour period will be considered a single earth movement. The expiration of this policy will not reduce the seventy-two (72) hour period.

**j.**   "Electronic data processing equipment or media" means any computer, computer system or component, hardware, network, microprocessor, microchip, integrated circuit or similar devices or components in computer or non-computer equipment, operating systems, data, programs or other software stored on electronic, electro-mechanical, electro-magnetic data processing or production equipment.

**k.**   "Fine arts" means paintings; etchings; pictures; tapestries; rare or art glass; art glass windows; valuable rugs; statuary; sculptures; antique furniture; antique jewelry; bric-a-brac; porcelains; and similar property of rarity, historical value, or artistic merit excluding automobiles, coins, stamps, furs, jewelry, precious stones, precious metals, watercraft, aircraft, money, securities.

**l.**   "Flood" means flood; surface waters; rising waters; waves; tides or tidal water; the release of water, the rising, overflowing or breaking of boundaries of natural or man-made bodies of water; or their spray, or sewer back-up resulting from any of the foregoing; regardless of any other cause or event contributing concurrently or in any other sequence of loss. However, direct physical damage by fire, explosion or sprinkler leakage resulting from flood is not considered to be loss by flood within the terms and conditions of this policy. All flood within a continuous seventy-two (72) hour period will be considered a single flood. The expiration of this policy will not reduce the seventy two (72) hour period..

**m.**   "Fungi" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

**n.**   "High hazard zones for earth movement" means:

The states of Alaska, California and Hawaii together with the Country of Japan

.

**o.**   "Lease interest" means the excess rent paid for the same or similar replacement property over actual rent payable plus cash bonuses or advance rent paid (including maintenance or operating charges) for each month during the unexpired term of the Insured's lease.

**p.**   "Location" means:

  **(1)**   As specified in the schedule of locations, except for "miscellaneous unnamed locations"; or

  **(2)**   If not so specified or if a "miscellaneous unnamed location", a building, yard, dock, wharf, pier or bulkhead (or any group of the foregoing) bounded on all sides by public streets, clear land space or open waterways, each not less than fifty feet wide.  Any bridge or tunnel crossing such street, space or waterway will render such separation inoperative for the purpose of this definition.

**q.**   "Miscellaneous unnamed location" means a "location" owned, leased or rented by the Insured but not specified in the schedule of locations.

**r.**   "NA" means "not applicable" to that coverage part, coinsurance, deductible, (sub) limit of liability or other policy provisions.

**s.**   ""Named windstorm" means any named or identified storm or weather disturbance that is named

INSURED COPY

**7-Eleven_0000065**

 **MSIG**

**Policy Number – FIR 1122580**

by the U.S. National Weather Service and/or National Hurricane Center occurring within a "named windstorm zone". Such storm or weather disturbance includes all weather phenomenon associated with or occurring in conjunction with the storm or weather disturbance, including, but not limited to storm surge, flood, wind, hail, sleet, tornadoes, hurricane or lightning. All "named windstorms" that occur within any seventy-two (72) hour period will constitute a single "occurrence". The expiration of this policy will not reduce the seventy-two (72) hour period.

**t.** "Named windstorm zone" means:

**(1)** The entire states of Florida and Hawaii;
**(2)** Puerto Rico;
**(3)** The U.S. Virgin Islands;
**(4)** The area within 50 miles from the coast of the Gulf of Mexico and the Atlantic Ocean within the states of Texas, Louisiana, Mississippi, Alabama, Georgia, South Carolina, North Carolina, Virginia, Maryland, Delaware, New Jersey, Pennsylvania, New York, Connecticut, Rhode Island, Massachusetts, New Hampshire and Maine.

**u.** "NCP" means no coverage has been purchased and therefore no coverage is provided.

**v.** "Net lease interest" means that sum which placed at 6% interest rate compounded annually would equal the "lease interest" (less any amounts otherwise payable hereunder).

**w.** "New Madrid earthquake control zone" means:

**Arkansas, counties of:**
Arkansas, Ashley, Chicot, Clay, Craighead, Crittenden, Cross, Desha, Drew, Fulton, Grant, Greene, Independence, Izard, Jackson, Jefferson, Lawrence, Lee, Lincoln, Lonoke, Mississippi, Monroe, Phillips, Poinsett, Prairie, Pulaski, Randolph, Saline, Sharp, St. Francis, White, Woodruff

**Illinois, counties of:**
Alexander, Bond, Calhoun, Christian, Clark, Clay, Clinton, Coles, Crawford, Cumberland, Edwards, Effingham, Fayette, Franklin, Gallatin, Greene, Hamilton, Hardin, Jackson, Jasper, Jefferson, Jersey, Johnson, Lawrence, Macoupin, Madison, Marion, Massac, Monroe, Montgomery, Morgan, Perry, Pike, Pope, Pulaski, Randolph, Richland, Saline, Sangamon, Scott, Shelby, St. Clair, Union, Wabash, Washington, Wayne, White, Williamson

**Indiana, counties of:**
Crawford, Daviess, Dubois, Gibson, Greene, Knox, Lawrence, Martin, Orange, Perry, Pike, Posey, Spencer, Sullivan, Vanderburgh, Warrick

**Kentucky, counties of:**
Ballard, Breckinridge, Butler, Caldwell, Calloway, Carlisle, Christian, Crittenden, Daviess, Fulton, Graves, Hancock, Henderson, Hickman, Hopkins, Livingston, Logan, Lyon, Marshall, McCracken, McLean, Muhlenberg, Ohio, Simpson, Todd, Trigg, Union, Warren, Webster

**Mississippi, counties of:**
Alcorn, Benton, Bolivar, Calhoun, Carroll, Chickasaw, Choctaw, Clay, Coahoma, De Soto, Grenada, Holmes, Humphreys, Issaquena, Itawamba, Lafayette, Lee, Leflore, Lowndes, Marshall, Monroe, Montgomery, Oktibbeha, Panola, Pontotoc, Prentiss, Quitman, Sharkey, Sunflower, Tallahatchie, Tate, Tippah, Tishomingo, Tunica, Union, Warren, Washington, Webster, Yalobusha, Yazoo

**Missouri, counties of:**

INSURED COPY

7-Eleven_0000066



Audrain, Bollinger, Butler, Callaway, Cape Girardeau, Carter, Cole, Crawford, Dent, Dunklin, Franklin, Gasconade, Howell, Iron, Jefferson, Lincoln, Madison, Maries, Marion, Miller, Mississippi, Montgomery, New Madrid, Oregon, Osage, Pemiscot, Perry, Phelps, Pike, Pulaski, Ralls, Reynolds, Ripley, Scott, Shannon, St. Charles, St. Francois, St. Louis, Ste. Genevieve, Stoddard, Texas, Warren, Washington, Wayne

**Tennessee, counties of:**
Benton, Carroll, Cheatham, Chester, Crockett, Decatur, Dickson, Dyer, Fayette, Gibson, Hardeman, Hardin, Haywood, Henderson, Henry, Hickman, Houston, Humphreys, Lake, Lauderdale, Lawrence, Lewis, Madison, McNairy, Montgomery, Obion, Perry, Robertson, Shelby, Stewart, Tipton, Wayne, Weakley

x.   "Normal" means the condition that would have existed had no direct physical loss or damage occurred.

y.   "Occurrence" means the sum total of all loss or damage of the type insured, including any insured **TIME ELEMENT** loss, arising out of or caused by one discrete event of physical loss or damage.

z.   "Pacific Northwest earthquake control zone" means:

**Oregon, counties of:**
Clackamas, Clatsop, Columbia, Multnomah, Tillamook, Washington, Yamhill

**Washington, counties of:**
Clallam, Clark, Cowlitz, Grays Harbor, Jefferson, Island, King, Kitsap, Lewis, Mason, Pacific, Pierce, San Juan, Skagit, Snohmish, Thurston, Wahkiakum, Whatcom

aa.   "Pollutant" means any solid, liquid, gaseous or thermal irritant, contaminant or any toxic or hazardous substance or any substance which may, does, or is alleged to affect adversely the environment, property, persons or animals, including but not limited to acids, alkalis, bacteria, chemicals, fumes, "fungi", organisms or micro-organisms, smoke, soot, vapor, viruses or other pathogens, and waste.  Waste includes materials which at any time are transported, handled, stored, treated, disposed of or processed as waste by or for the Insured, or for whom the Insured is legally liable.

bb.   "Profits" means the amount that would have been received by the Insured from the sale of goods belonging to the Insured, in excess of the cost to the Insured of such goods.

cc.   "Royalties" means the income the Insured is not able to collect under royalty or licensing agreements.

dd.   "Sinkhole collapse" means the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone, dolomite or similar rock formations.

ee.   "Valuable papers and records" means written, printed or otherwise inscribed documents and records, including books, maps, films, drawings, abstracts, deeds, mortgages and manuscripts, all of which must be of value to the Insured.

ff.   "Volcanic action" means volcanic activity resulting from airborne volcanic blast or airborne shock waves; ash, dust or particulate matter; or lava flow.

gg.   Loss or damage caused by or resulting from any of the following:

INSURED COPY

 **MSIG**

**(a)** Explosion in or of the following property owned, operated or controlled by the Insured: steam boilers, including equipment attached to and forming a part thereof; steam turbines; steam engines; steam pipes interconnecting any of the foregoing; or gas turbines; except that liability is specifically assumed for loss resulting from explosion of accumulated gases or unconsumed fuel within the firebox (or the combustion chamber) of any fired vessel, other than gas turbines, or within the flues or passages which conduct the gases of combustion therefrom;

**(b)** Rupture, bursting, cracking, burning or bulging of:  steam boilers including equipment attached to and forming a part thereof; steam turbines; steam engines; steam pipes interconnecting any of the foregoing; hot water boilers or other equipment for heating water; pressure vessels, including equipment attached to and forming a part thereof; or, gas turbines;

**(c)** Mechanical or machinery breakdown, including rupture or bursting caused by centrifugal force; or

**(d)** Electrical injury or disturbance to electrical appliances, devices, fixtures, wiring, or other electrical or electronic equipment caused by electrical currents artificially generated; nor does this policy cover resulting damage to property caused by such "occurrences" except damage from resulting fire, water or other means to extinguish a fire, or combustion explosion outside any of the property described in this exclusion

As used in this Coverage Form, the singular of any definition includes the plural, and the plural includes the singular, unless otherwise noted.

INSURED COPY

**7-Eleven_0000068**

Long Term Agreement

Insured: 7-Eleven, Inc

Policy Number: FIR1122580

Policy Period: May 10th, 2018 to May 10th, 2021

The rate structure is agreed as follows:

1. Inception – May 10th, 2018 – 2019: 0.02529%
2. Anniversary Date #1 – May 10th, 2019 – 2020: 0.02655%
3. Anniversary Date #2 – May 10th, 2020 – 2021: 0.02788%

Annual Policy Period is defined as the period specified in the each of the above points 1 through 3.

In regards to Anniversary Date #2, if the loss ratio is below 65% for the period May 10th 2019 -2020 the rate will be unchanged at 0.02655%

The Insurer reserves the right at the Anniversary Date to alter the terms and conditions of the Policy as follows:

(a) If the **Loss Ratio** exceeds 80% - the Insurer reserves the right to cancel the policy or alter the terms and/or conditions.

**Loss Ratio** - shall mean the percentage of the total paid claims and outstanding reserves (including related loss adjustment expenses) excess of deductible during the Annual Policy Period divided by the annual **Net Earned Premium**.

**Premium Rate -** shall mean the premium rate as specified in this agreement.

**Net Earned Premium** – shall mean the total adjusted premium for the annual policy period excluding all acquisition costs and taxes.

(b) If there is a material change in the laws or regulations in force in any country or territory to which the indemnity provided by the Policy applies.

(c) The unavailability, or significant change to, Insurer's treaty and/or facultative reinsurance cover (including captive reinsurance) on the same terms, conditions, or capacity as at the original inception date of the policy, which directly impacts the Insurers ability to provide the capacity under the Policy.

(d) If there is a change in control of the Insured.

(e) If the Insured is placed in receivership.

If due to any of the above mentioned circumstances the Insurer elect to cancel the Policy or to amend or alter terms and conditions of the Policy, The Policyholder must be informed in writing of the Insurer's decision, together with the details of the proposed amendments not later than 30 days prior to Anniversary Date.

The Insured may, at the Anniversary Date, or from the day of occurrence, request the Insurer to alter the terms and conditions or end the Insurers participation, if any of the following occur.

MS 5627 05 20

7-Eleven_0000069

A)      If there is a change in control of the Insurer.

B)      If there are material changes in the business activities of the Insured

C)      If the insurer is placed in receivership.

D)      If the Security rating (on Standard & Poor's basis) of the Insurer falls below A- during the Policy Period.

If the Insurer does not agree to amend the terms and conditions in accordance with the conditions above then the Insured may at its option either:

- Terminate the Insurer's Participation Agreement by written notice to the Insurer,
or
- Continue the existing terms for the remainder of the Policy Period.
In case of cancellation the Insurer shall refund the unearned annual premium.

It is further agreed that:

1)  It is a requirement that the Insured submit an updated schedule of values to Company no later than thirty (30) days prior to the Anniversary Date.  Such        data shall include replacement cost amounts for all Insured real and personal property, projected Time Element calculations, loss information and details of any material change in exposure.

Upon review of the schedule of values, the Company shall adjust the premium at pre-agreed **Premium Rate** either upward or downward to compensate for such change in exposure.

2)  At the end of each twelve (12) month period, any aggregate (sub) limits shown in the policy as annual aggregates reduced during the policy term shall be reset to the full amount indicated in the policy unless amended otherwise during the policy term.

3)  Any imposition of or increase in taxes, contributions to government or natural catastrophe schemes or levies on premium will be borne by the Insured, and the terms of this Agreement do not apply to any separate rates charged for cover provided by or through governmental or non-governmental schemes or pools where the rating of the cover is not under control of the Insurer.

Adjustment Clause – Mid Term

It is understood and agreed that there shall be no premium adjustment during the term of the policy for additions or deletions of locations unless:

The total insured values of such additions or deletions for acquisitions and divestitures exceeds 5% of the total TIV **OR** 5% in respect of Insured locations within any High Hazard earthquake zones, Flood in FEMA Special Hazard Areas or Named Windstorm zones all as defined in the policy form.

In the event of an acquisition that exceeds 5% of the TIV or 5% of Insured locations within High Hazard Earthquake zones, Flood in FEMA Special Hazard Areas or Named Windstorm zones, the Insurer retains the right to determine the additional premium for the acquisition. However, the agreed rate structure will continue to apply for all other locations for the first and second anniversary policy periods.

Except as otherwise set forth herein, nothing herein shall amend, alter, expand or abridge the rights and obligations of any party under the Policy.  All other terms and conditions of the Policy continue to apply.

MS 5627 05 20

INSURED COPY

7-Eleven_0000070

This endorsement changes
the policy
**-- PLEASE READ THIS CAREFULLY --**

# VIRUS OR BACTERIA EXCLUSION

## PERILS EXCLUDED

The additional exclusion set forth below applies to all coverages, coverage extensions, supplemental coverages, optional coverages, and endorsements that are provided by the policy to which this endorsement is attached, including, but not limited to, those that provide coverage for property, earnings, extra expense, or interruption by civil authority.

The following exclusion is added under Perils Excluded:

**Virus or Bacteria --**

We do not pay for loss, cost, or expense caused by, resulting from, or relating to any virus, bacterium, or other microorganism that causes disease, illness, or physical distress or that is capable of causing disease, illness, or physical distress.

This exclusion applies to, but is not limited to, any loss, cost, or expense as a result of:

a.   any contamination by any virus, bacterium, or other microorganism; or

b.   any denial of access to property because of any virus, bacterium, or other microorganism.

## OTHER CONDITIONS

**Other Terms Remain in Effect --**

The terms of this endorsement, whether or not applicable to any loss, cost, or expense, cannot be construed to provide coverage for a loss, cost, or expense that would otherwise be excluded under the policy to which this endorsement is attached.

**MS 5533 04 20**                                                                                  **Page 1 of 1**
© 2020 MSIG Holdings (Americas), Inc.  All rights reserved.
(Includes copyrighted material of American Association of Insurance Services Inc., with its permission)

INSURED COPY

**7-Eleven_0000071**

# EXHIBIT 2

 **MSIG**

RECEIVED

SEP 29 2020

CORPORATE INSURANCE
DEPARTMENT

Kerryann A. Mitchell, CPCU, ARe
Senior Property Claims Analyst
Phone: 908-604-2974
Fax: 419-730-4930
Email: Kamitchell@msigusa.com

September 23, 2020

**VIA EMAIL AND CERTIFIED MAIL, R.R.R. (Article #9314 8699 0430 0075 3634 55)**
Ms. Nancy Laughlin
7-Eleven, Inc.
3200 Hackberry Road
Irving, Texas 75063
Nancy.Laughlin@7-11.com

|  |  |  |
|---|---|---|
| Re: | **Policyholder:** | 7-Eleven, Inc. |
|  | **Insurer:** | Mitsui Sumitomo Insurance Company of America |
|  | **Policy No.:** | FIR1122580, eff. 05/10/2020 – 05/10/2021 |
|  | **Date of Loss:** | 05/26/2020 to 06/08/2020 |
|  | **Location:** | Various Locations Across the United States |
|  | **Claim No:** | PA200166 |

Dear Ms. Laughlin:

Mitsui Sumitomo Marine Management (U.S.A.), Inc. is the claims administrator for Mitsui Sumitomo Insurance Company of America ("MSI") with respect to the referenced commercial property insurance policy issued to 7-Eleven, Inc. ("7-Eleven"), effective from May 10, 2020 to May 10, 2021 (the "Policy").

The purpose of this letter is to advise you that MSI is continuing its investigation of the losses 7-Eleven sustained following the death of George Floyd subject to a full reservation of rights under the Policy and at law. The following discussion summarizes the relevant facts and policy information, explains the basis for MSI's position, and requests certain additional information and documentation that MSI requires to complete its investigation of this matter.

### FACTUAL BACKGROUND

On June 3, 2020, 7-Eleven submitted a First Notice of Loss ("FNOL") to MSI claiming losses due to "Riot; Civil Disorder" following the death of George Floyd (the

**Mitsui Sumitomo Marine Management (U.S.A.), Inc., for
Mitsui Sumitomo Insurance USA Inc.
Mitsui Sumitomo Insurance Company of America
Aioi Nissay Dowa Insurance Company of America
Mailing Address: P.O. Box 818073, Cleveland, OH 44181
Office Address: 15 Independence Boulevard, P.O. Box 4602, Warren, NJ 07059-0602
www.msigusa.com**

Ms. Nancy Laughlin
7-Eleven, Inc.
September 23, 2020
Page 2

"Claims"). MSI has retained Sedgwick Claims Management Services Inc. ("Sedgwick") to assist in the investigation of the Claims.

On May 26, 2020, protests relating to Mr. Floyd's death began in Minneapolis. Shortly thereafter, other protests commenced across the nation. Although the demonstrations were largely peaceful, several instances of rioting and looting were reported at various times over many weeks in different cities across the country. Current media reports suggest that a number of different groups with separate motives may have been responsible for the various incidences of rioting and/or looting The looters, for example, are believed to have included: (1) organized extremist groups "working in caravans"; (2) gang members; (3) opportunists; (4) out-of-state instigators; and (5) foreign actors.[1]

The looters' motives, moreover, reportedly ranged from mere opportunism, to "deep anger and frustration about the way blacks and others are mistreated," to "a host of other issues," including dissatisfaction with "President Trump, the privilege exposed in the college admissions scandal, and widening inequality."[2] The looting, therefore, does not appear to have been a "coordinated riot," but rather an example of multiple groups engaging in a variety of unlawful conduct "to push their agendas."[3]

7-Eleven's FNOL stated that 760 of its stores were affected by the riots and looting, but that it expected that number to increase. 7-Eleven subsequently provided Sedgwick with preliminary schedules concerning 467 of its stores. Those schedules indicated that 250 stores sustained property damage ranging from (what 7-Eleven characterizes as) a "total loss" to "minor damage," such as broken glass and signage. According to the schedules, the remaining 217 stores suffered no damage but were boarded-up for a number of days during the riots. Recently, 7-Eleven has advised that certain of this information may not be accurate and that 7-Eleven will provide revised schedules for MSI's consideration.

## POLICY INFORMATION

MSI issued Policy No. FIR1122580 to 7-Eleven, effective from May 10, 2020 to May 10, 2021 (the "Policy"). The Policy provides commercial property insurance pursuant to manuscript Form MS 5205 05 08. The Policy contains total limits of liability of $50 million, subject to various sub-limits for certain categories of loss and a $1 million per "occurrence" deductible. (MAN-CO (01/02)).

We address certain of the Policy's key terms, provisions, and exclusions below. Please review your copy of the Policy in its entirety for all other terms, conditions, exclusions, and endorsements. Please also note that the provisions of the Policy referenced

---

[1] See https://www.latimes.com/california/story/2020-06-05/looting-protests-george-floyd; https://www.abc.net.au/news/2020-06-05/is-the-looting-in-the-us-tied-to-the-protests/12315884; https://www.nytimes.com/article/george-floyd-protests-timeline.html.

[2] https://www.latimes.com/california/story/2020-06-05/looting-protests-george-floyd

[3] https://www.foxnews.com/us/george-floyd-riots-looting-destroy.

Ms. Nancy Laughlin
7-Eleven, Inc.
September 23, 2020
Page 3

in this letter are not meant to be representative of all portions of the Policy that may apply to 7-Eleven's Claims. Failure to cite a particular agreement, provision, exclusion, condition, or any other part of the Policy does not waive MSI's rights to invoke any portion of the Policy that potentially applies to the Claims.

## RESERVATION OF RIGHTS

For the reasons detailed below, MSI is investigating the Claims subject to a full reservation of rights under the Policy and at law.

### I.    The Deductible Endorsement

The Policy provides that "in each case of loss insured by this policy," with the exception of losses caused by earth movement, flood, and named windstorm, "the company will be liable only if the insured sustains a loss, including any insured time element loss, in a single 'occurrence' greater than" $1 million. (MAN-CO (01/02)). The Policy defines an "occurrence" as "the sum total of all loss or damage of the type insured, including any insured time element loss, arising out of or caused by *one discrete event of physical loss or damage*." (Policy, MS 5205 05 08, p. 50 of 51) (emphasis added).

Although MSI is continuing to investigate the Claims, based on the information provided to date, it appears that 7-Eleven's losses involve more than a single "occurrence" under the Policy. Indeed, the losses appear to have been caused by multiple uncoordinated groups with different motives, at various points in time, at hundreds of locations across the country. MSI, therefore, respectfully reserves the right to apply a separate deductible to each "occurrence," and to deny coverage for losses sustained as a result any "occurrence" that do not exceed $1 million.

This reservation applies to all potentially applicable coverages under the Policy, including the property damage, time element, civil authority, ingress/egress, and protection and preservation of property coverages discussed below.

### II.    Property Damage Coverage

#### A.    Insured Property

The Policy provides coverage for "direct physical loss or damage to insured property at an insured 'location' from a cause not hereinafter excluded." (Policy, MS 5205 05 08, Declarations – Section A, ¶ 5). "Insured property" includes, in pertinent part, real property in which 7-Eleven has an insurable interest, and personal property owned by 7-Eleven. (Policy, MS 5205 05 08, Property Damage – Section B, ¶ 1).

MSI understands that 7-Eleven operates most of its stores on a franchise-based business model. From the limited information provided to date, however, it is not clear whether 7-Eleven – or its franchisees – owns or has an insurable interest in certain of the property that was damaged by the riots and looting. MSI, therefore, respectfully reserves the

Ms. Nancy Laughlin
7-Eleven, Inc.
September 23, 2020
Page 4

right to deny or limit coverage for the Claims to the extent that that 7-Eleven does not own or otherwise possess an insurable interest in the damaged property.

### B. Demolition And Increased Cost Of Construction

The Policy further insures the "reasonable and necessary costs incurred . . . to satisfy the minimum requirements of the enforcement of any law or ordinance regulating the demolition, construction, repair, replacement or use of buildings or structures at an insured 'location,'" provided that:

1) Such law or ordinance is in force on the date of the insured direct physical loss or damage; and

2) Its enforcement is a direct result of such insured direct physical loss or damage.

(MS 5205 05 08, Property Damage – Section B, ¶ j(1)).  The recoverable costs include the "cost to repair or rebuild the physically damaged portion of such property with materials and in a manner to satisfy such law or ordinance." (Id., ¶ j(3)).

Based on the information provided to date, it appears that at least one of the 7-Eleven stores likely will require code upgrades during the repair and rebuilding process.  MSI, however, does not have any details surrounding the potentially required upgrades, including whether the enforcement of any applicable law or ordinance directly resulted from covered property damage.  Accordingly, MSI, respectfully reserves all rights to deny or limit coverage for code upgrades.

### III.   Time Element Coverage

### A.   "Actual Loss Sustained"

The Policy provides coverage for "time element" losses – including lost gross earnings – "directly resulting from physical loss or damage of the type insured by this policy," which "wholly or partially" prevents the insured from continuing its business operations or services.  (Policy, MS 5205 05 08, Time Element – Section C, ¶ 2.a., ¶ 3.a.(1)(c).)  The "recoverable gross earnings loss is the **actual loss sustained** by the Insured" of:  (1) gross earnings; (2) "[l]ess all charges and expenses that do not necessarily continue during the . . . suspension of business operations or services"; (3) "[p]lus all other earnings derived from the operation of the business." (Id., Section C, ¶ 3.a.(1)(a)) (emphasis added).  "Actual loss sustained," therefore, refers to the difference between the net profit 7-Eleven would have earned and the net profit that it did earn during the pertinent period.

Here, the rioting and looting occurred during the COVID-19 pandemic – a time when many stores may have been closed, operating at reduced hours, or experiencing decreased sales.  Accordingly, MSI reserves the right to adjust for the impact of the pandemic on 7-Eleven's business activity at the time of the riots and looting in calculating the "actual" time element losses "sustained" by 7-Eleven.

Ms. Nancy Laughlin
7-Eleven, Inc.
September 23, 2020
Page 5

### B. The "Idle Period" Exclusion

The Policy also precludes "time element" coverage for "[a]ny loss during any idle period, including but not limited to when production, operation, service or delivery or receipt of goods would cease, or would not have taken place or would have been prevented due to":

1) Direct physical loss or damage not insured by this policy on or off of the insured "location".

2) Planned or rescheduled shutdown.

3) Strikes or other work stoppage.

4) Any other reason other than direct physical loss or damage insured by this policy.

(Policy, MS 5205 05 08, p. 36 of 51). This exclusion thus bars coverage for time element losses sustained during any period when – for reasons other than physical loss of or damage to insured property – 7-Eleven's operations would have ceased, would have been prevented, or would otherwise not have taken place.

Based on the information provided to date, it is unclear whether, at the time of the riots and looting, certain 7-Eleven stores were closed or operating on abbreviated schedules because of the pandemic. MSI, therefore, respectfully reserves the right to deny or limit coverage for 7-Eleven's losses under this exclusion to the extent that 7-Eleven's operations were interrupted for reasons other than direct physical loss of or damage to insured property.

### IV.    Civil Authority Coverage Extension

7-Eleven's Claims also consist of earnings purportedly lost by approximately 1,500 stores that were not physically damaged, but which were subject to curfews imposed because of the riots and looting in the surrounding areas. The Policy contains a "civil authority" coverage extension for "the actual loss sustained and extra expense incurred by the Insured during the period of liability" if: (1) an order of civil authority prohibits access to the insured "location"; and (2) such order is the direct result of physical damage at the insured 'location' or within the specified geographical radius. (Policy, Form MS 5205 05 08, at p. 30 of 51). Civil authority coverage is limited to a 30-day period, which begins "at the time of [the requisite] physical damage." (Id.; Policy, Form MS 5205 05 08, at p. 5 of 51).

MSI currently does not have sufficient information to determine whether 7-Eleven's Claims trigger "civil authority" coverage under the Policy. MSI thus respectfully reserves the right to deny or limit such coverage to the extent that the applicable curfew orders did not "prohibit[] access" to the 7-Eleven stores, or were not issued as a "direct result of physical damage" at the stores or within the applicable geographical limitation. (Policy, Form MS 5205 05 08, at p. 30 of 51).

Ms. Nancy Laughlin
7-Eleven, Inc.
September 23, 2020
Page 6

## V.    Ingress/Egress Coverage Extension

Additionally, the Policy contains an "ingress/egress" coverage extension, which covers "time element" losses sustained by 7-Eleven because of the "necessary interruption" of its business "due to physical prevention of ingress to or egress from a[n] insured 'location', whether or not the premises or property of the Insured is damaged." (Policy, Form MS 5205 05 08, at p. 31 of 51). The "prevention" of ingress or egress, however, must be a "direct result of physical damage" to property within a certain distance of the insured location. (Id.). Ingress/egress coverage is limited to a 30-day period. (Policy, Form MS 5205 05 08, at p. 5 of 51).

As with "civil authority" coverage, MSI does not yet have enough information to determine whether "ingress/egress" coverage applies to 7-Eleven's Claims. MSI, therefore, respectfully reserves the right to decline or limit "ingress/egress" coverage for the Claims to the extent that access to the affected stores was not physically prevented, or that any such prevention of access was not the direct result of property damage within the prescribed radius.

## VI.    Protection And Preservation Of Property Coverage Extension

7-Eleven's Claims also include 217 locations that closed and boarded-up their stores in anticipation of looting. The Policy contains two "Protection and Preservation of Property" clauses.   The first covers the "[r]easonable and necessary costs incurred for actions to temporarily protect or preserve insured property provided such actions are necessary due to actual, or to prevent immediately impending, insured direct physical loss or damage to such insured property." (Policy, MS 5205 05 08, p. 17 of 51). The second provides time element coverage for the "actual loss sustained by the Insured for a period of time not to exceed 48 hours prior to and 48 hours after the Insured first taking reasonable action for the temporary protection and preservation of property insured by this policy provided such action is necessary to prevent immediately impending direct physical loss or damage insured by this policy at such insured property." (Policy, MS 5205 05 08, p. 32 of 51).

MSI does not currently have sufficient information to determine whether "Protection and Preservation of Property" coverage is triggered here.   MSI, therefore, respectfully reserves the right to deny or limit such coverage to the extent that the protective measures taken by 7-Eleven stores were not "necessary" to prevent "immediately impending" "direct physical loss or damage" to covered property.   Additionally, please note that the "Protection and Preservation of Property" coverages are "subject to the deductible provisions that would have applied had the direct physical loss or damage occurred." (Policy, MS 5205 05 08, pp. 17, 32 of 51).   Accordingly, for the reasons discussed in Part I above, such coverages are only available if the losses sustained by 7-Eleven as a result of each "occurrence" exceed $1 million.

## VII.    Other Applicable Insurance

The Policy provides that "[i]f there is other insurance that would apply in the absence of this policy, this policy will apply only for the amount of insured loss in excess of the

Ms. Nancy Laughlin
7-Eleven, Inc.
September 23, 2020
Page 7

amount due from that other insurance, whether that other insurance is collectible or not."
(Form MS 5205 05 08, General Provisions – Section E, ¶ 9.a).  MSI, however, "will not pay
more than any applicable limit in this policy."  (Id.).  Further, "[i]n no event" will the Policy
"apply as contributing insurance."  (Id., ¶ 9.b).

MSI understands that a number of the 7-Eleven franchisees have separate insurance
policies that may provide coverage for certain of the losses sustained from the riots and
looting.  Accordingly, MSI respectfully reserves the right to deny or limit coverage for the
Claims under the Policy to the extent that other insurance applies.

## REQUEST FOR INFORMATION

To assist MSI in its continued investigation of the Claims, please provide the
following information as soon as possible (in addition to the information requested to date by
Sedgwick):

1. An updated listing (including location) of each 7-Eleven store that sustained damage
   or loss resulting from the riots and looting following the death of George Floyd.

2. A detailed description of the damage or loss sustained by each store identified in
   response to Question 1, including all information available, including information
   submitted to the police, concerning who was responsible for the damage or loss and
   when it occurred.

3. An estimate of the damage or loss sustained at each of the affected 7-Eleven stores.

4. Information or documentation confirming 7-Eleven's ownership interest in the
   specific damaged property for which 7-Eleven seeks coverage under the Policy.

5. Copies of any other insurance policies that may provide coverage for 7-Eleven or the
   property described above.

6. To the extent that 7-Eleven is seeking time element coverage for its lost gross
   earnings, please explain in detail the nature of the financial relationship between 7-
   Eleven and its franchisees, including exactly how an individual store's loss of income
   impacts 7-Eleven's earnings.

These requests for information are preliminary in nature.  If the information provided by 7-
Eleven indicates that the losses sustained as a result of any one "occurrence" exceed $1
million, MSI likely will require additional information at that time and expressly reserves the
right to seek same.

\*       \*       \*

The foregoing is based on the information currently in MSI's possession.  If 7-Eleven
has any other information that you believe MSI should consider, please provide it to the
undersigned as soon as possible.  MSI's ongoing investigation of this matter should not be

Ms. Nancy Laughlin
7-Eleven, Inc.
September 23, 2020
Page 8

construed as a waiver of any rights that MSI may have to disclaim coverage with respect to the Claims, whether in whole or in part. Further, no action taken by MSI or its agents shall constitute an admission of coverage or be construed as a waiver of MSI's rights under any policies or at law.

In accordance with section 2695.7(b)(3) of California's Unfair Claims Settlement Practices Regulations, please be advised that if 7-Eleven believes all or a part of its Claims have been wrongfully denied or rejected, it may have the matter reviewed by the California Department of Insurance, Consumer Communications Bureau, 300 South Spring Street, South Tower, Los Angeles, California 90013, 1-800-927-HELP (4357) or 213-897-8921

MSI appreciates 7-Eleven's continued cooperation in our investigation of this matter. If you have any questions or would like to discuss any of the above, please do not hesitate to contact me.

Sincerely,

Kerryann Mitchell

Kerryann A. Mitchell, CPCU, ARe
Senior Property Claims Analyst
MITSUI SUMITOMO MARINE MANAGEMENT (U.S.A.), INC.
for Mitsui Sumitomo Insurance Company of America

cc:     Mr. Peter Jagger
        Aon Property Risk Consulting, Inc.
        5005 LBJ Freeway, Suite 1400
        Dallas, Texas 75244
        peter.jagger@aon.com

        Mr. John M. Harris
        Sedgwick Claims Management Services, Inc.
        4004 Belt Line Rd., Suite 205
        Addison, Texas 75001
        John.Harris@sedgwick.com

7-Eleven_0000079

# EXHIBIT 3

**John M. Harris**
Executive General Adjuster
Mobile (469) 502-8232
John.Harris@Sedgwick.com

October 22, 2020

**Nancy Laughlin**
**Director of Corporate Insurance & Risk Management**
**7-Eleven Inc.**
**3200 Hackberry Road**
**Irving, TX 75063**

**Sent by E-Mail to: Nancy.Laughlin@7-11.com**

| | |
|---|---|
| Insured | : **7-Eleven Inc.** |
| Date of Loss | : **May 26, 2020 to June 8, 2020** |
| Location of Loss | : **760 locations initially reported.** |
| Sedgwick File Number | : **DAL20487960** |
| Loss Type | : **Riot and Civil Disorder** |

Dear Ms. Laughlin:

This correspondence is sent in follow on the above captioned loss.

In summary, 7-Eleven, Inc. reported a claim to Mitsui Sumitomo Insurance Company Of America (Mitsui) for damages to many locations, resulting protests, riots, and civil disorder ensuing from the death of George Floyd on May 25, 2020 in Minneapolis.   We have been in discussion regarding affected stores, but have not confirmed and detail of damages for the stores remains outstanding.

Per our earlier communication, we have completed inspection of three major loss sites with your personnel and with a building consultant.  Those locations are identified as follows:

The locations and estimates received from our consultants are identified as follows:

| Store Number | Address | City | ST | Estimate | Depreciation | ACV | Notes |
|---|---|---|---|---|---|---|---|
| 11334 | 150 E. Champlost St | Philadelphia | PA | 809,937.78 | 245,172.31 | 564,765.47 | Includes equipment estimate. |
| 33892 | 200 N. Dearborn | Chicago | IL | 560,018.02 | 121,146.04 | 438,871.98 | Does not include equipment. |
| 19501 | 201 North 17th St | St. Louis | MO | 1,829,037.77 | 358,537.64 | 1,470,500.13 | Includes equipment estimate. |

We have reviewed the estimates with Mitsui.  The current estimate of loss for Store 19501 in St. Louis, MO, exceeds the occurrence deductible of $1,000,000 and we have received approval to obtain a Partial Proof of Loss forms to represent ACV payment of **$470,500.13** as follows:

| | |
|---|---|
| Estimate (per JS Held) | $1,829,037.77 |
| Depreciation | (358,537.64) |
| Policy Deductible | (1,000,000.00) |
| Net | **$ 470,500.13** |

I have enclosed a Partial Proof of Loss form for your completion.  Please fill in the form completely, to include the **Occupancy**, **Title and Interest** and **Changes** fields.  If you send me an incomplete form, I will be required to return it to you for completion.

We request signature from 7-Eleven in the presence of a notary and return to me at your earliest, by scan, fax, or mail.

On receipt of the completed Proof of Loss form and payment details, I will forward to the Mitsui in request of payment totaling **$470,500.13**.

Please reference the Mitsui letter of September 23, 2020 which provides additional policy comments and Reservation of Rights.

We again request information as noted in the letter as follows:

1. **An updated listing (including location) of each 7-Eleven store that sustained damage or loss resulting from the riots and looting following the death of George Floyd.**

2. **A detailed description of the damage or loss sustained by each store identified in response to Question 1, including all information available, including information submitted to the police, concerning who was responsible for the damage or loss and when it occurred.**

3. **An estimate of the damage or loss sustained at each of the affected 7-Eleven stores.**

4. **Information or documentation confirming 7-Eleven's ownership interest in the specific damaged property for which 7-Eleven seeks coverage under the Policy.**

5. **Copies of any other insurance policies that may provide coverage for 7-Eleven or the property described above.**

6. **To the extent that 7-Eleven is seeking time element coverage for its lost gross earnings, please explain in detail the nature of the financial relationship between 7-Eleven and its franchisees, including exactly how an individual store's loss of income impacts 7-Eleven's earnings.**

This letter is based on the information supplied as of this date.  It is not, and should not be construed as a waiver of Mitsui Sumitomo Insurance Company of America's rights or any of the terms, conditions, and exclusions of the insurance contract(s). Likewise, Mitsui Sumitomo Insurance Company of America is not estopped from asserting any defenses or any applicable exclusion under the Policy(ies) or at law.

7-Eleven_0000081

If you have questions or would like to discuss the Partial Proof of Loss form or request for information, please contact me.  Thanks.

Sincerely,

John M. Harris
Executive General Adjuster
Vericlaim Inc.
4004 Belt Line Rd.  Suite 205
Addison, Texas  75001

Cc: Peter Jagger / Aon Risk Solutions

Attachments:
1) 7-Eleven Dallas Partial Proof of Loss $470,500.13
2) 20.08.29-20061852-7 Eleven-Detailed Estimate with Depreciation Store 11334 $809,937.78
3) JS Held estimate 20.10.05-20062083-7-Eleven Store 33892 $560,018.02
4) JS Held 20.07.31-20061895-7-Eleven-Estimate St. Louis $1,562,285.19
5) JS Held 20.07.31-20061895-7-Eleven-Store Capital Review St. Louis $266,752.58

**7-Eleven_0000082**

# EXHIBIT 4

# JONES DAY

555 SOUTH FLOWER STREET • FIFTIETH FLOOR • LOS ANGELES, CALIFORNIA 90071.2300

TELEPHONE: +1.213.489.3939 • FACSIMILE: +1.213.243.2539

Direct Number:  (213) 243-2422
tchildress@jonesday.com

April 7, 2021

<u>**VIA E-MAIL**</u>

Kerryann A. Mitchell
Senior Property Claims Analyst
Mitsui Sumitomo Marine Management (U.S.A.), Inc.
Email: kamitchell@msigusa.com

> Re:    Insured: 7-Eleven, Inc.
> Policy No.: FIR1122580
> Claim No.: PA200166

Dear Ms. Mitchell:

Our firm has been retained on behalf of 7-Eleven, Inc. ("7-Eleven") as coverage counsel in connection with 7-Eleven's claim under the above-referenced policy (the "Policy") for losses arising from the nationwide rioting that followed George Floyd's death.  This letter responds to your correspondence of September 23, 2020 communicating Mitsui Sumitomo Insurance Company of America's ("MSI") reservation of rights and requests for additional information.

As set forth below, MSI has incorrectly determined that 7-Eleven's claim involves more than a single "occurrence" under the Policy.  7-Eleven accordingly requests that MSI promptly withdraw this erroneous position.  While we await MSI's response on this threshold issue, 7-Eleven in the meantime continues to reserve all of its own rights with respect to the other reservations expressed in your September 23, 2020 letter.

## I.    MSI's Erroneous Multiple "Occurrences" Position

Your letter contends that "7-Eleven's losses involve more than a single 'occurrence' under the Policy."  In addition, by refusing coverage for any losses below $1 million at individual stores and requesting a proof of loss only for losses over $1 million per store, MSI appears to maintain that the loss to each affected 7-Eleven store constitutes a separate "occurrence" subject to a separate $1 million per "occurrence" deductible under the Policy. MSI's multiple "occurrences" position is unsupported and without merit.

As an initial matter, MSI's multiple "occurrences" position is fundamentally inconsistent with the plain language of the Policy and established rules of policy interpretation.  The term "occurrence" is defined in the Policy as "the sum total of all loss or damage of the type insured,

7-Eleven_0000083

Kerryann A. Mitchell
April 7, 2021
Page 2

including any insured time element loss, arising out of or caused by one discrete event of physical loss or damage." Policy, p. 50. It is well-settled that "the words 'arising out of,' when used within an insurance policy, are 'broad, general, and comprehensive terms effecting broad coverage," which are uniformly understood to mean "originating from," "incident to," "growing out of" or "flowing from." *Am. States Ins. Co. v. Bailey*, 133 F.3d 363, 370 (5th Cir. 1998) (citations omitted); *see also Am. Empire Surplus Lines Ins. Co. v. Chabad House of N. Dade, Inc.*, No. 10-20872-CIV, 2010 WL 6243312, at *3 (S.D. Fla. Oct. 4, 2010) ("[A] claim arises out of an event … when there is some causal connection or relationship beyond pure coincidence."). There can accordingly be no legitimate dispute that, under the broad meaning of the words "arising out of," all of the property damage and business interruption losses to the affected 7-Eleven stores arose out of a single event of physical loss or damage—the nationwide rioting following George Floyd's death.

Indeed, the fact that the nationwide George Floyd rioting constitutes a single occurrence under the Policy is further evidenced by MSI's inability to coherently explain its purported multiple "occurrences" position. On the one hand, MSI attempts to manufacture separate occurrences by suggesting, without support, that the rioters had "different motives." However, even if credited, this would not change the fact that the losses unquestionably stemmed from the nationwide rioting following the death of George Floyd. On the other hand, MSI contends that the riot loss to each store constitutes its own occurrence. In addition to being at odds with MSI's irrelevant "different motives" theory, MSI's "each store" theory would render coverage under the Policy illusory. By way of example and without limitation, MSI's contention that losses at each store constitute a separate "occurrence" would require that each store incur preservation losses in excess of $1 million to trigger coverage under its "Protection and Preservation of Property Coverage" – an entirely unreasonable and unrealistic requirement given the nature of preservation losses and the "all risks" scope of the Policy. As such, MSI's flawed construction violates the settled rule that insurance policies "are to be interpreted in a manner that makes them reasonable and capable of being carried into effect…." *Safeco Ins. Co. of Am. v. Robert S.*, 26 Cal. 4th 758, 765 (2001); *see also Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 828 (Tex. 1997) (declining to adopt a policy interpretation which "would render insurance coverage illusory for many of the things for which insureds commonly purchase insurance").

7-Eleven accordingly expects MSI to honor its clear coverage obligations for this matter by acknowledging that 7-Eleven's losses as a result of the nationwide George Floyd rioting constitute a single "occurrence" under the Policy.

Kerryann A. Mitchell
April 7, 2021
Page 3

## II.    MSI's Requests for Information

In response to the information requests identified in your September 23, 2020 letter, 7-Eleven provides the following additional information:

- With respect to MSI's Requests 1 through 3, enclosed please find an updated spreadsheet which identifies the affected 7-Eleven insured locations, provides a description of the physical damage and/or loss sustained by each insured location, and includes an estimate of the cost of any physical damage and/or loss to each insured location.  Please note that the enclosed spreadsheet does not include a quantification of the time element losses at the affected 7-Eleven stores, for which 7-Eleven is entitled to coverage under the Policy.

- With respect to MSI's Requests 4 through 6, enclosed please find copies of the relevant Franchise Agreements, which supply the requested information.

7-Eleven will provide additional responsive information to MSI if and when available, and reserves its rights to supplement its claim submission as necessary.

Given MSI's erroneous multiple "occurrences" position, please be advised that 7-Eleven is relieved of any obligation to submit any further proofs of loss at this time (which have not been requested by MSI), but will make any necessary submissions upon MSI's acknowledgement that the above-referenced claim constitutes a single occurrence, subject to a single $1 million deductible.  In addition, to provide the parties with sufficient time to attempt to resolve any disagreements on this threshold issue, 7-Eleven requests that MSI agree to a one-year extension of the Policy's suit limitation deadline until May 26, 2022.

We look forward to your prompt response.  In the meantime, 7-Eleven continues to reserve all of its rights and remedies under the Policy in connection with this claim.

Very truly yours,

*/s/ Tyrone R. Childress*

Tyrone R. Childress

Enclosures

7-Eleven_0000085

# EXHIBIT 5

# MOUND COTTON WOLLAN & GREENGRASS LLP

COUNSELLORS AT LAW
ONE NEW YORK PLAZA
NEW YORK, NY 10004-1901

(212) 804-4200
FAX: (212) 344-8066
WWW.MOUNDCOTTON.COM

JEFFREY S. WEINSTEIN
(212) 804-4226
jweinstein@moundcotton.com

NEW YORK, NY

FLORHAM PARK, NJ

GARDEN CITY, NY

SAN FRANCISCO, CA

FORT LAUDERDALE, FL

HOUSTON, TX

April 30, 2021

**VIA E-MAIL**

Tyrone R. Childress, Esq.
tchildress@jonesday.com
Jones Day
555 South Flower Street
Los Angeles, California 90071

|     |                  |                                              |
| --- | ---------------- | -------------------------------------------- |
| Re: | Insured:         | 7-Eleven, Inc.                               |
|     | Insurer:         | Mitsui Sumitomo Insurance Company of America |
|     | Policy Nos:      | FIR1122580                                   |
|     | Policy Term:     | May 10, 2020 – May 10, 2021                  |
|     | Date of Loss:    | May 26, 2020 (as reported)                   |
|     | Loss Locations:  | Various                                      |
|     | Type of Loss:    | Riot; Civil Disorder (as reported)           |
|     | Our File No:     | 950.053                                      |

Dear Mr. Childress:

We act for Mitsui Sumitomo Marine Management (U.S.A.) Inc. ("MSMM"), the claims administrator for Mitsui Sumitomo Insurance Company of America ("Mitsui"), in connection with this matter. Your April 7, 2021 letter to Kerryann Mitchell of MSMM, which includes a request to extend the suit limitation deadline, has been referred to our attention for a response. Please address any further correspondence to our attention.

Your letter essentially asserts that the multiple "discrete events" that comprised 7-Eleven's losses should be aggregated into a single "occurrence" for purposes of this claim adjustment. For the reasons discussed below, Mitsui disagrees, and maintains its view that 7-Eleven's losses would constitute multiple occurrences under the Policy's "Occurrence" definition.

As an initial matter, Ms. Mitchell's September 23, 2020 reservation of rights letter does not take the conclusive position that the damage at each location would constitute "its own

MOUND COTTON WOLLAN & GREENGRASS LLP

Tyrone R. Childress, Esq.
April 30, 2021
Page 2

occurrence." Rather, the reservation of rights letter merely notes that "it appears that 7-Eleven's losses involve more than a single 'occurrence,' because the losses appear to have been caused by multiple uncoordinated groups with different motives, at various points in time, at hundreds of locations across the country." Mitsui stands by this position, but notes that it does not yet have sufficient information to determine the number of "occurrences" and therefore the number of separate deductibles to apply to the adjustment of this claim.

Similarly, your contention that Mitsui has only requested proofs of loss for stores with over $1 million in damage per store is incorrect. Rather, on Mitsui's behalf, its outside independent adjuster, Sedgwick, has requested information regarding *all* of the 7-Eleven locations that comprise the claim, so that it can assess the claims for property damage and/or loss of business income at each of those locations. We assume your reference regarding the information sought from your client is to the list in MSMM's September 23 letter entitled "Request for Information," after which it is stated that if the responsive information "indicates that the losses sustained as a result of any one "occurrence" exceed $1 million" then Mitsui likely will require additional information.

Mitsui is not suggesting that 7-Eleven is relieved of its obligation to provide information to substantiate its claim, notwithstanding any coverage and/or legal positions that may be asserted by Mitsui as the adjustment process continues. In that regard, we understand that much of the information requested by Sedgwick remains outstanding,[1] so we trust that 7-Eleven will continue to cooperate to provide timely and complete responses to all requests for information from this point forward.

---

[1] For example, we note that 7-Eleven has provided no dates of loss for the locations listed on the 131-page spreadsheet attached to your letter, nor has it provided support for the "Total Billed cost for Store (as of 11/30/2020)" column in the same spreadsheet. Moreover, the spreadsheet attached to your list appears to be incomplete. Also, on April 26, OIA John Harris of Sedgwick was informed by Ms. Nancy Laughlin of 7-Eleven that a location at 1662 7th St. NW in Washington, D.C. sustained almost $2 million in purported damage which had not been previously reported. In this regard, we also refer you to the Policy's "Requirements in Case of Loss" provision, which requires "immediate written notice to [Mitsui] of any loss."

Additionally, Mitsui, in Request for Information 5, requested "copies of any other insurance policies that may provide coverage for 7-Eleven or the property described [in the responses to requests 1 through 4]." To date, that does not appear to have been provided. We reiterate that, since the franchise agreement appears to require each franchisee to purchase insurance that "at a minimum … [insures] against destruction or damage by fire and other perils … such other hazards or risks which a prudent business person would insure against … [and] provide up to full replacement cost coverage for Inventory and Store Supplies," Mitsui also reserves the right to deny or limit coverage for 7-Eleven's claim under the Policy's "Other Insurance" provision.

Finally, we note that 7-Eleven has provided no information to substantiate its time-element losses, and has not responded to Request for Information 6.

7-Eleven_0000087

MOUND COTTON WOLLAN & GREENGRASS LLP

Tyrone R. Childress, Esq.
April 30, 2021
Page 3

I.     **The Facts Support Multiple Occurrences**

Mitsui's coverage positions asserted in this letter and its earlier correspondence are based on the facts underlying these incidents, as well as the applicable law. As to the former, 7-Eleven has provided little specific detail surrounding the events at each insured location for which 7-Eleven seeks coverage. Instead, 7-Eleven contends that the "occurrence" upon which its claim is based is "the nationwide rioting following George Floyd's death."

We note, however, that under the Policy, and applicable legal precedents, it is 7-Eleven's obligation to provide sufficient factual detail as to the cause(s) of its losses in order to substantiate its insurance claim. Putting aside, for the moment, whether the information presented thus far provides a sufficient basis upon which 7-Eleven may satisfy that obligation, we are left to make observations and coverage decisions based on the same publicly available information which, in many cases, describes nothing more than that at each loss location, street demonstrations are alleged to have taken place to protest racial injustice in and around the area of insured locations.

At those same locations, individuals or groups damaged stores and other buildings. We have no facts that indicate the persons who carried out that property damage came out into the streets to demonstrate for racial justice. The damage may have been perpetrated by individuals who had not participated in those demonstrations at all, but who saw an opportunity to capitalize on the general state of civil unrest. There is also no indication that these individuals or groups coordinated in any way with one another at any one loss location, let alone across multiple locations or in multiple cities or states.

As Mitsui noted in Ms. Mitchell's September 23 letter, it appears that separate individuals or spontaneous groups committed acts of malicious damage and looting to the stores at which 7-Eleven claims it sustained property damage and loss of business income. The motives of those who caused damage are similarly varied, ranging from opportunism to "deep anger and frustration about the way blacks and others are mistreated," to "a host of other issues," including dissatisfaction with "President Trump, the privilege exposed in the college admissions scandal, and widening inequality."[2] Others have reported that they do not believe the looting was a "coordinated riot," but rather an example of multiple groups utilizing civil unrest "to push their agendas."[3]

Although the incident in Minneapolis on May 25 resulting in George Floyd's death has been generally acknowledged by many as precipitating the civil unrest throughout the United States in late May/early June 2020, it is also widely known that there were a number of other

---

[2] https://www.latimes.com/california/story/2020-06-05/looting-protests-george-floyd.

[3] https://www.foxnews.com/us/george-floyd-riots-looting-destroy.

MOUND COTTON WOLLAN & GREENGRASS LLP

Tyrone R. Childress, Esq.
April 30, 2021
Page 4

events involving acts of alleged police misconduct that contributed to and/or precipitated some of the widespread civil unrest during this time. There had been a number of high profile incidents involving police activities and allegations of racism, including highly publicized incidents just prior to Mr. Floyd's death, i.e., the deaths of Ahmaud Arbery in Georgia, and Breonna Taylor in Kentucky, which led to significant public outcry, protest, and condemnation.

Nor is it even clear that the scale and scope of the demonstrations were solely connected to protests of police activity. It seems equally likely that, in response to the months-long COVID-related lockdowns and severe curtailing of social activity, the opportunity for people to gather in large groups was also a contributing cause to the size and scope of the protests. As noted by the Washington Post:

> Most people say they have gone to protests because they believe in racial justice and support the Black Lives Matter movement. But for many, particularly those who had never before turned out for a BLM protest, what pushed them into the streets was being hurt by pandemic public health measures. In this way, the pandemic has helped fuel what political scientists Lara Putnam, Erica Chenoweth and Jeremy Pressman wrote here at TMC has been the broadest and most sustained social movement in U.S. history.[4]

Elected officials similarly opined that the protests were not solely related to Mr. Floyd's death. NYC Mayor Bill de Blasio referred to a confluence of crises that helped widen the peaceful protests.[5] New York Governor Andrew Cuomo said something similar, noting that "it's not a coincidence that this is in the middle of the COVID crisis."[6] Keith Ellison, Minnesota's Attorney General, was unwilling to ascribe the property damage that occurred in May and June to Mr. Floyd's death. According to Mr. Ellison:

> The truth is, nobody really knows … there's been a lot of videotape taken by demonstrators of people who are very suspicious, who really did start breaking windows … there have

---

[4] See, e.g., https://www.washingtonpost.com/politics/2020/08/05/how-coronavirus-pandemic-helped-floyd-protests-become-biggest-us-history/.

[5] https://www.nbcnews.com/politics/politics-news/perfect-storm-coronavirus-lockdown-joblessness-fuel-longstanding-grievances-n1222546.

[6] Id.

7-Eleven_0000089

MOUND COTTON WOLLAN & GREENGRASS LLP

Tyrone R. Childress, Esq.
April 30, 2021
Page 5

been other photographs of cars with no license plates. Very suspicious behavior.[7]

Further, it appears equally likely that individuals or groups, using the protests as cover, took advantage of a police vacuum to cause damage and engage in acts of theft and violence.[8]

> [Jennifer Tejada, police chief in Emeryville, California, an Oakland suburb] and others said the break-ins typically targeted swanky stores. In Los Angeles, looters headed to Gucci, Prada and other designer stores along Rodeo Drive.
>
> In New York City's SoHo district, home fashion designer Christiane Lemieux told a TV news crew she watched masked looters pour out of five cars that had no front license plates. One shop reportedly was stripped bare, with losses estimated at over $1 million.
>
> In Santa Monica, California, burglars shoved aside a female demonstrator who tried to block them from smashing a store window. At a nearby shop, a man rushed outside with his prize – a surfboard – and rode off on a motorcycle.[9]

The idea that the looters and protesters were not the same people is supported by at least some sociological experts. According to a University of Maryland sociologist who has studied protests for two decades, it is rare for peaceful protesters to start stealing and setting fires at random. People flock to the sites of protests with different motivations, and those who want peace tend to stay peaceful.[10] "I've never seen somebody come in who's peaceful and then it's like, Hey, they just broke that window over there. I'm going to now start looting."[11]

The foregoing facts and circumstances must be taken into account when assessing the applicable case law as to the definition of "occurrence" in the Mitsui policy.

---

[7] https://www.nytimes.com/2020/05/31/us/george-floyd-protests-white-supremacists-antifa.html.

[8] https://www.usatoday.com/story/news/2020/06/15/criminals-used-george-floyd-protests-cover-looting-police-say/5324881002.

[9] Id.

[10] https://www.theatlantic.com/health/archive/2020/06/why-people-loot/612577/.

[11] Id.

7-Eleven_0000090

MOUND COTTON WOLLAN & GREENGRASS LLP

Tyrone R. Childress, Esq.
April 30, 2021
Page 6


II.     **Caselaw Supports Multiple Occurrences**

As a general matter, the meaning of "occurrence" will be interpreted in the context of the specific policy and facts of the case. See Nat'l R.R. Passenger Corp. v. Arch Specialty Ins. Co., 2015 WL 4940568 (S.D.N.Y. Aug. 3, 2015); see also World Trade Ctr. Props. LLC v. Hartford Fire Ins. Co., 345 F.3d 154, 180 (2d Cir. 2003). Any analysis surrounding the number of occurrences must therefore focus on the Policy's language.

Here, the Policy defines an "occurrence" as:

> the sum total of all loss or damage of the type insured, including any insured **TIME ELEMENT** loss, arising out of or caused by one discrete event of physical loss or damage.

Your letter focuses on the term "arising out of," contending that such language is exceedingly broad, and that therefore, all of 7-Eleven's property damage "arose out of" a single event of physical loss or damage: the rioting following Mr. Floyd's death. But that position overlooks the rest of the "occurrence" definition – "one discrete event of physical loss or damage" – which must be read in concert with "arising out of." See, e.g., State Farm Lloyds v. Page, 315 S.W.3d 525, 527 (Tex. 2010) ("We must read all parts of the contract together, giving effect to each word, clause, and sentence, and avoid making any provision within the policy inoperative."); Place v. Preferred Mut. Ins. Co., 190 A.D.3d 1208, 141 N.Y.S.3d 528, 531 (3d Dep't 2021) ("A provision's meaning 'must be determined upon consideration of the policy as a whole.'").

Indeed, the cases you cite do not address the interpretation of an "occurrence" definition, but rather, discuss the term "arising out of" in a vacuum. Both Am. States Ins. Co. v. Bailey[12] and Am. Empire Surplus Lines Ins. Co. v. Chabad House of N. Dade, Inc.,[13] address whether a policy's exclusion for "damages arising from sexual action" or its "abuse or molestation exception" excludes coverage, an altogether different question.[14]

---

[12] 133 F.3d 363, 370 (5th Cir. 1998).

[13] 2010 WL 6243312, at *2 (S.D. Fla. Oct. 4, 2010), report and recommendation adopted in part, overruled in part, 771 F. Supp. 2d 1336 (S.D. Fla. 2011), aff'd, 450 F. App'x 792 (11th Cir. 2011).

[14] Notably, neither Bailey nor Chabad addresses occurrences at all, but rather, are "duty to defend" decisions under a CGL policy. The Bailey court noted that the policy defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions," far broader than the occurrence definition here, and the Chabad court did not note a definition for "occurrence" at all. Further, under the Texas law applicable in Bailey, and the Florida law applicable in Chabad, "the duty to defend is broader than the duty to indemnify." Bailey, 133 F.3d at 368; Chabad 2010 WL 6243312 at *2, making any analogy between this claim under a first-party property policy and the issues addressed in Bailey and Chabad tenuous, at best.

MOUND COTTON WOLLAN & GREENGRASS LLP

Tyrone R. Childress, Esq.
April 30, 2021
Page 7

Here, however, "arising out of" is limited by the determiner "one," the adjective "discrete," and the noun "event," all of which further limit the "physical loss or damage" that makes up a single "occurrence." The Policy does not define "discrete" and "event." Therefore, the plain and ordinary meaning of those words apply.  See, e.g., State Farm Mut. Auto. Ins. Co. v. Elmore, 2020 IL 125441, ¶ 21 ("If the words of a policy can reasonably be given their plain, ordinary, and popular meaning, the provisions should be applied as written, and the parties should be bound to the agreement they made."); Ralex Services, Inc. v Southwest Mar. & Gen. Ins. Co., 155 AD3d 800, 802 (2d Dep't 2017) (same); In re Deepwater Horizon, 470 S.W.3d 452, 464 (Tex. 2015) (same).

The ordinary meaning of "discrete" is "individual; separate; distinct."[15] An "event" is "something that happens."[16] Thus, under the Policy, each individual, separate, and distinct happening of physical loss or damage may be its own "occurrence," subject to its own deductible.

Moreover, a majority of jurisdictions, including Texas, where 7-Eleven is headquartered and incorporated,[17] have adopted the "cause" test, which calculates the number of occurrences "by the cause or causes of the resulting injury." Appalachian Ins. Co. v. Liberty Mutual Ins. Co., 676 F.2d 56, 61 (3d Cir. 1982); see also Snelling & Snelling, Inc. v. Fed. Ins. Co., 205 F. App'x 199, 205 (5th Cir. 2006) ("Texas law focuses on the immediate cause of damage when determining the number of occurrences.").

Under the cause test, "the proper focus in interpreting 'occurrence' is on the events that cause the injuries and give rise to the insured's liability, rather than on the number of injurious effects." U.E. Texas One-Barrington, Ltd. v. Gen. Star Indem. Co., 332 F.3d 274, 277 (5th Cir. 2003); see also Newmont Mines Ltd. v. Hanover Ins. Co., 784 F.2d 127 (2d Cir. 1986) (each time property damage occurred "unexpectedly and without design" is a separate occurrence, "unless the damage … was [] part of a single, continuous event that already had caused other damage"). In other words, the proper focus is not "on the alleged overarching cause, but rather on the specific event that caused the loss." U.E. Texas, 332 F.3d at 278.

---

[15] Black's Law Dictionary (11th ed. 2019); see also https://www.merriam-webster.com/dictionary/discrete ("constituting a separate entity: individually distinct"); (https://www.dictionary.com/browse/discrete?s=t ("apart or detached from others; separate; distinct").

[16] https://www.merriam-webster.com/dictionary/event; see also https://www.dictionary.com/browse/event?s=t ("something that happens or is regarded as happening; an occurrence, especially one of some importance; … something that occurs in a certain place during a particular interval of time").

[17] Since 7-Eleven's claim spans numerous states, Mitsui has not yet determined which state's law applies.

7-Eleven_0000092

MOUND COTTON WOLLAN & GREENGRASS LLP

Tyrone R. Childress, Esq.
April 30, 2021
Page 8

Moreover, "[w]hen an occurrence is technically defined to include a series of losses arising from the same event, it includes only those losses proximately caused by that event." Seahawk Liquidating Trust v. Certain Underwriters at Lloyds London, 810 F.3d 986, 993 (5th Cir. 2016). The appropriate inquiry, therefore, is whether there was one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage. Evanston Ins. Co. v. Mid-Continent Cas. Co., 909 F.3d 143, 150 (5th Cir. 2018) ("the focus should ..be on the direct, immediate, and proximate cause of the losses to determine the number of occurrences."); see also Appalachian Ins. Co. v. Liberty Mut. Ins. Co., 676 F.2d 56, 61 (3d Cir. 1982) (same).

Because 7-Eleven cannot establish an unbroken chain of causation, its contention that its losses were the result of a single "occurrence" must fail. As discussed above, the direct cause of each act of vandalism, looting, rioting, or any other peril that may have led to damage at each loss location must be determined, rather than attributing all losses to a generalization of the political and/or socio-economic climate across the entire United States. Mitsui therefore disagrees with your contention that all instances of damage across the country, which occurred over a multi-day and possibly, multi-week period, could reasonably be deemed to be "one discrete event of physical loss or damage."

Thus, even if it is presumed that Mr. Floyd's death served as a catalyst for peaceful demonstrations, some of which devolved into riots, the information we have seen suggests that any vandalism and/or other acts leading to property damage were caused by individual actions. Mr. Floyd's death is too attenuated to the claimed loss or damage to be considered the "cause" of the claimed loss or damage – across hundreds of insured locations – for purposes of determining the number of occurrences.

III.     **Unconnected Criminal Acts are Separate Occurrences**

Moreover, when interpreting "occurrences" in the context of criminal activity, courts regularly rule that multiple acts of vandalism or violence constitute multiple "occurrences." For example, in Puerto Rico Elec. Power Auth. v. Philipps, 645 F. Supp. 770, 774 (D.P.R. 1986), the court rejected the Insured's argument that a four-month strike was a single "event," ruling that each of the 238 separate acts of vandalism was a separate "event," subject to a separate deductible, because the acts of vandalism were separated in time in place and were not directly connected to the strike itself. See Philipps, 645 F. Supp at 773-75; see also Goose Creek Consol. I.S.D. v. Cont'l Cas. Co., 658 S.W.2d 338, 340-41 (Tex. App. 1983) ("Where there are two fires at two different locations with two separate causal factors, there are two loss occurrences"); BHD v. Nippon Insurance Company of Europe, LTD, 54 Cal. Rptr. 2d 272 (Cal. Ct. App. 1996) (where there was "no evidence of a conspiracy or a systematic and organized scheme," a series of thefts committed by the same person in the insured jewelry store were each separate occurrences); Lexington Ins. Co. v. Travelers Indem. Co. of Illinois, 21 F. App'x 585, 587 (9th Cir. 2001) (four separate arson fires, in four separate buildings, at four separate locations, and at four separate times, were four separate occurrences even though one person was convicted of

MOUND COTTON WOLLAN & GREENGRASS LLP

Tyrone R. Childress, Esq.
April 30, 2021
Page 9

starting all four fires); Ran-Nan Inc. v Gen. Acc. Ins. Co. of Am., 252 F.3d 738 (5th Cir. 2001) (holding that thefts from a convenience store by two employees, working separately and independently, constituted separate occurrences); Basler Turbo Conversions LLC v. HCC Ins. Co., 601 F. Supp. 2d 1082 (E.D. Wis. 2009) (series of crimes committed by the same individual, at the same location, constituted separate occurrences because "it is not the scheme that caused the succession of thefts, but separate and independent human actions that were the product of separate instances of human deliberation and choice, separated by significant intervals of time").

Indeed, it is only where a criminal scheme is organized, systematic, and systemic that courts will determine that all losses are the result of a single occurrence. Compare Eott Energy Corp. v. Storebrand International Ins. Co., 52 Cal. Rptr. 2d 894 (Cal. Ct. App. 1996) (653 separate thefts of approximately 2.5 million gallons of diesel fuel over an eleven-month period by various truck drivers constituted a single occurrence because they were part of a single organized and systematic scheme to defraud the insured) with BHD, 54 Cal. Rptr.2d at 274 (series of thefts committed by the same person in the insured jewelry store were each separate occurrences because the thief did not have an overall plan, nor were the thefts part of a systematic and organized scheme).

With the foregoing precedents in mind, 7-Eleven has presented no information to suggest that its damages stem from a single discrete event of physical loss or damage. Rather, 7-Eleven's damages stem from multiple causes, i.e., the rioting, vandalism, and looting that may have occurred during or after numerous *separate* protests at *different* locations over numerous days and potentially, weeks. Moreover, it is not clear that the acts of damage to 7-Eleven's locations were anything but the actions of opportunistic criminals, not associated with any protest, who chose to enter these stores to steal some goods or otherwise to wreak havoc.

## IV.    **The Policy's Preservation of Property Provision does not Provide Illusory Coverage**

7-Eleven also contends that interpreting the Policy's "occurrence" definition as written (and in line with caselaw) would render the coverage provided by the Policy to be illusory. This charge is premised on your articulation of Mitsui's position as that, because the damage at each 7-Eleven location would likely be considered to be a separate "occurrence," any loss incurred by 7-Eleven would – under these circumstances – be subject to a per-store deductible. As a result, your letter concludes that because *here*, each store must incur at least $1 million in "preservation of property" expenses to exceed the Policy's deductible, the same must be true for *all* preservation of property claims. We disagree.

First, as noted above, Mitsui has not taken the position that each store's damage is a separate "occurrence," and thus subject to a separate deductible.

Second, your contention that 7-Eleven cannot incur covered preservation of property expenses – and so that coverage is somehow illusory – is incorrect. Even were multiple deductibles applied to the losses here, 7-Eleven may indeed incur compensable preservation of

MOUND COTTON WOLLAN & GREENGRASS LLP

Tyrone R. Childress, Esq.
April 30, 2021
Page 10

property costs, if those costs are combined with indemnifiable damage. For example, at least two stores (store 19501 in St. Louis and store 23120 in D.C.) appear to have each sustained over $1 million in damage. Even if the damage to each location is a separate "occurrence," and subject to a separate deductible, to the extent 7-Eleven has incurred compensable "preservation of property" costs for either location, and subject to confirmation that such costs were "reasonable and necessary" to prevent "immediately impending, insured direct physical loss or damage…," 7-Eleven would be entitled to recover its share of such expenses.

Similarly, both stores 19501 and 23120 appear to have been damaged by fire. To the extent 7-Eleven has incurred costs under subsection 2 of the Protection and Preservation of Property provision for certain fire-fighting related expenses, those costs too (if "reasonable and necessary") may be compensable, subject to an applicable "deductible."

Third, we are compelled to point out that the quoted sentence in Safeco Ins. Co. of Am. v. Robert S.[18] omits both its first three and last eight words. In full, the sentence reads: "**when reasonably practical**, contracts are to be interpreted in a manner that makes them reasonable and capable of being carried into effect, **and that is consistent with the parties' intent**" (emphasis added). Similarly, in Trinity Universal Ins. Co. v. Cowan,[19] the policy did not define the disputed term "accident." Because adopting the Trinity insurer's proposed definition of accident would create various ancillary problems, the Trinity court rejected the Trinity insurer's proposed definition. Here, and as discussed above, the Policy's "occurrence" definition is clear, unambiguous, and must be interpreted as written, and as adjudicated by many courts throughout the United States.

V.      **Mitsui agrees to Extend the Policy's Suit Limitation for Six Months**

Your letter requests that Mitsui agree to a one-year extension of the Policy's suit limitation deadline until May 26, 2022. As we discussed by telephone on April 28, Mitsui is willing to agree to a six-month extension, until November 26, 2021, and would also consider re-visiting this extension closer to November 26, depending on how Mitsui's claim investigation is proceeding.

VI.     **Mitsui is Willing to Discuss a Commercial Resolution of 7-Eleven's Claim**

Notwithstanding the foregoing, once Mitsui is advised by Sedgwick that it has received sufficient information to evaluate the entirety of this claim, and in an effort to resolve 7-Eleven's claim amicably, Mitsui is willing to discuss resolution of this matter more broadly pursuant to a "*White Waiver*" or other privileged settlement communications.

---

[18] 26 Cal. 4th 758, 765, 28 P.3d 889 (2001).

[19] 945 S.W.2d 819 (Tex. 1997).

7-Eleven_0000095

MOUND COTTON WOLLAN & GREENGRASS LLP

Tyrone R. Childress, Esq.
April 30, 2021
Page 11

*     *     *

Mitsui continues to reserve all rights, privileges, and defenses available under the Policy, at law, or otherwise. This letter, Mitsui's investigation of the claim, and any other efforts taken regarding the determination of coverage and/or the nature and extent of the loss or damage is not, and should not be construed as, a waiver of any terms, conditions, exclusions or other provisions of the Policy. For the avoidance of doubt, the terms and conditions addressed in MSMM's September 23, 2020 letter, and the reservations of rights stated, are incorporated by reference herein.

Please note that Sedgwick's role is limited to assisting with the investigation of the nature, scope, and cause of the claimed loss and damage under the Policy. Neither Sedgwick, nor any other consultant engaged to assist with this investigation, has the authority to make any decisions regarding coverage for the claim or to bind Mitsui with respect to coverage. All coverage decisions and matters regarding the interpretation and application of the terms, conditions, provisions, exclusions, and limitations of the Policy are reserved exclusively to Mitsui. To the extent 7-Eleven has any additional information to present in support of its claim, Mitsui will review it on a "without prejudice" basis.

If you have any questions or wish to discuss the matters raised in this letter further, please feel free to contact us.

Very truly yours,

*Jeffrey S. Weinstein*

JSW/SBW:cer

7-Eleven_0000096

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Joseph Van Asten on behalf of Peter Laun
Bar No. 24108952
jcvanasten@jonesday.com
Envelope ID: 69824723
Status as of 11/8/2022 9:38 AM CST

Associated Case Party: 7-ELEVEN INC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Joseph C. Van Asten | | jcvanasten@jonesday.com | 11/2/2022 5:23:18 PM | SENT |
| Tyrone R. Childress | | tchildress@jonesday.com | 11/2/2022 5:23:18 PM | SENT |
| Quenten A.Levin | | qlevin@jonesday.com | 11/2/2022 5:23:18 PM | SENT |
| Jason B.Lissy | | jlissy@jonesday.com | 11/2/2022 5:23:18 PM | SENT |